# IN THE U.S. BANKRUPTCY COURT
## DISTRICT OF KANSAS (KANSAS CITY)

IN RE: )
Albert Allan Brynds, Jr. )
           Debtor, )
and )
)    Case No 21-20342
Valerie Kay Fahrnow )
           Co-Debtor )
v. )    Chapter 13
)
HPA US1, LLC D/B/A PATHLIGHT )
PROPERTY MANAGEMENT )
           Creditor, )
)
William H. Griffin )
           Trustee. )

## <u>MOTION FOR RELIEF FROM AUTOMATIC STAY</u>

**COMES NOW** Creditor, HPA US1, LLC D/B/A PATHLIGHT PROPERTY MANAGEMENT (hereinafter "Creditor"), by and through the undersigned attorneys, moves the Court, pursuant to 11 U.S.C. 362(d), for relief from the automatic stay. In support of its Motion, Creditor offers the following suggestions:

1. On the March 31, 2021, Albert Allan Brynds, Jr. ("Debtor") and Valerie Kay Fahrnow ("Co-Debtor") filed their Voluntary Petition pursuant to Chapter 13 of Title 11 of the United States Code (the "Bankruptcy Code").

2 The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334 and §157. This is a core proceeding.

3. Venue is proper pursuant to 28 U.S.C. §1408.

4. William H. Griffin is the appointed United States Trustee ("Trustee").

5. Creditor is, and at all times herein pertinent was, a Kansas limited liability company duly organized and existing under the laws of the State of Kansas, and landlord of the premises located at 12519 CONNELL DRIVE, OVERLAND PARK, KS 66213 (the "Premise").

6. The Debtor and Co-Debtor are, at all times herein pertinent were, in possession of the Premise, for which rent remains due and unpaid.

File Code: 23260

7. Debtor and Co-Debtor remain in possession of the Premise.

8. On the 13th day of March, 2019 the Debtor and Co-Debtor executed a Lease wherein they promised to make monthly installment payments in the amount of $2,580.00 in exchange for possession of the Premise.

9. The term of the Lease was from the 27th day of April, 2019 to the 26th day of April 2020.

10. The monthly installment payment increased to $2,680.00 on April 27, 2020.

11. As of the 8th day of April, 2021 after credits for payments and adjustments, Creditor is owed the sum of $11,094.81 by Debtor and Co-Debtor as follows: $9,362.67 in rent, $587.55 in utilities; $956.59 in late fees, and a $188.00 filing fee.

12. An exact amount to bring the Debtor and Co-Debtor's account current is available upon request of an appropriate party.

13. The following amounts are now due and owing:

| Description: | Amount |
|---|---|
| Late Pre-Petition Rent | $7,040.00 |
| Late Pre-Petition Late Fees | $724.32 |
| Late Pre-Petition Utilities | $587.55 |
| Late Post-Petition Rent | $2,322.67 |
| Late Post-Petition Late Fee | $232.27 |
| Filing Fee: | $188.00 |
| Total | $11,094.81 |

14. Debtor and Co-Debtor have no equity in the leased Premise.

15. Creditor is seeking costs for bringing this Motion for Relief from Stay pursuant to 11 U.S.C. §1322(b)(2). The costs sought are $188.00 for the filing fee.

16. Creditor seeks relief from the automatic stay to permit Creditor to proceed with a civil eviction proceeding in the Limited Actions Court of Johnson County, Kansas and to enforce its rights to possession of the Premise. Debtor and Co-Debtor have failed to promptly provide adequate assurance that they will make payments pursuant to 11 U.S.C. § 365(b) towards the delinquency in the Lease, the estate lacks sufficient assets from which the delinquency can be

cured and the current monthly payments be made during the administration of the estate, Debtor and Co-Debtor enjoy no equity in the leased property, Creditor's interest in the real property lacks adequate protection, and if Creditor is not permitted to proceed with its eviction proceeding and gain possession of the Premise, Creditor will suffer irreparable injury, loss, damage and delay, which is prejudicial to Creditor.

17. For all of the reasons outlined above, Creditor requests that Bankr. R. 4001(a)(3) be waived.

18. Creditor is requesting that any order granted by this Court sustaining this Motion contain a provision that the order shall survive the conversion of this case to a Chapter 7 proceeding.

**WHEREFORE,** Creditor prays that it be granted Relief from the Automatic Stay of 11 U.S.C. § 362(a) to enforce its rights granted in the Lease, for costs, and for such further relief as the Courts deems proper.

<u>**SUMMARY OF EXHIBITS AND CERTIFICATE OF SERVICE**</u>

The following exhibits in reference to the Motion for Relief from Automatic Stay are available upon request:

1. Residential Lease
2. Payment Ledger

Respectfully Submitted,

ANDERSON & ASSOCIATES
By: <u>*/s/ Julie Anderson*</u>
Julie A. Anderson #21871
Jamie L. Walker #25575
4800 Rainbow Blvd., Suite 200
Westwood, KS 66205
913-262-2207 phone
913-262-2247 fax
julie@mokslaw.com
Attorney for Creditor

File Code: 23260

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing was mailed this 21st day of April, 2021 via U.S. mail, postage prepaid, to the following:

Albert Allan Brynds, Jr.
12519 Connell Dr.
Overland Park, KS 66213
Debtor

Valerie Kay Fahrnow
12519 Connell Dr.
Overland Park, KS 66213
Co-Debtor

Ryan A. Blay
15095 W. 116th St.
Olathe, KS 66062
Attorney for Debtor and Co-Debtor

William H. Griffin
5115 Roe Blvd., Ste. 200
Roeland Park, KS 66205
Trustee

  *s/ Julie A. Anderson*
Attorney for Creditor

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D



HPA US1 LLC

Partial Summary of Residential Lease Agreement

The following is a summary prepared for informational purposes only and does not substitute, replace or alter the applicable lease agreement with the tenant(s) identified below ("Lease"). In the event of a conflict between the Lease and the terms of this summary, the terms and provisions of the Lease shall govern and control.

**Premises Address:** 12519 Connell Drive
Overland Park  KS
66213

**Tenant (s):** Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro
(collectively)

**Contact Info:**  Email:  Valeriefahrnow@hotmail.com

Estimated Commencement Date: 04/27/2019

Last day of Initial Term: 04/26/2020

**Rent Due Date:**  1st day of each month

**Late Payment Fee:**  See Section 3 of Lease

**Initial Pet Fee**: $ 600
(non-refundable)

**Security Deposit:** 2580.00

**Monthly Base Rent:**

| | |
|---|---|
| 2580.00 | (yr. 1) |
| 2680.00 | (yr. 2) |
| 2780.00 | (yr. 3) |
| 2880.00 | (yr. 4) |
| 2990.00 | (yr. 5) |

## DOCUMENT REVIEW ACKNOWLEDGEMENT

### (HOME PARTNERS KANSAS)

Each of the undersigned persons identified as Tenant in the signature lines below (jointly and severally, "Tenant") acknowledges and agrees that he/she has had the opportunity to consult with his/her legal counsel regarding the Residential Lease Agreement ("Lease"), the Residential Right to Purchase Agreement together with the form Purchase Contract attached thereto ("RTP Agreement"), the Stewart Title Guaranty Company ("Escrow Agent") Sole Order Escrow Instructions together with the Escrow Instruction Agreement, together with all Exhibits and Addenda and other documents related to any of them, copies of which were delivered to Tenant, as well as this Document Review Acknowledgement ("Acknowledgment" and collectively with the foregoing referenced agreements, the "Agreements"). Whether each of the Tenants has chosen to consult with his/her legal counsel of choice regarding the Agreements or has voluntarily chosen to waive his/her right to consult with legal counsel, he/she acknowledges, agrees and represents to HPA US1 LLC _____, a Delaware limited liability company ("Home Partners") which is party to one or more of the Agreements, as follows:

1.  he/she has completely read and voluntarily accepts the terms and conditions of each of the Agreements;

2.  the terms of each of the Agreements shall not be construed against Home Partners, its affiliates, agents, successors or assigns, or any other party because of that party's role in drafting or revising such Agreements, nor construed in favor of any party because that party failed to understand the legal effect of the terms and conditions contained therein;

3.  Home Partners has submitted (or will submit) an offer to purchase a property which has been selected by Tenant and that will constitute the "Premises" as such term is used in the Agreements and which is identified below, which purchase offer has only been submitted (or will be submitted) in express reliance upon (a) the execution and delivery of this Acknowledgement by Tenant, (b) Tenant's acknowledged satisfaction with such Premises as well as the terms and conditions contained in each of the Agreements (including, if available, the estimated costs for Home Partners to acquire and rehabilitate the Premises, it being understood and agreed that the final costs thereof may not be known as of the date hereof, and are subject to adjustment as set forth in the Agreements), such satisfaction being confirmed by virtue of Tenant's execution and delivery of this Acknowledgement, the Lease and the RTP Agreement to Home Partners, and (c) Tenant's irrevocable offer to execute and deliver to Home Partners each of the Agreements in the event Home Partners' offer to purchase the Premises (as same may be modified) is accepted by the current owner thereof ("Purchase Offer"), without further negotiation or modification by Tenant, and after the blanks contained in the Lease and the RTP Agreement have been filled in with the deal-specific information (for example, the name(s) of Tenant and the Purchase Right Holder, the address of the Premises, the lease term dates, the rent schedule, the amount of the security deposit, the purchase price of the Premises during each year of the Lease term, town-specific addendums (if any) requiring provisions mandated by law, etc.);

4.  the submission of this Acknowledgment executed by Tenant to Home Partners shall constitute (a) Tenant's irrevocable authorization to Home Partners to make and enter into a Purchase Offer for the Premises (or a ratification of such authorization if such Purchase Offer has already been made based upon the verbal commitment of Tenant to sign the Agreements) and (b) an irrevocable offer by Tenant to enter into the Agreements if the Purchase Offer is accepted by the owner of the Premises, without which Home Partners would not be making a Purchase Offer or pursue such purchase to completion;

5.  simultaneously with the submission of this Acknowledgment executed by Tenant to Home Partners, Tenant will deliver to Home Partners a deposit in the amount of $ 2580.00 ("Deposit") which shall be in the form of cashier's check, money order or other immediately available funds. The Deposit will initially be held as a good faith deposit under this Acknowledgement (and shall be deposited by Home Partners into a sole order escrow with the Escrow Agent upon the full acceptance and execution of the Purchase Offer). Upon the later to occur of (a) the full execution and delivery of the Lease and the RTP Agreement by Tenant and Home Partners and (b) the acquisition of title to the Premises by Home Partners, (I) all or a portion of the Deposit shall automatically be credited toward the Security Deposit required under the Lease; provided, however that if the amount of the Deposit is insufficient to cover all Security Deposit amounts required by the Lease, then Tenant shall immediately deposit any Security Deposit short-fall to Home Partners in accordance with the terms of the Lease, and (II) the balance, if any, of the Deposit remaining after the application in (I), shall be applied as a credit against the Pro-Rated Rent then due under the Lease at such time as Tenant pays the balance of Pro-Rated Rent, if any, due under the Lease;

6.  Tenant acknowledges that Home Partners shall have incurred significant costs in an attempt to purchase (or the actual purchase of) the Premises and **SPECIFICALLY ACKNOWLEDGES AND AGREES THAT HOME PARTNERS SHALL HAVE THE RIGHT TO RETAIN THE DEPOSIT MADE UNDER THIS ACKNOWLEDGMENT (PRIOR TO THE APPLICATION OF SUCH DEPOSIT BY HOME PARTNERS**

DocumentReviewAckmt:KS-2018-01

**AGAINST THE SECURITY DEPOSIT REQUIRED UNDER THE LEASE AS DESCRIBED IN PARAGRAPH 5 ABOVE), (a) TO REIMBURSE HOME PARTNERS FOR ITS OUT-OF-POCKET COSTS AND EXPENSES INCURRED IN CONNECTION WITH PURCHASING OR ATTEMPTING TO PURCHASE THE PREMISES (INCLUDING, BUT NOT LIMITED TO, PROCESSING TENANT'S APPLICATION AND SCREENING TENANT FOR THE HOME PARTNERS' LEASE WITH RIGHT TO PURCHASE PROGRAM, INSPECTION COSTS, THIRD PARTY PROFESSIONAL COSTS, CLOSING COSTS, REHABILITATION COSTS OF THE PREMISES, ATTORNEYS' FEES AND SIMILAR COSTS; COLLECTIVELY, "TERMINATION COSTS") AND (b) TO THE EXTENT THAT THE AMOUNT OF THE DEPOSIT SO RETAINED BY HOME PARTNERS EXCEEDS THE AGGREGATE AMOUNT OF THE TERMINATION COSTS, SUCH DIFFERENCE SHALL BE DEEMED TO BE LIQUIDATED DAMAGES TO COMPENSATE HOME PARTNERS FOR THE LOSS OF ITS BARGAIN (TENANT ACKNOWLEDGES AND AGREES THAT THE AMOUNT OF HOME PARTNERS' ACTUAL DAMAGES IN SUCH CIRCUMSTANCE WOULD BE DIFFICULT, IF NOT IMPOSSIBLE, TO DETERMINE AND THAT THE AMOUNT OF THE DEPOSIT IN EXCESS OF THE TERMINATION COSTS ARE A REASONABLE ESTIMATE OF DAMAGES AND NOT A PENALTY), in the event Tenant changes its mind or fails to execute and deliver all of the remaining Agreements (or attempts to revoke same if delivered prior to the full execution and delivery thereof by Home Partners);**

_____ (Tenants' Initials)

7. Tenant acknowledges that Home Partners shall have expended significant time and resources in connection with reviewing any application and/or documentation submitted by Tenant and its efforts to make a Purchase Offer for the Premises (whether accepted by the seller or not) and agrees that should Tenant fail to consummate the transactions contemplated by the Agreements, then Tenant agrees that for a period of seven (7) years after the date below (the "Restricted Term"), each Tenant shall be disqualified from participation in the Home Partners' Lease with a Right to Purchase Program and none of them shall submit an application for any such (or similar) program with Home Partners or its affiliates and in the event such application is made, Tenant acknowledges and agrees that Home Partners and/or its affiliates shall have the right during the Restricted Term to disapprove any application for a lease or residency made by any of them;

8. the terms of this Acknowledgement shall be binding on Tenant whether or not the remainder of the Agreements are executed (in whole or in part) or if executed, later terminated; and

9. the common address of the Premises is: __12519 Connell Drive, Overland Park, KS, 66213_____

_____.

Tenant and Home Partners has each executed this Document Review Acknowledgment as of the date written below.

**TENANT:**

_____
Name: Valerie Fahrnow

_____
Name: Albert Brunds

_____
Name: Ashlynne Fahrnow

_____
Name: Marcok Muro

Date: __3/13/2019_____

Acknowledged and agreed to by the undersigned as of
__4/15/2019_____:

__HPA US1 LLC_____, a Delaware limited liability company

By:_____
 kara Barford
Printed Name: _____
Title: Authorized Agent

2

## ESCROW INSTRUCTION AGREEMENT

Each of the undersigned persons who collectively constitute the "Tenant" for purposes hereof, understands agrees and acknowledges that ___HPA US1 LLC___, a Delaware limited liability company ("Home Partners") has submitted a purchase offer to buy that certain residential property located at ___12519 Connell Drive, Overland Park, KS, 66213___ that will constitute the "Premises" as such term is used in the Residential Lease Agreement ("Lease") and the Residential Right to Purchase Agreement ("RTP Agreement" and collectively with the Lease and any Addenda thereto, the "Agreements"), which purchase offer was submitted in reliance on the Tenant's acknowledgment that it has both selected and confirmed its satisfaction with both the Premises and all of the terms and conditions contained in the Agreements together with the Document Review Acknowledgment executed by Tenant, and Stewart Title Guaranty Company's ("Escrow Agent") Sole Order Escrow Instructions, copies of which have been provided to Tenant (collectively, the "Final Documents") and the unconditional commitment on behalf of the Tenant to execute and deliver to Home Partners the Final Documents, without further negotiation or changes.

Home Partners' offer to purchase the Premises has been accepted by the current owner of the Premises. Concurrently with the execution of this Escrow Instruction Agreement, Tenant (a) shall execute and deliver to Home Partners the Lease, the RTP Agreement and the Document Review Acknowledgment, (b) unconditionally and irrevocably agrees that Home Partners shall have the right to issue a written **sole order direction** substantially in the form of Exhibit A attached hereto to Escrow Agent to release to Home Partners (or as Home Partners shall direct) the Deposit previously submitted by Tenant to Home Partners (which was previously deposited into escrow pursuant to the Sole Order Escrow Instructions) upon the earlier to occur of (i) the closing of the purchase of the Premises by Home Partners (or its assignee) from the current owner thereof or (ii) Home Partners becoming entitled to all or any portion of such funds pursuant to the terms of any of the Final Documents, (c) acknowledges that the sole condition to Home Partners' right to collect and retain the escrowed funds is either of the reasons identified in (b) above, and (d) shall promptly be mailed a copy of the sole order direction submitted by Home Partners to Escrow Agent for return of the funds if such demand is made pursuant to subsection (b)(ii) above.

If Tenant claims all or any portion of the escrowed funds or disputes Home Partners' right to collect, direct and/or retain the escrowed funds or if there are any controversies related to the escrowed funds, the escrow, the Sole Order Escrow Instructions or this Escrow Instruction Agreement, then Tenant must submit the claim, dispute or controversy to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. Each party shall pay its own attorneys' fees, costs, and expenses including any filing, appearance or other arbitration fees. If Tenant files suit instead of instituting arbitration proceedings, then Tenant shall pay Landlord's reasonable attorneys' fees, costs and expenses, including court costs, seeking to compel arbitration in accordance with this arbitration agreement. Tenant shall not be entitled to any consequential, incidental or exemplary damages. The terms of the arbitration agreement shall supersede any conflicting provisions of the American Arbitration Association. For the avoidance of doubt, the terms of the arbitration agreement shall not apply to the Lease, the RTP Agreement or any of the other Final Documents, but shall only pertain to resolution of the escrowed funds pursuant to this Escrow Instruction Agreement.

**ACKNOWLEDGED AND AGREED TO this date:** ___4/15/2019___.

**TENANT:**

DocuSigned by:

Name: Valerie Fahrnow

DocuSigned by:

Name: Ashlyne Fahrnow

DocuSigned by:

Name: Albert Brynds

DocuSigned by:

Name: Mareck Muro

---

Tenant Name: Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro

Premises Address: ___12519 Connell Drive, Overland Park, KS, 66213___

Escrow InstructionAgmt: KS-2018-01

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

## EXHIBIT A

### TO ESCROW INSTRUCTION AGREEMENT

Stewart Title Guaranty Company

_____

**Date:** 4/15/2019

**ESCROW ACCOUNT NUMBER:** _____

**ADDRESS OF PREMISES:** 12519 Connell Drive, Overland Park, KS, 66213

Ladies and Gentlemen:

Pursuant to the Sole Order Escrow Instructions entered into by the undersigned for the above-referenced Escrow and Address of Premises, effective immediately, the undersigned hereby orders and directs Stewart Title Guaranty Company, as Escrowee, to deliver all amounts previously deposited with it as Escrowee pursuant to the above Escrow Account Number, to HPA US1 LLC , a Delaware limited liability company (or as the undersigned shall direct), together with any interest that may have been earned thereon, pursuant to such instructions as the undersigned or its legal representatives or assigns provide.

HPA US1 LLC , a Delaware limited liability company

By:_____

Name: B15997C2DF1E4AE...

Title: Authorized Agent

Tenant Name: Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro

Premises Address: 12519 Connell Drive, Overland Park, KS, 66213

Escrow InstructionAgmt: KS-2018-01

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

**RESIDENTIAL LEASE AGREEMENT**
**(HOME PARTNERS KANSAS)**

**This Residential Lease Agreement** (the "*Lease*") is made and entered into effective as of the Effective Date (defined below) by and among  Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro
(individually or if more than one person is named, collectively, "*Tenant*") and  HPA US1 LLC          , a Delaware limited liability company ("*Landlord*").

**WHEREAS,** Landlord desires to lease to Tenant upon the terms and conditions contained herein the Premises (defined below) and Tenant desires to lease the Premises from Landlord on the terms and conditions contained herein.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and obligations stated herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the recitals set forth above are incorporated into this Lease as though fully set forth below, and otherwise agree as follows:

1.  **BASIC LEASE INFORMATION**.

    A.    "*Effective Date*" shall have the meaning set forth on the signature page of this Lease.

    B.    "*Household Members*" shall mean Tenant and each of the following people who shall be members of the household:

    Name: _____        Name: _____

    Name: _____        Name: _____

    C.    "*Landlord Notice Address*" shall mean:

    HPA US1 LLC
    180 N Stetson Ave Suite 3650,
    Chicago, IL 60601
    Attn:  General Counsel Telephone:
    (877) 234-5155 Email:
    notices@homepartners.com FAX:
    (312) 780-1669

    With a copy to:

    HPA US1 LLC
    c/o Pathlight Property Management
    6500 International Pkwy #1100
    Plano, TX 75093
    Attn:  Property Manager
    Telephone:  (800) 527-5030
    Email: movein@pathlightmgt.com
    FAX:  (866) 221-8563

    D.    "*Monthly Base Rent*" shall mean $ 2580.00            per calendar month during the Initial Term. Effective as of the first day of each Renewal Term, the Monthly Base Rent amount shall be increased to the following amount specified for such Renewal Term (subject to adjustment in accordance with the terms of this Lease):

| LEASE TERM | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|
| Initial Term (Year 1) | $ 30960.00 | $ 2580.00 |
| First Renewal Term (Year 2) | $ 32160.00 | $ 2680.00 |
| Second Renewal Term (Year 3) | $ 33360.00 | $ 2780.00 |
| Third Renewal Term (Year 4) | $ 34560.00 | $ 2880.00 |
| Fourth Renewal Term (Year 5) | $ 35880.00 | $ 2990.00 |

Tenant Name: Valerie Fahrnow          Albert Brynds          Page 1   Ashlyne Fahrnow          Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS, 66213
Lease-KS:  2018-01

Case 21-20542   Doc# 18-1   Filed 04/21/21   Page 6 of 62



E.   <u>Payments of Rent</u> (as defined in Section 2.T) and all other amounts due under this Lease shall be made payable to the order of: "Pathlight Property Management" and shall be paid at the following address or such other name and address as Landlord shall, from time to time, designate in writing:

Pathlight Property Management
6500 International Pkwy #1100
Plano, TX 75093

Telephone:  (800) 527-5030

F.   "*Premises*" shall mean the real property (together with improvements located thereon owned by Landlord) having a street address of: _12519 Connell Drive, Overland Park, KS, 66213_____.

G.   "*Security Deposit*" shall mean an amount equal to $___2580.00_____.

H.   "*Tenant's Notice Address*" shall mean the Premises (and _12519 Connell Drive, Overland Park, KS, 66213_____ _____ for information purposes only) and Email shall be Valeriefahrnow@hotmail.com.

I.   "*Tenant Notice Recipient*" shall mean _Valerie Fahrnow_____.

J.   "*Utility Billing Service Fee*" shall mean an amount equal to $__7.95____ per calendar month.

K.   "*Utility One-Time Fee*" shall mean an amount equal to $__30.00____, which shall be due and payable on or before the first day of the month immediately following the month in which the Commencement Date occurs (for the avoidance of doubt, if the Commencement Date is February 1 or February 15, such amount shall be due and payable on or before March 1).

2.   **DEFINITIONS**.  The following are definitions of some of the defined terms used in this Lease. The definitions of other defined terms are found throughout this Lease. Capitalized terms used in this Lease which are not otherwise defined herein shall have the meanings ascribed to them in the Right to Purchase Agreement, which is being signed concurrently with this Lease.

A.   "*Additional Rent*" shall mean any and all sums (exclusive of Monthly Base Rent and Pro-Rated Rent) that are required to be paid to Landlord by Tenant hereunder, or which sums are deemed to be Additional Rent under this Lease.

B.   "*Applicable Laws*" shall mean, collectively, any and all laws, ordinances, statutes, rules, regulations and orders of any and all governmental or quasi-governmental authorities or bodies applicable to the Premises.

C.   "*Business Day(s)*" shall mean Mondays through Fridays exclusive of normal Federal holidays.

D.   "*Business Hours*" shall mean 9 a.m. through 5 p.m., **Central Time.**

E.   "*Commencement Date*" shall be the date that Landlord tenders possession of the Premises to Tenant which shall be documented in the Commencement Date Notification.

F.   "*Estimated Commencement Date*" is _04/27/2019_____.

G.   "*Expiration Date*" shall mean 11:59 p.m. on the last day of the Term, as the same may be extended pursuant to Paragraph 1.f.ii of the Right to Purchase Agreement.

H.   "*First Renewal Term Start Date*" will be the first day of the First Renewal Term, which shall be documented in the Commencement Date Notification.

I.   "*HOA Rules*" shall mean, collectively, all rules, regulations, declaration of covenants, conditions and restrictions, and/or bylaws of any applicable homeowner association, master/umbrella association or condominium association ("*HOA*").

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 7 of 62



DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

J. "*Initial Term*" shall mean a period of twelve (12) calendar months commencing on the Commencement Date. "*Renewal Term*" shall mean each consecutive twelve (12) calendar month period immediately following the Initial Term and starting on the First Renewal Term Start Date or previous Renewal Term. The Initial Term, as extended by all effective Renewal Terms is referred to herein as the "*Term*."

K. "*Landlord's Agents*" or "*Landlord Indemnitees*" shall mean in each case, collectively, any member, officer, director, employee, agent (including Landlord's property managers), representatives, personnel and assigns of Landlord or any of its affiliates.

L. "*Landlord's Rights and Remedies*" shall mean, collectively, each and every right and remedy contained in this Lease, other written agreements among the parties relating to the Premises, or which is afforded to Landlord pursuant to Applicable Laws or in equity.

M. "*Late Payment Fee*" shall have the meaning set forth in Section 4.

N. "*Occupants*" shall mean any of Tenant, Household Members, occupants, invitees, licensees, guests, visitors, agents or employees or any person entering the Premises except Landlord and Landlord's Agents.

O. "*Pro-Rated Rent*" shall mean the amount of Monthly Base Rent due for the month in which the Commencement Date occurs. For example, if the Commencement Date is the first day of a calendar month, then the Pro-Rated Rent shall be equal to the full amount of the Monthly Base Rent; however, if the Commencement Date is not the first day of a calendar month, then the Pro-Rated Rent shall equal the Monthly Base Rent due for such month multiplied by a fraction, the numerator of which is the number of days from and including the Commencement Date through and including the last day of such month and the denominator of which is the number of days in such calendar month (for example, if Monthly Base Rent equals $1,000 and the Commencement Date is April 16, then the Pro-Rated Rent shall be equal to $500 (i.e., $1,000 x 15/30)).

P. "*Pro-Rated Rent Due Date*" shall have the meaning set forth in Section 4, which shall be documented in the Commencement Date Notification.

Q. "*Purchase Right Holder*" shall mean all of the persons identified as such in the Right to Purchase Agreement.

R. "*Purchaser*" shall have the meaning set forth in the Right to Purchase Agreement.

S. "*Renewal Term*" shall have the meaning set forth in Section 2.J.

T. "*Rent*" shall mean all Monthly Base Rent, Pro-Rated Rent and Additional Rent together with any other amounts due and payable by the Tenant under this Lease.

U. "*Right to Purchase Agreement*" or "*RTP Agreement*" shall mean that certain Residential Right to Purchase Agreement of approximately even date herewith (together with any Addenda or amendments thereto), entered into between Landlord and Purchase Right Holder.

V. "*Term*" shall have the meaning set forth in Section 2.J.

3. **LEASE TERM.** Subject to the terms and conditions of this Lease, the Right to Purchase Agreement, any other written agreements among the parties pertaining to the Premises, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, for use as a private, single family dwelling/residence only, the Premises commencing on the Commencement Date and ending on the Expiration Date. **Unless Tenant is in default under any provision of this Lease or Purchase Right Holder is in default of the Right to Purchase Agreement, upon each scheduled Expiration Date, the Term of this Lease will automatically renew for one (1) additional Renewal Term unless Tenant shall have given Landlord written notice of Tenant's intention to terminate this Lease effective as of the then-scheduled Expiration Date, which notice must be given at least sixty (60) days prior to the then-scheduled Expiration Date. Each Renewal Term shall be upon the same terms and conditions as are contained in this Lease, except for the amount of the Monthly Base Rent. Notwithstanding anything contained herein or in the Right to Purchase Agreement to the contrary, (a) the Term shall not automatically renew at the end of the Fourth (4th) Renewal Term and (b) the last day of the Term shall be no later than the last day of the Fourth Renewal Term.**

Tenant Name: Valerie Fahrnow    Albert Brynds    Page 3   Ashlyne Fahrnow    Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS, 66213
Lease-KS: 2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 8 of 62

Each Tenant acknowledges and agrees that his or her right to continue leasing and/or occupying the Premises may cease sooner than the scheduled Expiration Date in the event (i) the Purchase Right Holder purchases the Premises, in which event the Term of this Lease shall terminate effective as of the actual Closing Date (as defined in the Right to Purchase Agreement) or (ii) Landlord terminates this Lease in the event of a default by Tenant under this Lease. **If Tenant is in default of this Lease, Landlord shall have the right to exercise Landlord's Rights and Remedies including the right to terminate this Lease (that would automatically result in a termination of the Right to Purchase Agreement) or the right to notify Tenant that this Lease shall expire upon the expiration of the then-existing Term and shall not automatically renew for any subsequent Renewal Term.** This Lease will not renew on a month-to-month basis under any circumstances. Tenant may have rights under Applicable Laws to terminate this Lease in certain situations involving family violence, sexual assault or military deployment or transfer.

If the Premises is part of an HOA and this Lease, Tenant and/or the Occupants must be approved by such HOA, then this Lease is expressly contingent upon receiving such approvals from the HOA. Any application fee or separate security deposit required by the HOA shall be paid by Landlord. If any required HOA approval is not obtained prior to the Estimated Commencement Date (as same may be extended pursuant to Section 44), then upon notice from Landlord, this Lease shall terminate and Tenant shall receive a return of any Security Deposit and pre-paid Rent. Tenant agrees to use due diligence in applying for HOA approval and to comply with the requirements for obtaining approval. Furthermore, and notwithstanding anything contained in this Lease to the contrary, in the event the HOA should amend or modify any applicable HOA Rules resulting in the restriction or prohibition of Landlord's right to lease the Premises to Tenant beyond the then-applicable Initial Term or Renewal Term or in the event that the HOA refuses to approve the Lease and/or the Tenant for any applicable Renewal Term, then Landlord shall have the right to terminate the Term of this Lease upon notice to Tenant, which notice shall be given promptly after Landlord has actual knowledge of such HOA restriction or refusal. Upon the giving of such termination notice by Landlord, the Term of this Lease shall terminate and expire effective as of the date set forth in such notice, which date shall be the then-scheduled Expiration Date (or such earlier date as may be required by the HOA) and Tenant shall have no further rights to renew the Term of this Lease.

4. **RENT AND LATE CHARGES.** Tenant agrees to pay to Landlord the Monthly Base Rent together with any Additional Rent in advance, and without demand, on or before 11:59 p.m. on the first day of every month during the Term at the address contained herein for payment of Rent (or such other address as Landlord may designate in writing to Tenant) or pursuant to an online rent payment system designated by Landlord or Landlord's Agents). On or before three (3) Business Days after Tenant's receipt of notice that Landlord has closed on the acquisition of title to the Premises (the "*Pro-Rated Rent Due Date*"), Tenant shall pay to Landlord the Pro-Rated Rent due for the month of the Commencement Date. If the Expiration Date is not the last day of a calendar month, then the Monthly Base Rent for such last month of the Term shall be prorated based upon the number of days in such calendar month. Landlord shall provide Tenant with a Commencement Date Notification identifying the Commencement Date, Expiration Date and Pro-Rated Rent. If the first day of a Renewal Term is not the first day of a calendar month, then the Monthly Base Rent for the month in which it occurs shall be prorated based upon the amounts payable before and after the commencement of such Renewal Term.

Tenant agrees to make all Rent payments on or before the date when due and all Rent shall be paid by check or certified funds (i.e., money order, wire transfer or cashier's check). If payment is made by personal check, Landlord is authorized to scan the check and convert it into a one-time electronic debit from the bank account against which the check was written. In addition to Landlord's Rights and Remedies, Tenant agrees to pay a service charge equal to the sum of Thirty Dollars ($30.00) for each check or other bank instrument tendered for payment of any of Tenant's obligations hereunder that is returned, dishonored or unpaid by the institution upon which it was drawn (whether for insufficient funds, stop payment or any other reason) or is a rejected electronic payment (but in no event an amount that is higher than permitted by Applicable Law) (each, a "*Returned Payment*" and each such service charge, a "*Returned Payment Fee*"). Returned Payment Fees shall be considered Additional Rent. Additionally, after two (2) or more Returned Payments within any rolling twelve-month period or upon the occurrence of a default by Tenant under this Lease, Landlord shall have the right to require Tenant to make all future Rent payments with certified funds (i.e., money order, wire transfer or cashier's check). Rent sent by U.S. mail or otherwise shall be deemed paid on the date actually received by Landlord or Landlord's Agent.

If any portion of any required Rent payment is not received by Landlord on or before five (5) days from the date when due including any Returned Payment (each such unpaid amount, an "*Overdue Payment Amount*"), then Tenant shall pay to Landlord, in addition to such Overdue Payment Amount, a "late fee" in the amount of, whichever is highest, (a) One Hundred Dollars ($100.00) or (b) ten percent (10%) of the applicable Overdue Payment Amount (not to exceed the maximum late fee permitted by Applicable Law) (each, a "*Late Payment Fee*"), per month, for each month that any portion of such Overdue Payment Amount remains delinquent, to cover administrative expenses for the late payment. In the event that any such payment is due to a Returned Payment, Tenant shall also pay the Returned Payment Fee in addition to the Late Payment Fee, plus any applicable bank fees. Tenant and Landlord each agrees that the Late Payment Fee is based on a fair and reasonable estimate of uncertain damages and actual expenses

incurred by Landlord as a result of Tenant's failure to pay Rent when due, and that the amount of actual expenses and damages are not susceptible to precise calculation but include Landlord's costs of communicating with Tenant regarding the late payment, loss of use of funds, and increased accounting and administrative expenses resulting from the late payment of Rent. Landlord's acceptance of a Late Payment Fee does not waive any of Landlord's Rights and Remedies. Any Late Payment Fees shall be automatically due and payable and considered Additional Rent.

Timely payment of all sums due under this Lease by Tenant is an independent covenant of each and every other covenant of this Lease. Tenant agrees that it shall not have the right to deduct, withhold or offset any portion of the Rent from any claim it may have against Landlord, in any action by Tenant, except to the extent expressly authorized by Applicable Laws. Regardless of any notation or restrictions on a check or money order, all sums received by Landlord from Tenant shall be applied to the oldest outstanding monetary obligation owed by Tenant to Landlord (except if Applicable Law requires that it be applied in a different order). After the applicable Rent due date, Landlord is not obligated to accept Rent payments, any Overdue Payment Amounts or Rent in less than the full amount due, and Landlord's refusal to accept such payments (or acceptance of less than the full amount due) shall not constitute a waiver of any of Landlord's Rights and Remedies. Should Tenant fail to make timely Rent payments under this Lease, Tenant agrees to pay Landlord's costs and expenses incurred in collecting any such Rent, together with reasonable attorneys' fees to the extent permitted under Applicable Law. Furthermore, Tenant's failure to make timely Rent payments shall constitute a default under this Lease and may result in its termination by Landlord.

5. **SECURITY DEPOSIT.** Upon the last to occur of (i) the full execution and delivery of this Lease and the RTP Agreement and (ii) Landlord's acquisition of title to the Premises, all or a portion of the Deposit (not exceeding the amount of the Security Deposit due under this Lease) made by Tenant as required by the Document Review Acknowledgment shall automatically convert to and become the Security Deposit required under this Lease. However, if it shall be insufficient to cover the entire required Security Deposit, then Tenant must deposit with Landlord the shortfall within three (3) days after notice from Landlord (but in any event prior to Tenant gaining possession of the Premises). In the event the Deposit exceeds the Security Deposit required, the excess shall be credited against the Rent or Pro-Rated Rent then due. It is understood and agreed that prior to the full execution and delivery of this Lease and the RTP Agreement, all funds deposited by Tenant shall be deemed to be the "Deposit" under the Document Review Acknowledgment and not a security deposit or prepaid rent under this Lease, unless Tenant is otherwise notified in writing by Landlord to the contrary.

The Security Deposit shall be held by Landlord as security for the complete performance by Tenant of each covenant and obligation under this Lease, including the timely payment of Rent. The Security Deposit shall not be considered an advance payment of Rent and Tenant is prohibited from applying any portion of the Security Deposit to Rent or other payments owed to Landlord and may not be used to pay the last month's Rent. The Security Deposit is not a measure of Tenant's liability for damages. Except and to the extent otherwise required by Applicable Laws, Landlord (a) shall not be required to keep the Security Deposit separate from its other assets but may be commingled therewith and shall have no fiduciary or trust obligations, (b) shall have the right to place the Security Deposit in an interest-bearing or income-producing account and retain any interest or income earned and (c) shall not be obligated to pay and Tenant is not entitled to interest on the Security Deposit. Landlord shall have the right, from time-to-time, without prejudice to any other remedy and without waiving such default, to use all or any portion of the Security Deposit to the extent necessary to cure or attempt to cure, in whole or in part, any default of Tenant under this Lease. Following any such application of the Security Deposit, Tenant shall pay to Landlord, within three (3) days after demand, the amount so applied in order to restore the Security Deposit to its original amount. If Landlord transfers or assigns its interest in the Premises during the Term, Landlord shall assign and transfer the Security Deposit to the transferee or assignee in which event Landlord shall thereafter have no further liability for the return of such Security Deposit.

Upon the expiration or earlier termination of this Lease and within the time periods required by Applicable Law, Landlord will (I) notify Tenant of its intention to impose a claim on the Security Deposit and the reasons for imposing such claim (including an itemized accounting of any set-offs or deductions made by Landlord from the Security Deposit) which reasons may include, but shall not be limited to, the cost of: replacing any missing keys, cleaning the Premises to the extent same was not cleaned in accordance with the terms of this Lease, repairing any damage to the Premises (normal wear and tear excepted), repairing any damage caused by scratches or indentations caused by furniture or other means in wood or resilient floorings within the Premises, repairing or replacing more than normal wear and tear on floors and carpeting, repairing, the cost of steam cleaning carpeting, re-painting and performing or taking such other actions as Landlord deems reasonable to eliminate smells of smoke, pets or other odors, restoring or replacing personal property, payment of outstanding Rent obligations pursuant to this Lease, and any other reason permitted by Applicable Law and (II) refund to Tenant the balance of the Security Deposit remaining after permitted deductions and applications have been made therefrom.

Tenant Name: _Valerie Fahrnow_      _Albert Brynds_      Page 5  Ashlyne Fahrnow      Mareck Muro
Premises Address: _12519 Cornell Drive, Overland Park, KS, 66213_
Lease-KS: 2018-01

Case 21-20342    Doc# 18-1    Filed 04/21/21    Page 10 of 62

If there shall be more than one Tenant who executes this Lease, any deductions to be made from the Security Deposit will be joint and several, and Landlord shall not be liable for any understanding that may exist among two (2) or more Tenants as to the portion of the Security Deposit that one Tenant may be entitled to, as opposed to another Tenant. Security Deposit refunds may be made by one check payable collectively to all Tenants or, at Landlord's election, to any one Tenant, and shall be sent to the forwarding address provided by the Tenant Notice Recipient (otherwise, it shall be mailed to the Premises for forwarding by the postal service) in accordance with Sections 25 and 39 below, in which event that Tenant shall be responsible for distribution of such refund and the itemization, if any, to the other Tenants. Tenant is responsible for providing Landlord, in writing, with a forwarding address on or before vacating the Premises.

6. **UTILITIES AND SERVICES.** In addition to Monthly Base Rent, Tenant shall be responsible for obtaining and paying the cost of all utilities and services provided to the Premises during the Term which are identified as Excluded Utilities & Services (collectively, "*Excluded Utilities & Services*") on *Attachment A* including any related deposits, connection, disconnection, re-connection or other charges or fees charged by such utility or service provider. **Tenant shall transfer and commence utility service for each of the Excluded Utilities & Services into the name of one or more Tenant no later than 72 hours after the Commencement Date**, it being understood and agreed that if it shall fail to do so, then Tenant shall pay Landlord the sum of Fifty Dollars ($50.00) as an administrative fee for each month or partial month where Tenant shall have failed to do so (and same shall constitute Additional Rent which the parties agree is a fair and reasonable estimate of uncertain damages and actual expenses incurred by Landlord as a result of Tenant's failure as aforesaid) and Landlord shall have the right to cause all such Excluded Utilities & Services to be cancelled or disconnected without notice to Tenant. Landlord shall have the right, but not the obligation, to transfer water, sewer and/or garbage/trash removal service into Landlord's name notwithstanding that they are included within Excluded Utilities & Services (as well as any other Excluded Utilities that Tenant has failed to transfer into Tenant's name), and bill Tenant for such services to the Premises during the Term as Additional Rent which shall be due and payable with the next Monthly Base Rent payment. Except for amounts billed to Tenant by Landlord, all Excluded Utilities & Services shall be paid by Tenant directly to the service providers. During the Term, Tenant shall not allow Excluded Utilities & Services to be disconnected for any reason including due to Tenant's failure to pay the same (but excepting only when such failure is due to force majeure beyond Tenant's reasonable control, or when the applicable system is to be repaired or under repair). Tenant shall pay Landlord, as Additional Rent: (a) the Utility Billing Service Fee along with the Monthly Base Rent for each month where Landlord provides Tenant a bill for reimbursement for any Excluded Utility & Service paid for by Landlord plus (b) the Utility One-Time Fee on or before the date set forth in Section 1.K.

Landlord shall be responsible for payment of the utilities and services which are identified as Included Utilities & Services (collectively, "*Included Utilities & Services*") on *Attachment A* including any related deposits, charges or fees. Landlord shall not be liable for failure to furnish such Included Utilities when such failure is beyond Landlord's reasonable control, due to force majeure, or when the applicable system is to be repaired or under repair.

7. **PETS.** No animals are allowed, even temporarily, anywhere on the Premises without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. As a condition of obtaining Landlord's consent, Tenant must sign a separate "Pet Addendum" to this Lease which may require the payment of separate pet fees, separate deposits, pet rents and/or other charges (all of which shall be considered and collectable as Additional Rent for all purposes under this Lease) and which may set limits on the number, types and weight of allowable pets.

8. **USE OF PREMISES; COMPLIANCE.** The Premises shall be used and occupied only as a private, single-family dwelling/residence by Tenant and the Household Members identified in Section 1.B and no others except as Tenant may notify Landlord in the case of minors who are under 18 years of age. Tenant shall not allow any other person to use or occupy the Premises for more than 14 days within any one calendar month without Landlord's prior written consent. No part of the Premises shall be used at any time during the Term by any Occupant for the purpose of carrying on any business, profession, or trade of any kind, or for any purpose other than as a private, single-family dwelling/residence; provided, however, that Tenant shall be entitled to have a home-office provided that customers or clients do not visit the Premises and the same does not violate Applicable Laws or the HOA Rules.

Tenant shall ensure that all Occupants comply with all Applicable Laws and HOA Rules as well as any occupancy rules and regulations of Landlord which Landlord may distribute from time to time and failure to comply with same will be considered a default under the terms of this Lease. Tenant shall be responsible for any fees, penalties, charges or payments for violation of any HOA Rules to the extent caused by or on behalf of any Occupant and if Tenant fails to timely pay the same, then Landlord shall have the right to pay them on Tenant's behalf which payments by Landlord shall be considered Additional Rent to be included with the next Monthly Base Rent payment, it being understood and agreed that Landlord's obligation to pay HOA dues or fees as part of the Included Utilities & Services shall not include any such payments to the extent due to a violation or alleged violation of HOA Rules by or on behalf of any Occupant.

Tenant Name: Valerie Fahrnow        Albert Brynds        Page 6    Ashlyne Fahrnow        Mareck Muro
Premises Address: 12519 Cornell Drive, Overland Park, KS 66213
Lease-KS: 2018-01

Case 21-20342    Doc# 18-1    Filed 04/21/21    Page 11 of 62

9. **DISCLOSURE RIGHTS.** If a third party requests information on Tenant or Tenant's rental history, whether for law-enforcement or governmental purposes or otherwise pursuant to an order of any court of competent jurisdiction, Landlord may provide such information as may be permitted by Applicable Law without claim from Tenant. Landlord shall also have the right to report Overdue Payment Amounts to credit agencies.

10. **MOVE-IN CONDITION OF PREMISES.** Tenant confirms that it has physically inspected the Premises and acknowledges that the Premises are in good order and repair and in a safe and clean condition. No representations as to the condition or repair of the Premises have been made by Landlord prior to or at the execution of this Lease that are not contained in this Lease. Tenant will be provided with a Move-In Condition Form ("*Condition Form*") for the Premises on or before the Commencement Date and, **within five (5) days after the Commencement Date, Tenant must sign and return one copy of the Condition Form to Landlord's Agent** on which Tenant must note all defects or damage relating to the Premises existing as of the Commencement Date (except to the extent such damage was caused by or on behalf of any Occupant). Tenant acknowledges that any damage to the Premises beyond normal wear and tear which is not so noted on the Condition Form returned by Tenant will be presumed to have been caused by Tenant; therefore, it is important to note any such damage and to timely return the Condition Form. Except for the covenants of Landlord expressly contained in this Lease or other documents executed by Landlord, or as otherwise required or specified by Applicable Laws, Tenant agrees that (a) it is leasing the Premises in its "**AS-IS, WHERE-IS, WITH ALL FAULTS**" condition as of the Effective Date and specifically and expressly without any warranties, representations or guarantees, either express or implied, as to its condition, fitness for any particular purpose, merchantability or any other warranty of any kind, nature, or type whatsoever from or on behalf of Landlord, and (b) Landlord has no obligation to perform any work, supply any materials, incur any expense or make any alterations or improvements to any portion of the Premises.

*Attachment B* to this Lease entitled "*State and Federal Disclosures*" contains a list, summary and/or copies of certain disclosures provided by Landlord to Tenant prior to execution of this Lease and by its execution of this Lease, Tenant acknowledges receipt thereof.

Landlord shall not discriminate against Tenant in the provision of services or in any other manner on the basis of race, religion, sex, national origin, familial status or disability, nor on the basis of any class protected by Applicable Law.

11. **TENANT SAFETY AND PROPERTY LOSS.** Each Occupant must exercise due care for their safety and security, especially in the use of smoke and carbon monoxide detectors, keyed deadbolt locks, window latches and other safety or security devices. Tenant must promptly notify Landlord in the event any window or door locks are inoperable. Unless Landlord instructs otherwise, during freezing weather conditions, Tenant must keep the Premises heated to at least 50 degrees Fahrenheit. Tenant will be liable for damage to the Premises and others' property if damage is caused due to violation of these requirements including but not limited to, by frozen, leaking or broken water pipes. Tenant shall be responsible for maintaining the Premises (including sidewalks and driveways) reasonably clean and free from dirt, weeds and rubbish, snow and ice (including salting when necessary) so that same are in a safe condition. Landlord has the right, but no obligation, to remove any ice, sleet, snow, dirt, weeds and rubbish, and the cost thereof shall be considered and collectable as Additional Rent. Landlord makes no promise or in any way guarantees the safety or security of any Occupant against the criminal actions of other Occupants or third parties, it being understood and agreed that the responsibility of protecting Occupants and their property, family, guests, agents and invitees from acts of crime is solely the responsibility of Tenant and law enforcement agencies. Landlord has not in any way stated or implied to Tenant that the security of any person or property was or is provided or that the Premises and/or surrounding neighborhood has been or will be free of crime.

Landlord shall (a) not be liable to any Occupant for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism or other crimes, (b) not be obligated to furnish security personnel, security lighting, security gates or fences, alarm systems or other forms of security, and (c) not be responsible for obtaining criminal-history checks on any Occupant. If Tenant or any Occupant is affected by a crime involving damage to person or property or theft in or about the Premises, Tenant must promptly notify Landlord and provide a written report to Landlord and to the appropriate law-enforcement agency and Tenant also must furnish Landlord with the law-enforcement agency's incident report number upon request. **Tenant should dial 911 or immediately call local rescue/emergency, fire, or police personnel in case of accident, fire, smoke, suspected criminal activity, or other emergency involving imminent damage or harm in or about the Premises.**

12. **INSURANCE; LIMITATION OF LIABILITY.** Landlord is not an insurer and does not maintain insurance to cover the personal property, possessions or personal injury of any Occupant. Except to the extent required by Applicable Laws, Landlord shall not be liable for any destruction, damage, loss of personal property, possessions or personal injury to any Occupant (including as may be occasioned by fire, smoke, mold, rain, flood, leaking plumbing, gas or water pipes, water, snow, hail, ice, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane or other causes) or for any damage arising from acts, omissions or neglect of Landlord or anyone claiming through Landlord.



Tenant agrees that all damage to personal property and possessions and any personal injury of any Occupant in the Premises shall be at the risk of the owner of such personal property. During the Term, Tenant shall maintain in full force and effect, renter's insurance ("*Renter's Insurance*") on an occurrence basis which must include (1) general liability coverage in an amount of not less than $300,000.00 (or such higher amount as may be required by any Pool/Spa or other Addendum now or hereafter made a part of this Lease) and (2) personal property coverage in an amount that Tenant deems sufficient to cover the repair or replacement costs of any loss to Tenant's personal property located at the Premises. Tenant is required to (a) cause Landlord to be named as an "additional interested party" (or similar status) on the general liability portion of the Renter's Insurance policy, (b) cause the insurer or agent to provide Landlord with written evidence of such insurance prior to taking possession of the Premises (e.g., by delivery of a certificate of insurance) and (c) take all actions necessary for Landlord to be notified by the issuer of the Renter's Insurance if such coverage is terminated or not renewed (i.e., the issuer of such insurance must agree to name Landlord as an additional interested party and provide at least 30 days' prior written notice to Landlord of its intention to cancel or not renew such policy, 10 days for nonpayment). Unless Landlord otherwise indicates in writing, evidence of insurance required to be maintained by Tenant pursuant to this Lease shall be delivered by Tenant to Landlord's Agent at the address indicated in Section 1.C.

Tenant's failure to maintain or provide evidence of the required Renter's Insurance is a default under this Lease and may result in, with or without notice to Tenant and/or Tenant's opportunity to cure (except as otherwise provided by Applicable Laws), Landlord's purchasing insurance up to the amounts specified herein for Renter's Insurance (such insurance being referred to herein as "*Replacement Renter Insurance*"), in which event (A) the cost of such Replacement Renter Insurance plus an administrative fee in the amount of $3.00 for each month or partial month during the period during which such Replacement Renter Insurance is applicable (or, if lower, the maximum amount of such administrative fee as is permitted by Applicable Law, it being understood and agreed that such administrative fee is a fair and reasonable estimate of actual expenses incurred by Landlord as a result of having to obtain the Replacement Renter Insurance and that the amount of actual expenses are not susceptible to ready calculation but include Landlord's costs of communicating with Tenant, and increased accounting and administrative expenses resulting from Tenant's failure to provide Landlord with evidence of the required Renter's Insurance) shall constitute Additional Rent payable by Tenant with Tenant's next Monthly Base Rent payment due, (B) Landlord shall not be obligated to include Tenant as an insured on such Replacement Renter Insurance (or if included, Tenant may be a secondary beneficiary under such policy while Landlord is the primary beneficiary thereof), (C) Landlord shall not be obligated to include Tenant's personal belongings in the coverage of such Replacement Renter Insurance, and (D) Landlord shall have no liability for failure to obtain any Replacement Renter Insurance or for the failure of such insurance to cover Tenant's belongings. **Any Replacement Renter Insurance policy obtained by Landlord shall terminate contemporaneously with the expiration or termination of this Lease.** At least fifteen (15) days prior to the cancellation or expiration of each policy of Renter's Insurance, Tenant shall provide Landlord with written evidence of renewal thereof and payment of the premium therefor. Any Renter's Insurance maintained (or required to be maintained) by Tenant hereunder shall be primary to any insurance carried independently by Landlord, and Tenant agrees to look solely to, and seek recovery only from, Tenant's insurance carriers in the event of a loss. To the maximum extent allowed under Applicable Laws, Tenant hereby releases Landlord Indemnitees and their respective insurance companies for any and all losses or damages to the Premises, the contents thereof or injury or death to any person, except to the extent such loss, damage or injury is due to Landlord's gross negligence.

13. **SUBLET; ASSIGNMENT.** Tenant shall not (a) assign this Lease (in whole or in part), (b) sublet or grant any license to use the Premises (in whole or in part), nor (c) permit the transfer of any interest in the Premises acquired through this Lease. Any assignment, subletting or license in violation of this Section shall be null and void and shall, at Landlord's option, be a default under this Lease for which Landlord may terminate the same. Subject to Applicable Laws, Landlord shall have the absolute right to transfer and/or assign, in whole or in part, all of its rights and obligations under this Lease and in the Premises whereupon (i) Landlord shall be released from any further obligations under this Lease and (ii) Tenant shall look solely to such successor in interest of Landlord for the performance of such obligations, subject to Landlord's transfer of the remaining Security Deposit in accordance with Section 5. The Premises shall not be used or occupied as a hotel or for any other transient use, rented for any short-term basis, nor advertised or listed for rental on sites such as Airbnb, craigslist or the like.

14. **ALTERATIONS AND IMPROVEMENTS.** Tenant will use customary diligence in maintaining the Premises and will not make or permit any alterations or improvements to any part of the Premises (including painting, wall papering and other decorating or installation of any appliances or other equipment of any kind [except those that only need to merely be plugged into an outlet]), nor allow any signs or placards posted or placed thereon, without the prior written consent of Landlord, which consent may be withheld in Landlord's reasonable discretion. Landlord will permit Tenant to install a satellite dish, antennas or cables for personal, private use on the Premises only if Tenant so requests in advance of any installation and enters into a separate Satellite Dish and Antenna Addendum in such form as Landlord may reasonably require governing such installation and use. Any such installation must be performed in a professional manner and in conformity with any applicable HOA Rules. In no event shall any such work or equipment penetrate the roof of the Premises nor do anything which could void any warranties on any portion of the Premises.

Tenant Name: Valerie Fahrnow          Albert Brynds          Page 8     Ashlyne Fahrnow          Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS 66213
Lease-KS: 2018-01

Case 21-20342     Doc# 18-1     Filed 04/21/21     Page 13 of 62

Tenant shall not alter, damage, disable or remove any part of the Premises or property therefrom including alarm systems, telephone and internet/television cables or wiring, screens, locks, security devices or fire extinguishers. Any alterations or improvements that are made to the Premises (whether made by Tenant or Landlord) will become the property of Landlord and will remain upon termination of this Lease. Should Landlord give its prior written consent to any alterations or improvements, Tenant shall promptly pay for same in full and shall obtain lien waivers from all third party vendors as Landlord may require. Tenant shall not create or permit to be created any mechanic, contractor, materialman or other liens or security interests against the Premises. Tenant shall be responsible for all costs and expenses incurred by Landlord for repair or restoration as a result of any alterations or improvements made by or on behalf of Tenant to the Premises (whether approved or unapproved by Landlord, however, if the same were not approved by Landlord, Landlord shall have the right to restore the Premises to the condition existing on the Commencement Date and the cost of such restoration shall be borne by Tenant), including all attorneys' fees and costs incurred to remove any liens from the Premises, all of which shall be considered Additional Rent.

15. **KEYS; LOCKS; DAMAGE CHARGE LIST.** Locks to the Premises have been changed or re-keyed or the access code changed prior to the Commencement Date. Tenant will be provided two (2) copies of keys for each lock on the Premises and one (1) access device for remote garage access (if applicable) on the Premises and Tenant shall pay for any other keys, access device, or locks replaced by Landlord. No additional alarm systems, lock changes, additions or re-keying is permitted unless Landlord has given prior written consent thereto. Tenant shall not remove any locks from the Premises, even if installed by Tenant. The cost of Landlord or its agent opening or re-keying the Premises if Tenant is locked out or loses keys and requires or requests access to the Premises or re-keying to the Premises shall be borne by Tenant as Additional Rent.

16. **MAINTENANCE AND REPAIR.** Subject to the terms of this Section, Sections 8 and 17 hereof, Landlord shall use reasonable efforts to maintain, at its cost (but subject to the terms of the Right to Purchase Agreement): (1) the foundations, roof, exterior walls, structural members and mechanical systems (including HVAC systems, hot water heater, electrical and plumbing systems and sump pump, if any) of the residence located at the Premises, in habitable condition, together with (2) any items which are required by Applicable Laws to be maintained by Landlord. Landlord shall not be required to repaint, re-carpet or re-finish the floors of the Premises either prior to or during the Term (unless same is included within "Landlord Work," in the Renovation Addendum For Landlord Work) nor to repair conditions caused by any Occupants. Any appliances contained in the Premises are provided for the Tenant's convenience and Landlord does not warrant the fitness or uninterrupted use or enjoyment of such appliances by Tenant and Landlord shall not be liable for any damages caused by such appliances' failure nor for their repair or replacement except Landlord shall exercise reasonable efforts to cause the following appliances to be in working order throughout the Term (except if such failure is caused by an Occupant), to the extent same were provided by Landlord as of the Commencement Date: refrigerator, dishwasher, oven and stove. Landlord shall not be responsible for any appliances owned by Tenant. Any interruption of Tenant's use and enjoyment of appliances shall not constitute "constructive eviction," nor form the basis for any defense, set-off or counter-claim by Tenant. Tenant shall be responsible for the maintenance, repair and replacement of all appliances owned by Tenant and for all damage caused by them, including if Tenant fails to remove any appliances from the Premises on or before the last day of the Term. Nothing set forth herein is intended to abrogate or waive any obligations of Landlord required by Applicable Laws to repair conditions at the Premises.

**Tenant shall, at Tenant's expense, maintain the Premises (including all appliances, systems and fixtures located thereon but excluding only those items which are required to be maintained by Landlord)** and keep same in a clean, safe and healthy condition and in good working order, at all times during the Term, and shall suffer no waste therein, and shall be responsible for payment of the cost of (a) all repairs, maintenance or replacement required to the Premises, including the walls, windows, storms doors/windows and screens, ceilings, paint, plastering, plumbing work, pipes, appliances and fixtures belonging to the Premises, **whenever such damage or injury to the same shall have resulted from misuse, waste or neglect by any Occupant,** and (b) any and all repairs, maintenance or replacement required to the Premises that shall be necessary to restore the Premises to the same condition as when Tenant took possession of the Premises (including any work performed by Landlord thereafter), normal wear and tear excepted. Landlord shall have the right to cause such repairs, maintenance or replacements described in this Section 16 to be made and to recover all costs and expenses relating thereto from Tenant as Additional Rent and shall be due and payable with the next Monthly Base Rent payment after receipt of notification from Landlord of the costs thereof. Unless otherwise permitted by Applicable Laws, Tenant shall not, without the prior written consent of Landlord, have the right to make repairs to the Premises and set them off or deduct them against Rent due or otherwise withhold Rent (including Monthly Base Rent or Additional Rent). **The amount of Rent was agreed upon based on the express understanding that Tenant will be responsible for the maintenance needs of the Premises as provided in this Lease and in the absence of Tenant's agreement to maintain the Premises at its cost in accordance with the terms of this Lease, Landlord would have charged a higher rent amount.**



Tenant shall maintain the garden, landscaping, trees and shrubs located at the Premises and provide regular and routine landscape care. Tenant agrees to water, on a regular and routine basis, the lawn and landscaping at the Premises but shall observe all Applicable Laws and HOA Rules pertaining thereto, such as times watering is permitted.

Tenant shall be charged an amount equal to $75.00 (or such higher amount as may be charged for no-shows by the service provider) ("*No-Show Fee*") any time that Landlord shall have the right or shall be obligated to perform work or inspections or Landlord's Agents are entitled to show the Premises to the extent Landlord or Landlord's Agent has (A) scheduled an appointment with Tenant and (B) Tenant was not at the Premises at the scheduled time of the appointment or Tenant has repeated refused to schedule an appointment. Additionally, Landlord reserves the right to charge Tenant a fee for each service call ("*Service Call Fee*") resulting from Tenant's maintenance or repair request regarding the Premises (in addition to any other charges which Tenant may be responsible in connection with such service call); provided, however, (x) no Service Call Fee shall exceed the sum of $35.00 and (y) Service Call Fees shall be waived if the service call relates solely to an item that Landlord is required to maintain pursuant to the first grammatical paragraph of this Section 16. No-Show Fees and Service Call Fees shall constitute and be collectable as Additional Rent.

Tenant shall, at Tenant's expense: (aa) take all such actions as are reasonably necessary to promptly eliminate any dangerous condition on the Premises, (bb) not keep on the Premises any item of a dangerous, flammable or explosive character that might unreasonably increase the danger of fire or explosion on the Premises or that might be considered hazardous, such as kerosene or fuel oil heaters which are expressly prohibited, (cc) know the location and operation of the main water cut-off valve and all electric breakers and how to switch the valve or breakers off at appropriate times to mitigate any potential damage, (dd) keep the Premises and exterior in a neat and sanitary condition and in compliance with all applicable health and safety regulations, Applicable Laws and HOA Rules, (ee) supply and immediately replace at Tenant's cost: (1) all light bulbs, fluorescent tubes, and batteries for smoke detectors and carbon monoxide detectors, garage door openers, ceiling fan remotes and (2) air conditioning/furnace filters at least once every three (3) calendar months, (ff) inspect and maintain in compliance with the information tag thereon, all Landlord-supplied fire extinguishers, if any, it being understood and agreed that any fire extinguishers supplied are without charge for convenience of Tenant only and no warranty is made as to their sufficiency for the Premises, and (gg) use reasonable efforts (including providing appropriate climate control) to maintain the Premises in such a condition as to prevent the accumulation of moisture and the growth of mold or mildew in the Premises and remove any standing water from the Premises. No waterbeds or other liquid-filled furniture are permitted inside the Premises.

Applicable Laws may require that the Premises be equipped with carbon monoxide or smoke detectors and/or other detectors in certain locations. Requests from Tenant for additional installation, inspection or repair of any detectors provided by Landlord must be in writing and delivered to Landlord. Disconnecting, relocating, damaging or disturbing a carbon monoxide, smoke or other detector or removing a battery without immediately replacing it with a working battery are expressly prohibited by this Lease and may subject Tenant to civil penalties and liability for damages and attorneys' fees. Tenant agrees that it shall check the operation of each detector at least monthly, change each battery, at Tenant's cost, at least once every six (6) months and immediately notify Landlord if it becomes aware that the detectors cease working at any time.

17. **DAMAGE TO PREMISES.** Tenant must promptly reimburse Landlord for all loss, damage, government or HOA fines, and cost/expenses of repairs or service to the extent caused by an Occupant or resulting from a violation of Tenant's obligations under this Lease (including damages resulting from Tenant's failure to maintain utilities or services resulting in damage to the Premises such as from frozen pipes). Tenant shall provide Landlord with immediate notice of any fire or other casualty that occurs and causes damage to the Premises.

If (a) the Premises are destroyed or rendered wholly or partially uninhabitable by fire, storm, earthquake or other casualty, or (b) Landlord reasonably believes that such damage to the Premises is catastrophic or substantial (for example, if water enters the Premises in significant amounts), or (c) performance of needed repairs to the Premises would pose a danger to the Occupants, then Landlord shall notify Tenant within thirty (30) days after Landlord becomes aware of such casualty whether Landlord has elected to repair the Premises or terminate this Lease (including the effective date of such termination). If the Premises are not habitable and repairing the Premises would be expected to take more than thirty (30) days from the date of such casualty, then Tenant shall have the right to terminate this Lease upon written notice given to Landlord within ten (10) days after such casualty. The Term shall expire upon receipt of a termination notice from the other party given pursuant to this Section (or the termination date set forth in such notice if from Landlord), Landlord shall have the right to remove Tenant's personal property and belongings from the Premises if Landlord believes they would cause a health or safety hazard (including the creation of mold in the event of water infiltration) and Landlord shall refund any prepaid Rent (on a pro-rata basis) accruing from and after the date of such termination. Tenant shall be responsible for all costs and expenses incurred by Landlord to repair or restore the Premises to the condition it was in immediately

prior to the fire or other casualty to the extent the damage was caused by any Occupant. Landlord shall not be obligated to repair or restore the Premises if insurance proceeds are insufficient to complete same.

18. **REQUESTS, REPAIRS, MALFUNCTIONS.** All notices and requests (e.g., for repairs, installations, services or security related matters) from Tenant must be in writing (except in the case of emergencies). **IN CASE OF EMERGENCIES SUCH AS FIRE, SMOKE, GAS, EXPLOSION, OVERFLOWING SEWAGE, UNCONTROLLABLE RUNNING WATER, WATER LEAKS, ELECTRICAL SHORTS OR CRIME IN PROGRESS OR OTHER EMERGENCY SITUATION, TENANT MUST PROMPTLY NOTIFY LANDLORD AND LANDLORD'S AGENTS BY TELEPHONE OR ELECTRONIC MAIL IN ADDITION TO THE** FOREGOING FORMAL NOTICE REQUIREMENT. Landlord's written notes or responses to Tenant's verbal requests do not constitute a written request from Tenant and do not waive the strict requirement for written notices under this Lease. Tenant must promptly notify Landlord of any conditions that pose a hazard to the Premises, personal property, health, or safety of the Tenant or any Occupants, including but not limited to electrical problems, malfunctioning lights, broken or missing locks or latches. Air conditioning problems are not emergencies; however, if air conditioning or other equipment malfunctions, Tenant must notify Landlord as soon as possible. Landlord may change or install utility lines or equipment serving the Premises if the work is done without unreasonably and substantially increasing Tenant's utility costs. Landlord may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, Tenant must notify Landlord immediately. Landlord will act with reasonable diligence to make repairs and reconnections, taking into consideration when casualty insurance proceeds are received. Rent will not abate in whole or in part except to the extent required under Applicable Laws.

19. **LANDLORD'S RIGHT OF ENTRY AND ACCESS.** Except to the extent prohibited by Applicable Law, Landlord and Landlord's Agents shall have the right (but not the obligation) to enter the interior and exterior of the Premises at all reasonable times with reasonable notice (which notice shall be at least 24 hours in advance of the intended entry unless Tenant otherwise agrees to a shorter notice period), and at all times in the event of an emergency, in order to inspect, make necessary or agreed repairs, decorations, alterations or improvements, supply necessary or agreed services, test smoke and other detectors, or exhibit the Premises to prospective or actual purchasers, mortgagees, tenants, workmen or contractors, or enforce the provisions of this Lease. Tenant shall not unreasonably withhold consent (to the extent such consent is required by Applicable Law) to Landlord's entering the Premises at a specified time where the Landlord has given at least one day's notice of intent to enter. Tenant will allow Landlord to have prominently placed upon the Premises, at all times, "For Rent/Lease/Sale" notices or similarly worded notices and will not interfere therewith, it being understood and agreed that Landlord shall not post such signs unless Tenant is in default under this Lease or during the two (2) months prior to the scheduled Expiration Date if Tenant shall have provided notice of its intention not to renew this Lease or if there shall be no remaining Renewal Term.

Landlord's Agents are authorized to place and use a keysafe/lockbox ("*Keybox*") on the Premises containing a key to the Premises which is opened by a special combination, key or programmed access device so that persons with the access device may, in Tenant's absence, access the interior of the home from time to time in order to show it to prospective residents or purchasers during the last two (2) months prior to the then-scheduled Expiration Date. Tenant shall have the right to withdraw Tenant's authorization to use a Keybox by providing written notice to Landlord in which event Landlord will remove the Keybox within a reasonable period of time. Landlord's removal of the Keybox does not alleviate Tenant's obligation to make the Premises available for showings and inspections pursuant to this Lease. If Landlord's Agent has given Tenant the requisite notice of their intent to access the Premises in order to show it to prospective residents or purchasers and are denied or are not able to access the Premises because either of Tenant's failure to make it accessible or is absent after having scheduled a time for a showing, then as consideration for the withdrawal of the Keybox, Landlord shall have the right to charge Tenant a "*No-Show Fee*" in the amount of $75.00 for each time that Landlord or Landlord's Agent shall have the right to show the Premises pursuant to this Section and Tenant has either (A) refused to schedule an appointment for at the time requested for such showing or (B) Tenant was not at the Premises at the scheduled appointment time. The Keybox is a convenience but involves risk (such as unauthorized entry, theft, property damage, or personal injury) and Landlord and Landlord's Agents are not responsible to any Occupants for any damages, injuries, or losses arising from use of the Keybox. Tenant acknowledges that Landlord has advised Tenant of the need for safeguarding and insuring Tenant's personal property and valuables located on the Premises. During any inspection of the Premises, Tenant hereby authorizes Landlord and Landlord's Agents to take videos or photographs or other images of the interior and exterior of the Premises and to use same in any advertisements to lease or sell the Premises as well as to document the condition of the Premises.

20. **SUBORDINATION; ATTORNMENT; ESTOPPEL CERTIFICATES.** This Lease and Tenant's interest hereunder are and shall be subject to and subordinate, junior and inferior to (a) any and all mortgages, deeds of trust, deeds to secure debt, security devices, liens or encumbrances now or hereafter placed on or against any part of the Premises and any and all renewals, extensions or modifications thereof ("*Liens*") and to any and all advances now or hereafter made under any such Liens (including future advances) and the interest payable on such Liens, (b) any restrictive covenants affecting the Premises, (c) the rights of any



HOA affecting the Premises (including any HOA Rules), and (d) any existing or future deeds placed on the Premises. Upon Landlord's request, Tenant will execute such instruments evidencing such subordination at Landlord's request and shall recognize and attorn to any successor to Landlord's interest in this Lease (including a mortgagee or other person acquiring Landlord's interest by way of foreclosure, deed in lieu of foreclosure or other proceedings) as "Landlord" hereunder.  Tenant shall within ten (10) days after receiving a request from Landlord, provide a certificate signed by Tenant stating whether or not all conditions under this Lease to be performed by Landlord prior the date of such certificate have been satisfied and whether or not Landlord is then in default in the performance of any covenant, agreement or condition contained in this Lease and specifying, if any, each such unsatisfied condition and each such default.  Landlord and anyone identified in such estoppel shall have the right to rely upon the information provided by Tenant therein.

Upon the first day of each Renewal Term, each person constituting Tenant shall be deemed to have acknowledged and agreed that as of such date: (i) Tenant has no claims arising under this Lease against Landlord or Landlord's Agents, (ii) to the best of his/her knowledge, Tenant is not aware of any default or failure on the part of Landlord to keep or perform any covenant, condition or undertaking to be kept or performed by Landlord under this Lease, and (iii) the Premises is in good working order and repair.

21.  **TIME IS OF THE ESSENCE.  Tenant agrees that time is of the essence for any and all payments, charges, costs and expenses required to be paid by Tenant and the performance of each and every covenant, term, agreement and condition hereunder including but not limited to the giving of notices, and Tenant shall be held in strict compliance with the same.**

22.  **TENANT'S HOLDOVER.**  If Tenant continues to occupy any portion of the Premises after the expiration or other termination of this Lease or the termination of Tenant's right of possession, then such occupancy shall be that of a tenancy at sufferance. Tenant shall, throughout the entire holdover period, be subject to all the terms and provisions of this Lease and, subject to Applicable Law, shall pay for its use and occupancy of the Premises an amount (on a per month basis without reduction for any partial months during any such holdover) equal to one hundred fifty percent (150%) of the Monthly Base Rent for the then-existing Term beyond which Tenant retained possession plus applicable Additional Rent and any other damages suffered by Landlord as a result of the holdover including the loss of prospective income and/or claims for damages asserted by a successor tenant or purchaser. No holding over by Tenant or payments of money by Tenant to Landlord after the expiration of the Term shall be construed to extend the Term or prevent Landlord from recovery of immediate possession of the Premises by summary proceedings or otherwise and Landlord shall be entitled to exercise any of Landlord's Rights and Remedies and recover from Tenant all damages sustained as a result of Tenant's failure to vacate the Premises, including direct and consequential damages, lost rent, court costs and reasonable attorneys' fees, to the extent permitted or provided for by Applicable Laws.

23.  **RELEASE; INDEMNIFICATION; LIMITATION OF LIABILITY.**  There are some limitations on Tenant's ability to bring an action against Landlord which are described in this Section. Some of these limitations are, however, subject to Applicable Laws. Tenant, on behalf of all Occupants (and their respective personal representatives, heirs, executors, administrators, agents and permitted assigns), agrees that (a) Landlord Indemnitees shall not be liable for any injury or harm to any person or property caused by a defective condition of the Premises to the greatest extent permitted by Applicable Laws and (b) all Occupants release and discharge the Landlord Indemnitees from any and all suits, actions, causes of action, damages, demands, claims, liabilities, judgments, fines, penalties and costs, and fees and expenses including, without limitation, reasonable attorneys' fees and costs of enforcement for the subject matter therein, whether known or unknown (collectively, "*Claims*") arising out of Occupants' use of, or acts or omissions in or about the Premises, or this Lease, except to the extent such Claims are due to Landlord's gross negligence.

**TENANT ACKNOWLEDGES THAT, TO THE MAXIMUM EXTENT ALLOWED UNDER APPLICABLE LAWS: (i) TENANT HAS CAREFULLY READ THIS RELEASE AND FULLY UNDERSTANDS THAT IT IS A RELEASE OF LIABILITY, and (ii) ON BEHALF OF ALL OCCUPANTS, TENANT IS RELEASING THE LANDLORD INDEMNITEES FROM ANY RIGHTS WHICH SUCH OCCUPANTS MAY HAVE TO BRING OR ASSERT A CLAIM OR ACTION AGAINST THE LANDLORD INDEMNITEES WITH RESPECT TO ANY CLAIMS AGAINST ANY LANDLORD INDEMNITEES, THE PREMISES OR THIS LEASE.**

Tenant shall indemnify, protect, defend and hold Landlord Indemnitees harmless from any and all Claims associated with any injury or harm to any person or property occurring on or about the Premises including but not limited to any breach by Tenant of this Lease and/or any damage or liability caused by any Occupant during the Lease Term, except to the extent that the injury or harm is caused by the gross negligence on the part of Landlord.

Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises or the proceeds therefrom and in no event shall any individual or personal liability be asserted against Landlord or any Landlord Indemnitees in connection with this Lease or the Premises nor shall any recourse be had to any other property or assets of any Landlord Indemnitees.  In no

Tenant Name: Valerie Fahrnow          Albert Brynds          Page 12  Ashlyne Fahrnow          Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS 66213
Lease-KS: 2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 17 of 62

event shall Landlord be liable for consequential or punitive damages as a result of a breach or default under or otherwise in connection with this Lease. None of Landlord's Agents shall be personally liable for any of Landlord's contractual, statutory, or other obligations merely by virtue of acting on Landlord's behalf. All provisions contained in this Lease regarding Landlord's non-liability and non-duty apply to Landlord's Agents.

24. **DEFAULT.** If (a) Tenant fails to comply with any of the provisions of this Lease (including but not limited to the failure to timely pay Rent or perform any other obligations under this Lease) and fails to cure such default within any applicable notice or cure periods contained in this Lease, (b) the Right to Purchase Agreement is terminated due to a default on the part of the Purchase Right Holder, or (c) the Executed Purchase Contract is terminated due to a default on the part of the purchaser thereunder, then such default shall constitute a default under this Lease and Landlord shall have the right, at any time thereafter, at its election, without limiting Landlord's Rights and Remedies, to do any one or more of the following: (i) terminate this Lease, (ii) terminate Tenant's right of possession of the Premises (including that of any Occupants), (iii) terminate the Right to Purchase Agreement and/or Executed Purchase Contract, if applicable, (iv) exercise any of Landlord's Rights and Remedies, and/or (v) re-enter the Premises or any part thereof, with or without (to the extent permitted by Applicable Laws) notice or process of law, regain possession thereof, and remove Tenant and any Occupants therefrom. To the extent not prohibited by Applicable Laws, upon any default by Tenant, all Rent for the remainder of the Term will be accelerated and will be immediately due and payable together with such expenses as Landlord may incur including, but not limited to, attorney's fees, court costs and constable fees, brokerage fees and costs of putting the Premises in good order and/or preparing the Premises for re-rental. Tenant's right of possession may be terminated without terminating Tenant's liability to pay Rent.

25. **MULTIPLE TENANTS.** Each person constituting Tenant (should there be more than one) is and shall be jointly and severally liable for all obligations of Tenant under this Lease. If there is a violation of this Lease by any one Occupant, then all persons constituting Tenant will be considered to have violated this Lease. Each person constituting Tenant irrevocably acknowledges and agrees that Landlord's requests and notices required or permitted to be sent pursuant to the terms of this Lease shall be sent to the Tenant Notice Recipient at the Premises and such notice shall conclusively constitute notice to all persons constituting Tenant and Occupant. Notices and requests from any Tenant to Landlord (including notices of Lease termination, repair requests, and entry permissions) shall constitute notice from all persons constituting Tenant. Tenant shall have the right to change the person identified as the Tenant Notice Recipient pursuant to a notice to Landlord signed by all of the Tenants identifying such new Tenant Notice Recipient. Tenant shall cause the Tenant Notice Recipient to be the same person who is identified as the Purchase Right Holder Notice Recipient under the Right to Purchase Agreement.

26. **SURRENDER; ABANDONMENT; RIGHT TO RE-LET.** If at any time during the Term, Tenant surrenders, abandons or vacates the Premises (or any material part thereof), Landlord shall have the right, at its option, to re-enter and obtain possession of the Premises and without becoming liable to Tenant for damages or for any payment of any kind whatsoever. Tenant shall give Landlord notice of any anticipated extended absence from the Premises of more than fourteen (14) days. If Tenant is absent from the Premises for three (3) consecutive weeks without notifying Landlord in writing of Tenant's absence, Landlord may deem the Premises abandoned unless there is no outstanding default in the payment of Rent. Landlord may, at its discretion, on behalf of Tenant, re-let the Premises for such rent and on such other terms and conditions as Landlord may see fit, including re-letting Premises, for the whole or any part of the then unexpired Term. Landlord shall have the right to receive and collect all rent payable by virtue of such re-letting and, at Landlord's option, hold Tenant liable for any difference between: (i) the Rent that would have been payable under this Lease during the balance of the unexpired Term as if this Lease had continued in force, and (ii) the net rent for such period realized by Landlord by means of such re-letting. If Landlord's right of re-entry is exercised following abandonment, surrender or vacation of the Premises by Tenant or at any time after the Term has expired or been terminated, then Landlord shall have the right to consider any personal property left on the Premises to also have been abandoned and title thereto shall automatically transfer to Landlord without the necessity of a bill of sale and Landlord may, at its election, dispose of such personal property in any manner allowed by Applicable Law which Landlord, it its sole discretion, determines is appropriate, including, without limitation: (a) disposing of such personal property in the trash or a landfill; (b) giving such personal property to a charitable organization; and/or (c) storing and selling such personal property, and Tenant shall be liable for reimbursing Landlord for all of Landlord's reasonable costs for packing, removing, storing and/or selling the personal property left in the Premises after surrender or abandonment to the extent permitted by Applicable Law. Tenant agrees that the value of any personal property left in the Premises after Tenant's move-out has a value of $0. Surrender, abandonment, or judicial eviction shall end Tenant's right of possession for all purposes under this Lease and shall give Landlord the immediate right to: clean up, make repairs in, and re-let the Premises; determine any Security Deposit set-offs or deductions; remove abandoned property left on the Premises; and/or exercise any other of Landlord's Rights and Remedies.

27. **EMINENT DOMAIN.** If any portion of the Premises is condemned or expropriated by any governmental authority or title thereto is conveyed in lieu of condemnation ("*Eminent Domain*") in a manner that would prevent lawful occupancy of the

Tenant Name: Valerie Fahrnow    Albert Brynds    Page 13    Ashlyne Fahrnow    Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS, 66213
Lease-KS: 2018-01

remainder of the Premises, then this Lease shall be terminated effective as of the date of such taking, in which event Rent and other charges shall be prorated based upon such termination date and Landlord shall refund to Tenant any Rent or other charges paid in advance.  Unless this Lease is so terminated, Rent shall not abate. Landlord shall not be liable to Tenant for any damages, payments, amounts or compensation due or payable to Landlord as a result of Eminent Domain and Landlord shall be entitled to (and Tenant hereby assigns to Landlord) the entire award or compensation and any portion of any compensation awarded for the diminution in value of the leasehold interest or fee of the Premises.

28.  **CLEANING PRIOR TO MOVE-OUT.**  Tenant shall surrender the Premises to Landlord on the last day of the Term as clean as and otherwise in the same condition as when Tenant took possession of the Premises, normal wear and tear excepted. Prior to the last day of the Term, Tenant must thoroughly clean the entire Premises, all personal property and furniture belonging to Tenant must be removed and all debris removed and placed in appropriate garbage containers.  Tenant must follow any move-out cleaning instructions if provided.  If Tenant does not clean adequately, as determined in the reasonable discretion of Landlord, Tenant will be liable for reasonable cleaning charges.

29.  **MOVE-OUT INSPECTION.**  Tenant shall give Landlord prior notice of the date on which Tenant is moving out of the Premises, if prior to the last day of the Term (it being understood and agreed that such move-out notice will not release Tenant from liability for the remainder of the Term). Landlord's Agent will conduct a move-out inspection of the Premises upon expiration of the Term, it being understood and agreed that Landlord's Agent has no authority to bind or limit Landlord regarding set-offs or deductions for repairs, damages, or charges for items discussed during any move-out inspection, and any statements or estimates made by Landlord's Agent during or after any inspection are subject to correction, modification, or disapproval before Tenant is provided with final refunding or accounting.  Landlord encourages Tenant to take pictures of the interior and exterior of Premises at the move-out inspection to document the condition of the Premises.

30.  **ATTORNEYS' FEES.**  Intentionally deleted.

31.  **RENT AFTER NOTICE OR SUIT.**  After giving notice to vacate to Tenant, the service of notice or commencement of a suit (including eviction), or after final judgment for possession of the Premises, Landlord shall have the right to receive, accept and collect any Rent or other sums due, and the payment of such shall not waive or affect said notice, filing or judgment or diminish Landlord's Rights and Remedies, including right of eviction, or any other contractual or statutory right, as allowed by Applicable Laws.  Accepting money at any time does not waive Landlord's right to damages, or past or future Rent or other sums.

32.  **RECORDING.**  Tenant shall not record this Lease nor any memorandum hereof in the public records of any public office.  In the event that Tenant shall violate such no-recording prohibition, Landlord shall have the right to immediately terminate this Lease and to unilaterally record a termination notice in such public records.

33.  **GOVERNING LAW; TRIAL BY JURY; APPLICABLE LAWS.**  This Lease shall be governed, construed and interpreted by, through and in accordance with Kansas law, without reference to its conflict of law provisions. The parties agree that any suit or proceeding arising under this Lease shall be brought solely in a federal or state court serving the county in which the Premises is located.  Each party consents to the jurisdiction of these courts and waives any objection to jurisdiction or venue. EXCEPT TO THE EXTENT PROHIBITED BY APPLICABLE LAW, EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS LEASE. **Notwithstanding anything contained in this Lease to the contrary, in the event any of Landlord's rights, obligations or remedies contained in this Lease are subject to, inconsistent with or are prohibited by the terms of Applicable Laws, then each such provision shall automatically be deemed to have been modified and limited so that it complies with such Applicable Laws** (for example, if Applicable Law requires that Landlord perform an obligation within 3 days but the Lease states that it will be performed promptly, the 3-day period of time shall govern)**.** Likewise, nothing contained herein is intended to limit or interfere with any rights which are expressly granted to Tenant pursuant to Applicable Laws and which are considered by such Applicable Laws to be non-waivable by Tenant. In construing this Lease and the Right to Purchase Agreement, no provision hereof or thereof shall require the performance or waiver by Tenant of any applicable obligation or right that would violate Applicable Laws and any such provision shall be interpreted so as to comply therewith.

34.  **SEVERABILITY.**  If any clause, phrase, provision or portion of this Lease or the application thereof, including without limitation, to any person or circumstance, shall, for any reason and to any extent, be invalid or unenforceable under Applicable Laws, such event shall not affect, impair or render invalid or unenforceable, the remainder of this Lease nor any other clause, phrase, provision or portion hereof, nor shall it affect the application of any clause, phrase, provision or portion hereof to other persons or circumstances, but instead the remainder shall remain in full force and effect as though any invalid or unenforceable part was not

Tenant Name: _Valerie Fahrnow_____ _____Albert Brynds_____ Page 14 _Ashlyne Fahrnow_____ _____Mareck Muro_____

Premises Address: __12519 Connell Drive, Overland Park, KS, 66213____

Lease-KS:  2018-01

Case 21-20342    Doc# 18-1    Filed 04/21/21    Page 19 of 62



written into this Lease and shall be enforced to the maximum extent permitted by Applicable Laws.  The omission of initials on any page shall not invalidate this Lease.

35. **SURVIVAL.**  Notwithstanding anything contained in this Lease to the contrary, all of Landlord's rights and Tenant's outstanding payment obligations shall survive the expiration or earlier termination of this Lease, whether by lapse of time or otherwise, and shall not relieve Tenant from Tenant's obligations accruing prior to the expiration of the Term.

36. **CONSTRUCTION; SUCCESSORS; BINDING EFFECT.**  The words "Landlord" and "Tenant" wherever used herein shall be construed to mean "Landlords" and "Tenants" in case more than one person constitutes either party to this Lease. The covenants, obligations, conditions and agreements herein shall be binding upon and inure to the benefit of their respective successors, heirs, executors, administrators and permitted assigns.  The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

37. **NO WAIVER.**  All rights and remedies of Landlord provided herein shall be cumulative, the exercise or use of any one or more shall not bar Landlord from the exercise or use of any other right or remedy provided herein or otherwise provided by law nor shall the exercise of any right waive any other right or remedy of Landlord. No waiver of a breach or default by either party shall be deemed a continuing waiver and no indulgence, waiver, election or non-election by Landlord under this Lease or the Right to Purchase Agreement shall affect Tenant's or Purchase Right Holder's duties and liabilities hereunder or under the Right to Purchase Agreement, as the case may be. Failure of Landlord to declare any default immediately upon its occurrence, or delay of Landlord in taking any action or pursuing remedies in connection with an event of default shall not constitute a waiver of such default, nor shall it constitute an estoppel against Landlord nor a waiver with respect to any subsequent default. The acceptance by Landlord of Rent hereunder shall not be construed to be a waiver of any breach by Tenant of any term, covenant or condition of this Lease.  No act or omission by Landlord or Landlord's Agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such a surrender shall be valid unless in writing and signed by Landlord. Except when notice or demand is required by statute, Tenant waives any notice and demand for performance from Landlord if Tenant defaults under this Lease.  Landlord's exercising one remedy will not constitute an election or waiver of any other of Landlord's Rights and Remedies.

38. **ATTORNEY REVIEW.  Tenant acknowledges that (a) it has received a copy of the Right to Purchase Agreement and that it is familiar with the terms thereof, (b) certain terms and provisions of the Right to Purchase Agreement may affect Tenant's rights under this Lease (and vice versa) and (c) Tenant has had an adequate opportunity to read and study this Lease and the Right to Purchase Agreement (and associated documents) and to consult with legal counsel if Tenant so desired.  Accordingly, the terms of this Lease and the Right to Purchase Agreement are not to be construed against any party because of that party's role in drafting such documents nor construed in favor of any party because that party failed to understand the legal effect of the provisions of such documents.**

39. **NOTICES.**  Except as otherwise provided elsewhere in this Lease, all notices permitted or required under this Lease shall be in writing and shall be served by one party to the other party (each, a "*Notice*") at the addresses set forth below. **If notice is required to be given to Landlord, notice must be sent to both Landlord and Landlord's Agent at the addresses set forth below**.  Notice shall be given in the following manner (or otherwise as permitted by Kansas law): (i) by personal delivery of such Notice (in which event such Notice shall be effective on the date of such delivery); (ii) in the case of Notice to Tenant, Landlord shall have the right to post the Notice upon the front door of the Premises and mail a copy if required by Applicable Law (in which event such Notice shall be effective on the date of such delivery); (iii) in any other manner permitted by Applicable Law; (iv) by mailing the Notice to the addresses contained herein by U.S. regular, registered or certified mail, return receipt requested (in which event such notice shall be effective three (3) Business Days after the date of mailing); (v) by facsimile transmission in which event it shall be effective as of date and time of delivery thereof provided that the Notice transmitted shall be received on a Business Day and during Business Hours and in the event such Notice is received either on a non-Business Day or during non-Business Hours, then the effective date and time of delivery of such Notice shall be 9:00 a.m. **Central Time** of the first Business Day after delivery; (vi) by electronic mail transmission in which event it shall be effective as of the date and time of the electronic mail transmission, provided that the Notice transmitted shall be sent on a Business Day during Business Hours and recipient shall have acknowledged such transmission (or it can be shown that the transmission was opened by the recipient).  In the event an electronic mail transmission Notice is transmitted either during non-Business Hours or a non-Business Day, the effective date and time of Notice shall be 9:00 a.m. **Central Time** of the first Business Day after delivery; or (vii) by a nationally-recognized overnight delivery or courier company (e.g., FedEx) in which event such Notice shall be effective one (1) Business Day after the date of deposit with the courier, shipping prepaid. In addition to the foregoing delivery options, notices from Landlord may be delivered to Tenant via a link to Landlord's portal.

Tenant Name: Valerie Fahrnow          Albert Brynds          Page 15  Ashlyne Fahrnow          Mareck Muro
Premises Address:  12519 Connell Drive, Overland Park, KS 66213
Lease-KS:  2018-01

Notices to Landlord shall be sent to Landlord's Notice Address in Section 1.C and Notices to Tenant shall be addressed to the Tenant Notice Recipient and sent to the Premises; provided, however, that if a physical mailing address other than the Premises is inserted in Section 1.H as Tenant's Notice Address, then such address shall be used solely for the mailing by U.S. regular mail of an informational copy of Notices otherwise sent to the Premises, it being agreed that Landlord's failure to send such informational copy shall not affect the effectiveness of Notices sent to the Premises or otherwise delivered in accordance with this Section. The person identified as the Tenant Notice Recipient in Section 1.I is authorized to deliver and accept Notices on behalf of all Tenants and Occupants pursuant to Section 25 above. THERE SHALL BE ONLY ONE DESIGNATED TENANT NOTICE RECIPIENT.

Unless otherwise designated by notice to Tenant, (a) Pathlight Property Management, identified in Section 1.C., is the person or entity authorized to manage the Premises on behalf of Landlord, and (b) the following address is to be used for service of process on Landlord (however, copies shall also be given as otherwise required by this Section 39):

Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware  19808

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this Section (or, in the case of notices to Tenant Notice Recipient, where an informational copy is to be sent) by written notice thereof to the other party.  Written notice from Landlord, Landlord's Agent or Landlord's attorney shall constitute notice from Landlord. Any person giving a notice under this Lease should retain a copy of the memo, letter, or facsimile document that was given. Facsimiles and portable document format (pdf) signatures are binding. All notices must be signed (if by email, signature may be typed within the email).  Tenant must give Landlord Tenant's forwarding address in writing within five (5) days after the Expiration Date.

40.  **DESCRIPTIVE HEADINGS; ENTIRE AGREEMENT; MODIFICATION.** The descriptive headings used herein are for convenience of reference only, and they are not intended to have any effect whatsoever in determining the rights or obligations of the Landlord or Tenant. This Lease, together with any Addenda and attachments hereto which are by this reference incorporated herein and made a part hereof, the Right to Purchase Agreement, the Document Review Acknowledgment signed by Tenant, together with any other written documents signed by Landlord and/or Tenant and delivered to the other, constitute the complete and entire agreement among the parties with respect to the Premises, and no representations or oral statements of either party are binding unless contained herein or therein; however, the statements made and information contained in Tenant's lease application shall be considered material representations in this Lease such that any omissions or misrepresentations therein shall be considered a default of this Lease by Tenant. Neither Landlord nor any of Landlord's Agents has made any oral or other promises, representations, or agreements except to the extent contained in this Lease, the Right to Purchase Agreement, the Document Review Acknowledgment and any other written documents signed by Landlord and delivered to Tenant. Landlord's Agents have no authority to waive, amend, or terminate this Lease or the Right to Purchase Agreement or any part of either and no authority to make promises, representations, or agreements that impose security duties or other obligations on Landlord or Landlord's Agents unless in each instance such authority is in writing from Landlord. Landlord and Tenant expressly agree that except as otherwise provided by Applicable Laws, there are and shall be no implied warranties of merchantability, suitability, fitness for a particular purpose or of any other kind arising out of this Lease or the Premises, and that there are no warranties which extend beyond those expressly set forth in this Lease. This Lease and the Right to Purchase Agreement and other written documents signed by Landlord and/or Tenant pertaining to the Premises shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto and thereto, as applicable.

41.  **RIGHT TO PURCHASE AGREEMENT**.  Notwithstanding anything contained in this Lease to the contrary, (a) Tenant authorizes and directs Landlord to apply a credit against the Purchase Price for the benefit of the Purchaser at Closing (in the event the Premises are sold as a result of the exercise of the Purchase Right contained in the Right to Purchase Agreement), in an amount equal to (i) the pro-rated amount of pre-paid Rent owing to Tenant under this Lease based upon the Closing Date, if any, plus (ii) any remaining Security Deposit then being held by Landlord as of the date of Closing (subject to permitted setoffs), plus (iii) any pet fees paid by Tenant under this Lease, in each of the foregoing cases to the extent same would otherwise be due and owing to Tenant under this Lease; provided, however, that if all (but not less than all) of the persons who comprise Tenant collectively direct Landlord, in writing delivered at least five (5) days prior to the scheduled Closing Date, that any or all of such amounts not be applied against the Purchase Price, then Landlord shall comply with such direction; (b) the Term of this Lease may be extended pursuant to the terms of the Right to Purchase Agreement; and (c) this Lease shall automatically terminate and expire on the date on which the sale of the Premises is consummated pursuant to the Right to Purchase Agreement or Executed Purchase Contract, as applicable, and such Closing Date shall, for all purposes under this Lease, be deemed to be the last day of the Term of this Lease.

Tenant Name: Valerie Fahrnow          Albert Brynds          Page 16 Ashlyne Fahrnow          Mareck Muro
Premises Address: _12519 Connell Drive Overland Park, KS 66213_
Lease-KS:  2018-01



Tenant specifically waives any right it may have to a return of the Security Deposit, pet fees or pre-paid Rent so long as same are paid or credited to the Purchaser at Closing as set forth in the immediately preceding paragraph or are otherwise applied by Landlord as permitted by this Lease, and hereby irrevocably assigns to the Purchase Right Holder and/or the Purchaser under the Right to Purchase Agreement or the Executed Purchase Contract, as applicable, any and all rights Tenant may have thereto, it being understood and agreed that any amounts credited against the Purchase Price as aforesaid shall automatically be deemed to have been returned to the Tenant under this Lease and Landlord shall have no further obligation to account to Tenant for same under this Lease. Furthermore, Landlord shall have the absolute right to terminate the Right to Purchase Agreement upon a default by Tenant hereunder which is not cured within any applicable notice or cure periods. Likewise, a default by the Purchase Right Holder and/or the Purchaser, as applicable or a termination of the Right to Purchase Agreement or the Executed Purchase Contract shall constitute a default under this Lease and Landlord shall have the right (but not the obligation) to exercise any of Landlord's Rights and Remedies.

42. **NO THIRD PARTY BENEFICIARIES.** This Lease does not create any rights, claims or benefits inuring to any person or entity that is not a party to this Lease, nor does it create or establish any third party beneficiary to this Lease. Tenant shall not be a third party beneficiary of any agreements entered into by Landlord which may affect the Premises.

43. **NON-TERRORIST REPRESENTATION.** Each person or entity constituting Tenant by its execution of this Lease certifies that he/she has not been nor will be designated or named as a terrorist, a "Specially Designated National and Blocked Person," or any other banned or blocked individual or entity pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website. Any violation of this Section shall constitute a default under this Lease. Tenant shall defend, indemnify, and hold harmless the Landlord Indemnitees from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any current or future breach of the foregoing certification.

44. **POSSESSION; AGREEMENT EFFECTIVENESS; NO OFFER.** In the event Landlord cannot deliver possession of the Premises to Tenant upon the Estimated Commencement Date identified in Section 2.F, then Landlord shall have no liability to Tenant, but Rent shall abate until possession is given and the Commencement Date and Expiration Date shall automatically be extended for such additional period of time until possession can be given to Tenant; provided, however, that if (a) Landlord is unable to deliver possession of the Premises to Tenant within thirty (30) days after the Estimated Commencement Date (and such delay was not caused by Landlord's performance of Landlord Work, Repair & Maintenance Work or other work requested by Tenant and agreed to by Landlord in writing) or (b) Landlord has not acquired title to the Premises within 30 days after the Estimated Commencement Date (it being understood and agreed that Landlord's obligations under this Lease are expressly contingent upon Landlord acquiring title to the Premises prior to the expiration of such 30-day period), then Landlord and Tenant shall each have the right to terminate this Lease and the Right to Purchase Agreement (but not one without the other) upon notice to the other delivered after the 30th day after the Estimated Commencement Date but prior to Landlord's actual delivery of the Premises to Tenant, in which event this Lease and the Right to Purchase Agreement shall each be deemed to have been void *ab initio* (to have never been of any force or effect), neither party shall have any further obligation to the other hereunder or thereunder, and any Security Deposit and prepaid Rent shall be promptly refunded to Tenant, except as otherwise provided in the Document Review Agreement to the contrary. Notwithstanding the foregoing to the contrary, it is understood that if Landlord has not acquired title to the Premises based upon Tenant's indication that it has withdrawn or revoked (or attempted to withdraw or revoke) this Lease or the RTP Agreement prior to their full execution and delivery (or thereafter but prior to the Commencement Date), whether or not same is prohibited by the terms thereof, then Landlord shall be entitled to retain the Deposit described in the Document Review Acknowledgment.

Landlord has delivered a copy of this Lease to Tenant for Tenant's review only, and the delivery hereof does not constitute an offer or an option to Tenant. **Notwithstanding anything contained in this Lease to the contrary, the submission of this Lease to Landlord, executed on behalf of Tenant, shall constitute an irrevocable offer to Landlord to enter into this Lease which may be accepted by Landlord within fifteen (15) days after Tenant's submission thereof to Landlord, and Tenant shall not have the right to terminate this Lease nor revoke its offer within such 15-day period.**

**Landlord has made or will be making an offer to purchase the Premises in reliance upon Tenant's having submitted a signed copy of this Lease and the Purchase Right Holder having submitted a signed Right to Purchase Agreement to Landlord**. Tenant acknowledges that Landlord shall have incurred significant costs in an attempt to purchase (or the actual purchase of) the Premises in material reliance upon such irrevocable offer. As such, in the event Tenant or the Purchase Right Holder changes its mind or attempts to revoke or terminate this Lease or the Right to Purchase Agreement prior to the last to occur of (i) the full execution and delivery of this Lease and the Right to Purchase Agreement by Landlord and (ii) Landlord's acquisition of title to the Premises, then if Landlord agrees to a termination of Tenant's irrevocable submission of this Lease and the Right to Purchase Agreement to Landlord within such 15-day period (it being understood and agreed that Landlord shall have no obligation to so agree

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 22 of 62



in either event), Landlord shall have the right to retain the Deposit made by Tenant pursuant to the Document Acknowledgement Agreement (regardless of whether or not same is deemed to be prepaid Rent, Security Deposit or otherwise) to reimburse Landlord for the out-of-pocket costs and expenses incurred by Landlord in connection with purchasing or attempting to purchase the Premises (including but not limited to inspection costs, third party professional costs, closing costs, rehabilitation costs of the Premises, attorneys' fees and the like, as same may more particularly be described in the Document Review Acknowledgment, collectively, the "*Termination Costs*"), and to the extent that amount of the Deposit retained by Landlord exceeds the aggregate amount of the Termination Costs, such difference shall be deemed to be liquidated damages to compensate Landlord for the loss of its bargain. The parties acknowledge and agree that the amount of Landlord's actual damages in such circumstance would be difficult, if not impossible, to determine and that the amount of the Deposit in excess of Termination Costs is a reasonable estimate of Landlord's damages and not a penalty. Except for the rights and obligations of Landlord and Tenant contained in Paragraph 21 of the Right to Purchase Agreement, this Section and the obligations contained in the Document Review Acknowledgment (which shall all become binding against Tenant and Purchase Right Holder upon their execution and submission to Landlord of this Lease, the Right to Purchase Agreement and the Document Review Acknowledgment, whether or not they are accepted by Landlord or if accepted, later terminated), this Lease (and the Right to Purchase Agreement) shall not otherwise become effective against Landlord until this Lease and the Right to Purchase Agreement have been executed by Landlord and Tenant or Purchase Right Holder, as applicable, and a fully executed copy of each is delivered to Tenant and the Purchase Right Holder, as applicable.

45. **PRIVACY STATEMENT**. By executing this Lease, Tenant hereby (a) reaffirms its consent to be bound by Landlord's Privacy Statement which can be found at www.homepartners.com ("*Site*"), as same may be modified from time to time ("*Privacy Statement*"), (b) consents to the collection and use by Landlord and Landlord's Agents (on Landlord's behalf) of Tenant's personally identifiable information ("*Personal Information*") whether via use of the Site, provided offline to or obtained by Landlord (e.g., a paper lease application, social security number, information contained in a credit or employment history check, etc.) and (c) expressly authorizes Landlord to use and/or disclose Personal Information for any of the following reasons: (i) to communicate with Tenant, (ii) to share or use such Personal Information to process and verify information contained in Tenant's lease application, to perform background and credit checks, and to enforce this Lease, the Right to Purchase Agreement and other Tenant obligations, (iii) promotional or marketing purposes, (iv) to share such Personal Information with Landlord's Agents, affiliates or third parties in connection with the business purposes of Landlord, the Site or the Premises, (v) as required or permitted by Applicable Laws in the event of a criminal investigation, suspected illegal activity or as requested by government or regulatory authorities, (vi) in connection with an acquisition, financing, merger, restructuring, sale or other transfer involving the Premises, this Lease or all or any portion of Landlord's business and/or (vii) for other business purposes of Landlord. If Tenant does not wish to receive future commercial email messages from Landlord, it may opt out of receiving such commercial email messages by following the link and instructions provided in the Site or in such email messages, which opt-out right applies to commercial email messages only.

46. **REPRESENTATIONS IN APPLICATION FOR LEASE**. This Lease has been entered into in reliance on the information given by Tenant on Tenant's application for Lease which information is made a part of this Lease by this reference. Tenant shall promptly advise Landlord in writing of any changes to the information contained in the application. If any of Tenant's material representations are found to be misleading, incorrect, untrue or omitted, it shall constitute a default under this Lease and Landlord shall have the right to immediately terminate this Lease and require Tenant to vacate the Premises, to the extent permitted by Applicable Law.

[remainder of page intentionally left blank]

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

47. **ORIGINALS AND ATTACHMENTS.** This Lease has been executed in multiple originals, each with original signatures. When the Condition Form is completed, both Tenant and Landlord should retain a copy. The items checked below are attached to this Lease and are incorporated herein by this reference and are binding upon the parties even if not initialed or signed:

☒ Attachment A (Utilities & Services)
☒ Attachment B (State and Federal Disclosures)
☒ Crime Free Lease Addendum
☒ Utilities Transfer Authorization
☒ Pet Addendum
☒ Condition Form (to be provided on or about the Commencement Date)
☐ HOA Rules and Related Documents
☐ Rules and Regulations
☒ Renovation Addendum For Landlord Work
☒ Repair, Maintenance & Improvement Addendum
☒ Mold Addendum
☒ Commencement Date Notification (form attached)
☐ Other:_____

In Witness Whereof, the parties have executed this Lease, intending to be legally bound thereby, effective as of the date set forth after Landlord's signature below as the Effective Date.

**Tenant:**

Name: Valerie Fahrnow

Name: Albert Brynds

Name: Ashlyne Fahrnow

Name: Mareck Muro

**Landlord:**

HPA US1 LLC_____,
a Delaware limited liability company

By: kara Barford
Name: _____

Title:  Authorized Agent

"*Effective Date*":  4/15/2019
_____

Tenant Name:  Valerie Fahrnow          Albert Brynds     Page 19  Ashlyne Fahrnow          Mareck Muro
Premises Address:  12519 Cornell Drive, Overland Park, KS  66213
Lease-KS:  2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 24 of 62

## ATTACHMENT A

## UTILITIES & SERVICES

**Excluded Utilities & Services\*** (Tenant's responsibility and expense) (check all that apply):

- ☒ Electricity
- ☒ Gas/Heating fuel
- ☒ Window and Door storms & screens replacement, except to the extent performance of same is required by Landlord pursuant to Applicable Law
- ☒ Pest control (interior and exterior), except to the extent performance of same is required by Landlord pursuant to Applicable Law
- ☒ Furnace/HVAC - supply and change heating and air conditioning filters at least once a month
- ☒ Water service
- ☒ Sewage disposal service
- ☒ Rubbish removal
- ☒ Regular lawn mowing
- ☒ Landscape maintenance which includes, but is not limited to, lawn mowing, removing weeds and debris, fertilizing, mulching and trimming all lawns, shrubbery, flowers, trees and other landscaping and foliage
- ☒ Snow and ice removal and salting, as necessary
- ☒ Replacement with working batteries in smoke/carbon monoxide detectors no less than every 6 months
- ☒ Replacement of light bulbs, as needed
- ☒ Day-to-day maintenance and repairs but excluding any repairs required to be made by Landlord pursuant to Applicable Laws
- ☐ Other: _____

\* To the extent Excluded Utilities & Services are included within HOA dues or fees (if applicable), Tenant shall not be responsible for the separate payment thereof.

**Included Utilities & Services** (Landlord's responsibility and expense) (check all that apply):

- ☒ All Taxes relating to the Premises, including Water & Sewer Taxes
- ☒ HOA dues or fees (if any)\*
- ☒ Furnace/HVAC cleaning and servicing (if Landlord elects to perform same, which it shall not be obligated to do)
- ☒ Storms & Screens replacement, but only to the extent Applicable Law requires same to be performed by Landlord
- ☒ Pest control (interior and exterior), but only to the extent Applicable Law requires same to be performed by Landlord
- ☒ Any repairs required to be made by Landlord pursuant to Applicable Laws (except as otherwise provided in the Lease, Right to Purchase Agreement or the Executed Purchase Contract)
- ☐ Other: _____

Tenant Name: Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro
Premises Address: 12519 Cornell Drive, Overland Park, KS 66213
Lease-KS: 2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 25 of 62

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

**ATTACHMENT B**

**STATE (KANSAS) AND FEDERAL PURCHASE AND LEASE DISCLOSURES**

1.  ASBESTOS:  If the Premises was constructed before 1981, it may contain asbestos-containing materials.  If checked, Landlord has provided Tenant with an Asbestos Addendum disclosing any information known by Landlord regarding the location and condition of asbestos actually known to exist in the Premises.  Tenant may not disturb in any manner any areas noted in any Asbestos Addendum.

    ☐ **Check** if Premises was built before 1981.

    ☐ _____ **Check** and **Tenant to initial** if Landlord provided Tenant with an Asbestos Addendum.

2.  LEAD WARNING STATEMENT:  Housing built before 1978 may contain lead-based paint. Lead-based paint, paint chips, and dust can pose health hazards if not maintained properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, (i) landlords must disclose in writing the presence of known lead-based paint and/or lead-based paint hazards in the Premises in an owner's "Disclosure of Information on Lead-Based Paint and/or Lead Based Hazards" and (ii) tenants must also receive a federally-approved EPA information pamphlet "Protect Your Family From Lead in Your Home" on lead poisoning prevention (jointly, "**Lead Disclosures**").  Note to Tenant and Landlord: Waiver of Statutory and Lead Disclosures is prohibited by Law.

    ☐ Check if Premises was built before 1978.

    ☐ _____ **Check** and **Tenant to initial** if Tenant acknowledges that it received both of the Lead Disclosures from Landlord prior to the Commencement Date.

    *"Every tenant of a residential dwelling that was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning.*

    *Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impair memory. Lead poisoning also poses a particular risk to pregnant women.*

    *The owner of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the owner's possession and notify the tenant of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase."* (24 CFR 35.80 et seq. & 42 USC 4852d).

3.  RADON GAS NOTIFICATION: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building, in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Kansas.  Additional information regarding radon and radon testing may be obtained from your county public health unit.

4.  HOMEOWNERS' ASSOCIATION:

    ☐ **Check** if Premises is located within an HOA.  See Section 3 of the Lease for additional HOA provisions.

5.  See Commencement Date Notification and the Right to Purchase Agreement for additional disclosures which may have been provided to and acknowledged by Tenant.

    ☐ _____ **Check** and **Tenant to initial** if Landlord provided Tenant with a Seller's Disclosure Statement for Residential Property.

Tenant Name: _Valerie Fahrnow_          _Albert Brynds_          _Ashlyne Fahrnow_          _Mareck Muro_

Premises Address: _12519 Connell Drive, Overland Park, KS, 66213_

Lease-KS:  2018-01

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

**FOR PURPOSES OF THIS <u>ATTACHMENT B</u>, REFERENCES TO TENANT SHALL INCLUDE THE PURCHASE RIGHT HOLDER.**

**THE UNDERSIGNED ACKNOWLEDGES HAVING RECEIVED AND READ THE FOREGOING LIST OF DISCLOSURES AS WELL AS HAVING RECEIVED ANY SEPARATE DISCLOSURES REFERENCED IN THIS <u>ATTACHMENT B</u> AS OF ___4/15/2019_____.**

**Tenant:**

_____
Name: ___Valerie Fahrnow_____

_____
Name: ___Albert Brynds_____

_____
Name: ___Ashlyne Fahrnow_____

_____
Name: ___Mareck Muro_____

**Landlord:**

_HPA US1 LLC_____,
a Delaware limited liability company

By:_____

Name: _____

Title:  Authorized Agent

---

Tenant Name:  Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro
Premises Address:  12519 Connell Drive, Overland Park, KS, 66213
Lease-KS:  2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 27 of 62

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

**CRIME FREE LEASE ADDENDUM**

As part of the consideration for the execution or renewal of a lease of the Premises identified in the Residential Lease Agreement ("*Lease*") among the undersigned parties to which this Crime Free Lease Addendum ("*Crime Free Addendum*" or "*Addendum*") is attached, in addition to all other terms of the Lease, Landlord and Tenant hereby agree that this Crime Free Addendum expressly amends the Lease as follows:

1. Tenant covenants and agrees that each Occupant:

   a. Shall not engage in any criminal activity or violation of local municipal code or any other violations as defined by local, state or federal law, including drug-related criminal activity, on, near or off the Premises. Drug related criminal activity shall mean the illegal manufacture, sale, distribution, use, possession and possession with intent to manufacture, sell, distribute, or use an illegal or controlled substance (also as defined in § 102 of the Controlled Substance Act [21 U.S.C. 802]).

   b. Shall not engage in any act that is intended to facilitate any criminal activity or violation of local municipal ordinances or any other violations as defined by any local, state or federal law and/or obstruct or resist law enforcement's efforts against criminal activity on, near or off the Premises.

   c. Shall not permit the Premises to be used for or to facilitate any violations of Applicable Laws.

   d. Shall not engage in the unlawful manufacturing, selling, using, storing, keeping or giving of an illegal or controlled substance as defined in any Applicable Laws, at any locations, whether on, near or off the Premises.

   e. Shall not engage in any illegal activity, including, but not limited to prostitution, criminal street gang activity, threatening or intimidating acts, the unlawful discharge of a weapon on, near or off the Premises, or any breach of the Lease that otherwise jeopardizes the health, safety and welfare of Landlord, Landlord's Agents, or any person or Occupant, or involving risk of imminent or actual damage to person or property.

   To the maximum extent not prohibited by Applicable Laws, Tenant agrees to be responsible for the actions of all Occupants, regardless of whether Tenant knew or should have known about any such actions.

2. *VIOLATION OF ANY OF THE PROVISIONS CONTAINED IN PARAGRAPH 1 ABOVE SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE LEASE AND SHALL CONSTITUTE GOOD CAUSE FOR IMMEDIATE TERMINATION OF THE LEASE, TENANT'S TENANCY AND EVICTION FROM THE PREMISES.* It is understood and agreed that a single violation of any of the provisions of this Addendum shall be deemed to constitute a serious, material and irreparable breach of the Lease for which no notice or opportunity to cure shall be required to be given and that such violation shall constitute good cause for immediate termination of the Lease or the exercise of other Landlord's Rights and Remedies. Unless otherwise provided by law, proof of violation shall not require a criminal conviction, but shall only require a preponderance of the evidence.

3. Tenant hereby authorizes Landlord and Landlord's Agents to use police-generated reports and/or business records as a hearsay exemption against Tenant and agrees that same shall constitute reliable, direct evidence in all eviction hearings and other litigation matters.

4. This Addendum is incorporated into the Lease as though fully set forth therein. In case of conflict between the provisions of this Addendum and any provisions of the Lease, the provisions of this Addendum shall govern. Capitalized terms used in this Addendum which are not otherwise defined herein shall have the meanings ascribed thereto in the Lease. This Addendum may be executed in one or more counterparts, each of which shall be deemed an original. The Lease, as amended by this Addendum, shall continue in full force and effect, subject to the terms and provisions thereof. This Addendum shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the Effective Date of the Lease.

**Tenant:**

Name: _Valerie Fahrnow_

Name: _Albert Brynds_

Name: _Ashlyne Fahrnow_

Name: _Mareck Muro_

**Landlord:**

_HPA US1 LLC_ ,
a Delaware limited liability company

By: _kara Barford_

Name: _____

Title: Authorized Agent

Tenant Name: _Valerie Fahrnow_    _Albert Brynds_    _Ashlyne Fahrnow_    _Mareck Muro_

Premises Address: _12519 Connell Drive, Overland Park, KS 66213_

Lease-KS: 2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 28 of 62

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

## UTILITIES TRANSFER AUTHORIZATION

As part of the consideration for the execution or renewal of a lease of the Premises identified in the Residential Lease Agreement ("*Lease*") to which this Utilities Transfer Authorization ("*Utilities Authorization*") is attached, in addition to all other terms of the Lease, Landlord and Tenant hereby agree as follows:

If Tenant fails to transfer accounts for utilities and services for which Tenant is responsible under the Lease (i.e., Excluded Utilities & Services) into the name of one or more of the persons who constitute Tenant **within 72 hours of the Commencement Date**, the same shall constitute a default under the terms of the Lease, and Tenant hereby unconditionally authorizes Landlord and its representatives to do so on Tenant's behalf (in the name of one or more of the persons who constitute Tenant, in Landlord's discretion) and to provide any information and take any actions necessary to do so.

Tenant agrees that if Tenant fails to timely pay for all Excluded Utilities, Landlord shall have the right, but not the obligation, to pay them on Tenant's behalf, and such payment shall not be considered a waiver under any circumstances under the Lease, but any and all such payments made by Landlord on Tenant's behalf shall be considered Additional Rent to be included with Tenant's next Monthly Base Rent payment due and payable in accordance with the terms of the Lease.

This Utilities Authorization is attached to and incorporated into the Lease as though fully set forth therein.  In case of conflict between the provisions of this Utilities Authorization and any provisions of the Lease, the provisions of this Utilities Authorization shall govern.  Capitalized terms used in this Utilities Authorization which are not otherwise defined herein shall have the meanings ascribed thereto in the Lease. This Utilities Authorization shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the undersigned has executed this Utilities Authorization as of _____4/15/2019_____ with respect to the Premises located at: _12519 Connell Drive, Overland Park, KS, 66213_____.

**Tenant:**

DocuSign by:
Name: Valerie Fahrnow

DocuSign by:
Name: Albert Brynds

DocuSign by:
Name: Ashlyne Fahrnow

DocuSign by:
Name: Mareck Muro

**Landlord:**

_HPA US1 LLC_____,
a Delaware limited liability company

DocuSigned by:
By:_kara Barford_____
Name: _B15997C2DF1E4AE..._____

Title:  Authorized Agent

Tenant Name: Valerie Fahrnow        Albert Brynds        Ashlyne Fahrnow        Mareck Muro
Premises Address: _12519 Connell Drive, Overland Park, KS, 66213_
Lease-KS: 2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 29 of 62

# PET ADDENDUM

As part of the consideration for the execution or renewal of a lease of the Premises identified in the Residential Lease Agreement ("*Lease*") to which the undersigned Landlord and Tenant are parties and to which this Pet Addendum to Residential Lease Agreement ("*Pet Addendum*") is attached, Landlord and Tenant hereby agree that this Pet Addendum expressly amends the Lease. Landlord and Tenant each hereby agrees to the following rules and regulations regarding the presence of pets in or around the Premises.

1.  Tenant agrees that only the pets listed and named below will occupy the Premises at any time. No additional, replacement or different pets are allowed. Only a combined maximum number of three (3) pets are allowed on the Premises at any time, each must be a non-aggressive breed and all must weigh less than 180 pounds in total combined weight. Any dog which is one of or a mix of the following breeds is expressly prohibited from being on the Premises: Rottweiler, Pit Bull, Doberman or Mastiff. Any pet that demonstrates aggressive behavior toward an individual or another animal shall be promptly and permanently removed from the Premises and failure to do so could result in legal action.

2.  Tenant shall abide by all Applicable Laws, insurance requirements and HOA Rules with respect to pets (including but not limited to licensing and shot requirements), and agrees that pets will not cause: danger, damage, nuisance, noise, health hazard or soil the Premises, grounds, or landscaping in or around the Premises. Tenant hereby accepts full responsibility and liability for any damage, injury or actions arising from or caused by the pets (both to the interior and exterior of the Premises). Tenant shall be responsible for ensuring that the pets do not damage property (including the Premises and property of others) and Tenant shall be solely responsible for all costs involved to restore same to the original undamaged condition, it being agreed that if same cannot be repaired or restored, then Tenant agrees to pay the full cost of replacement. Tenant shall be responsible for preventing the pets from engaging in behaviors or creating excessive noise at levels that may disturb neighbors including, but not limited to, barking, jumping, and running off-leash. Pets must be restrained or confined whenever a service call is requested or whenever it is likely to limit or prohibit Landlord or Landlord's Agents or others access to the Premises as permitted by the Lease. Landlord reserves the right to require that Tenant purchase and maintain dog bite liability insurance if Landlord has approved a dog at the Premises (other than a service or assistance animal).

3.  If there is reasonable cause to believe an emergency situation exists with respect to a pet and if reasonable efforts to contact Tenant are unsuccessful, Landlord or Landlord's Agents shall have the right to contact the local animal control authority and assist its staff in entering the home. Examples of an emergency situation include suspected abuse, abandonment, fire or other disaster, or any prolonged disturbance. If it becomes necessary for the pet to be boarded, all costs incurred will be the sole responsibility of Tenant.

4.  As a condition of Landlord consenting to Tenant having the pet(s) identified in this Pet Addendum at the Premises, Tenant agrees to pay a **$300.00 pet fee for each pet**. Tenant acknowledges that allowing pets to occupy the Premises will, of necessity, cause Landlord to incur additional cleaning and related expenses over and above normal expenses. The initial pet fee shall be due and payable on or before the Commencement Date or the date that the pet is first brought into the Premises, if after the Commencement Date. **The pet fee is non-refundable and shall be deemed to have been earned upon payment**, unless the Purchase Right Holder exercises the Purchase Right and purchases the Premises in accordance therewith, in which case (a) amounts paid by Tenant as a pet fee under this Lease shall be given as a credit against the Purchase Price at the Purchase Contract Closing (as such term is defined in the Right to Purchase Agreement) and (b) any damage to the Premises caused by the pets shall be deemed to have been caused by and accepted by Tenant, Purchase Right Holder and Purchaser, as the case may be, and neither Seller nor Landlord shall be responsible for repairing same. Landlord shall have the right, in accordance with Applicable Laws, to deduct from the Security Deposit the cost of repairing any damage caused to the Premises by any animals or pets during the Term which shall include, but not be limited to, the cost to professionally treat the Premises (interior and exterior) for fleas, ticks and the like if there is reasonable evidence of pet damage, repaint and clean carpets and window treatments, in each case with contractors selected by Landlord. Neither the amount of the pet fee nor Security Deposit shall limit Tenant's liability for damages as a result of such pets under the terms of this Pet Addendum or the Lease nor waive any of Landlord's Rights and Remedies.

5.  In the event of a violation of this Pet Addendum or any agreement in the Lease pertaining to pets or animals, Landlord shall have the right to take any or all of the following actions: (a) declare Tenant to be in default of this Pet Addendum and the Lease and exercise Landlord's Rights and Remedies including but not limited to termination of the Lease, (b) charge Tenant, as Additional Rent, an initial amount of $60.00 for the first day and $25.00 per day thereafter per pet for each day that such violation exists, (c) terminate this Pet Addendum (and Tenant's right to have a pet at the Premises) and require Tenant to immediately remove or cause to be removed the applicable pet from the Premises, with such removal time to depend on the severity of the situation, but in no event more than three (3) days after notice from Landlord, and/or (d) if Tenant fails to have the pet removed pursuant to (c), Landlord may remove or cause to be removed such pet from the Premises and deliver it to appropriate local authorities by

Tenant Name: <u>Valerie Fahrnow</u>     <u>Albert Brynds</u>     <u>Ashlyne Fahrnow</u>     <u>Mareck Muro</u>
Premises Address: <u>12519 Connell Drive, Overland Park, KS, 66213</u>
Lease-KS: 2018-01

providing at least 24 hours' prior notice to Tenant of Landlord's intention to remove the unauthorized pet; and (e) charge Tenant Landlord's cost to remove any unauthorized pet, exterminate the Premises for fleas and other insects, clean and deodorize the carpets and drapes located in the Premises and repair any damage to the Premises caused by the unauthorized pet (including repainting if necessary). When taking any action under this Pet Addendum (including this Paragraph 5), Landlord shall not be liable for any harm, injury, death or sickness to any pet.

6.  Tenant agrees that even if no pets occupy the Premises upon execution of the Lease, if a pet is brought onto the Premises at any time, the above conditions apply and Tenant shall be obligated to immediately notify Landlord of same and execute a new copy of this Pet Addendum.

7.  Notwithstanding anything to the contrary contained herein, no pet rent, pet fee or deposit shall be required under this Pet Addendum to the extent same is prohibited under the Americans with Disabilities Act, the Fair Housing Act or other Applicable Laws with respect to a "service or assistance" or similar animals. Landlord reserves the right to require that such service or assistance animal be governed by a separate agreement in accordance with Applicable Laws.

8.  This Pet Addendum is incorporated into the Lease as though fully set forth therein. In case of conflict between the provisions of this Pet Addendum and any provisions of the Lease, the provisions of this Pet Addendum shall govern. Capitalized terms used in this Pet Addendum which are not otherwise defined herein shall have the meanings ascribed thereto in the Lease. This Pet Addendum may be executed in one or more counterparts, each of which shall be deemed an original. The Lease, as amended by this Pet Addendum, shall continue in full force and effect, subject to the terms and provisions thereof. This Pet Addendum shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**Type of House Pet Description** (identify if House Dog or House Cat and if the animal is neither, it must be pre-approved by Landlord):

**Call Name**: _____  Type: Cat _____ Breed: Cat _____
Color: _____ Weight: 25 _____ Whelp Date: _____

**Call Name**: _____  Type: Cat _____ Breed: Cat _____
Color: _____ Weight: 10 _____ Whelp Date: _____

**Call Name**: _____  Type: _____ Breed: _____
Color: _____ Weight: _____ Whelp Date: _____

IN WITNESS WHEREOF, the parties hereto have executed this Pet Addendum as of the date set forth below.

☐ The undersigned Tenant has read and agrees to the conditions of this Pet Addendum and ☒ **WILL** have the pet(s) listed and named above occupying the Premises or ☐ **WILL NOT** have any pet occupying the Premises.

**Tenant:**

_____
Name: Valerie Fahrnow

_____
Name: Ashlyne Fahrnow

_____
Name: Albert Brynds

_____
Name: Mareck Muro

Date: ___3/13/2019___

**Landlord:**

HPA US1 LLC _____, a Delaware limited liability company

By: _____  Date: ___4/15/2019___
  kara Barford

Name: _____
Its: Authorized Agent

Tenant Name: Valerie Fahrnow    Albert Brynds    Ashlyne Fahrnow    Mareck Muro
Premises Address: 12519 Connell Drive Overland Park KS 66213
Lease-KS: 2018-01

Case 21-20342    Doc# 18-1    Filed 04/21/21    Page 31 of 62

## RENOVATION ADDENDUM FOR LANDLORD WORK

This Renovation Addendum For Landlord Work ("*Addendum*") is attached to and made a part of that certain Residential Lease Agreement (as heretofore amended and together with any other addenda thereto, the "*Lease*") to which the undersigned Landlord and Tenant are parties with respect to that certain home located at 12519 Connell Drive, Overland Park, KS, 66213 ("*Premises*"). Landlord and Tenant agree as follows:

1.      Landlord has agreed to perform or cause to be performed the renovation work to the Premises which is identified on Exhibit A attached to this Addendum and by this reference made a part hereof (collectively, "*Landlord Work*") and Landlord shall make a good faith effort to have such work substantially completed prior to the Commencement Date of the Lease.

2.      Other than as provided in this Addendum or the Lease, Landlord has no obligation to improve, alter or remodel the Premises.  All installations made to the Premises shall be and shall remain the property of Landlord.  If Landlord Work has not been substantially completed on or before the Commencement Date (provided the Premises may be occupied as a residence without material inconvenience to the Tenant and any life and safety issues of which Landlord has actual knowledge have been adequately addressed ("*Life Safety Issues*")), then within five (5) days after the Commencement Date, Tenant shall provide Landlord with a written "*Punch List*" of any items constituting Landlord Work that Tenant identifies as being incomplete or incorrect (which Tenant may include in the Condition Form), the Commencement Date shall remain unchanged and Landlord shall exercise reasonable efforts to cause the Punch List items to be promptly completed or corrected.  In the event of any dispute as to whether the Landlord Work has been substantially completed, Life Safety Issues have been adequately addressed, or whether the Punch List items have been completed, the decision of Landlord shall be final and binding on Landlord and Tenant absent manifest error. By taking possession of the Premises, Tenant shall be deemed to have accepted the physical condition of Premises and agreed that the Premises is in good order and satisfactory condition with all Landlord Work having been completed, except for items identified in the Punch List. The failure of Tenant to prepare and deliver to Landlord a written Punch List within the aforesaid period of time (time being of the essence), shall be deemed an acceptance by Tenant of the Premises and Landlord Work and a waiver of Tenant's right to provide a Punch List relative thereto. Landlord and Landlord's Agents together with their respective agents, contractors, mechanics and workmen, shall have the right to enter the Premises, at any time and with proper notice (if required by Applicable Law), to complete Punch List items, except to the extent prohibited by Applicable Laws, and such entry for such purpose shall not constitute an actual or constructive eviction in whole or in part, nor shall it entitle Tenant to any abatement or diminution of Rent, nor shall it relieve Tenant from any of its obligations under the Lease, nor shall it impose any liability upon Landlord or Landlord's Agents.

3.      Tenant acknowledges that the Purchase Price (as defined in the Right to Purchase Agreement) may be adjusted in accordance with the terms of Paragraph 22 of the Right to Purchase Agreement based, in part, on the cost of performing Landlord Work.  The cost of Landlord Work shall not affect Tenant's Monthly Base Rent obligations under the Lease.

4.      This Addendum may be executed in one or more counterparts, each of which shall be deemed an original. In case of a conflict between the provisions of this Addendum and any provisions of the Lease, the provisions of this Addendum shall govern and control. Capitalized terms used in this Addendum which are not otherwise defined herein shall have the meanings ascribed thereto in the Lease.  This Addendum may be executed in one or more counterparts, each of which shall be deemed an original. This Addendum shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the Effective Date.

**Tenant:**                                                                                    **Landlord:**

Name: Valerie Fahrnow                                                     HPA US1 LLC                    ,
                                                                                                a Delaware limited liability company

Name: Albert Brynds

                                                                                                By: _kara Barford_____

Name: Ashlyne Fahrnow                                                  Name: _____
                                                                                                Title:  Authorized Agent

Name: Mareck Muro

Tenant Name:  Valerie Fahrnow              Albert Brynds              Ashlyne Fahrnow              Mareck Muro
Premises Address:  12519 Connell Drive, Overland Park, KS, 66213
Lease-KS:  2018-01

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

**EXHIBIT A**

**TO RENOVATION ADDENDUM FOR LANDLORD WORK**

Landlord Work consists solely of the following items of work:

1. None requested.
2.

[end of Exhibit A]

Tenant Name: _Valerie Fahrnow_      Albert Brynds      Ashlyne Fahrnow      Mareck Muro
Premises Address: _12519 Connell Drive, Overland Park, KS, 66213_
Lease-KS: 2018-01

## REPAIR, MAINTENANCE & IMPROVEMENT ADDENDUM

This Repair, Maintenance & Improvement Addendum to Residential Lease & Right to Purchase ("*Addendum*") expressly amends both that certain Residential Lease Agreement ("*Lease*") and that certain Residential Right to Purchase Agreement ("*RTP Agreement*" and together with the Lease and any addenda or modifications to either of them, the "*Agreements*"), each between the Landlord identified below ("*Landlord*") and the Tenant and Purchase Right Holder, as applicable, who are identified below (who shall collectively be referred to herein as "*Tenant*" for purposes of this Addendum) with respect to that certain home located at ___12519 Connell Drive, Overland Park, KS, 66213_____ ("*Premises*"). Capitalized terms which are used in this Addendum but are not defined herein shall have the meaning ascribed thereto in the Agreements.

1.  Tenant has agreed to accept possession of the Premises in its current AS-IS, WHERE-IS, WITH ALL FAULTS condition and, except as expressly set forth in the Agreements or as provided by Applicable Laws, Landlord has no obligation to repair, improve, alter or remodel the Premises. The Rent and Purchase Price amounts were negotiated with the express understanding that Tenant will be responsible for repair and maintenance needs of the Premises, as specified in the Lease and RTP Agreement. In the absence of Tenant's agreement to maintain the Premises, Landlord would have charged a higher Rent and Purchase Price amount.

2.  "*Repair & Maintenance Costs*" shall mean Landlord's aggregate cost of repairing, replacing and improving any portion of the Premises including but not limited to (a) the appliances and fixtures currently or hereafter located within or serving same which shall include but not be limited to the range, oven, broiler, washer/dryer, microwave, refrigerator, sinks, toilets, drywall, cabinets, showers/tubs, and any other improvement, appliance or fixture located in or serving the Premises, to the extent same are owned by Landlord and Landlord has either agreed or is required to repair or replace same, (b) the items which are required to be maintained by Landlord pursuant to Section 16 of the Lease, Applicable Law, or otherwise, (c) any items which Landlord has expressly agreed to perform at its sole cost and expense (including at Tenant's request) pursuant to the Agreements (excluding Landlord Work) (collectively, "*Repair & Maintenance Work*"). The aggregate cost to Landlord of performing or causing to be performed all Repair & Maintenance Work is referred to as "*Repair & Maintenance Costs*". Repair & Maintenance Costs shall exclude any items which Tenant owns or is otherwise obligated to maintain and/or repair at Tenant's cost pursuant to the terms of the Lease and/or Applicable law and nothing contained herein shall relieve Tenant of the repair, maintenance or payment obligation relating thereto. Nothing contained herein is intended to modify any of the terms of the Renovation Addendum For Landlord Work which forms a part of the Lease.

3.  Landlord shall have the right to perform or cause to be performed any of the Repair & Maintenance Work and all such items shall become part of the Premises and shall be and shall remain the property of Landlord. Tenant shall provide Landlord with a Punch List any Repair & Maintenance Work that Tenant identifies as being incomplete or incorrect within ten (10) days after the performance thereof, in which event Landlord shall exercise reasonable efforts to cause the Punch List items to be promptly completed or corrected. In the event of any dispute as to whether any portion of the Repair & Maintenance Work has been completed, the decision of Landlord shall be final and binding on Landlord and Tenant absent manifest error. The failure of Tenant to notify Landlord of any deficiencies in the performance of any Repair & Maintenance Work within ten (10) days after the performance thereof (time being of the essence) shall be deemed an acceptance of the Repair & Maintenance Work, and a waiver of Tenant's right to provide a Punch List relative thereto or dispute same.

4.  Landlord, Landlord's Agents, contractors, mechanics and workmen shall have the right to enter the Premises at any time to perform the Repair & Maintenance Work and complete the Punch List items in accordance with Applicable Law and such entry for such purpose shall not constitute an actual or constructive eviction in whole or in part, nor shall it entitle Tenant to any abatement or diminution of Rent, nor shall it relieve Tenant from any of its obligations under the Agreements, nor shall it impose any liability upon Landlord.

5.  The Purchase Price as set forth in the RTP Agreement includes a Repair & Maintenance Reserve (as defined in the RTP Agreement) in the initial amount of $2,500.00 which may result in either a credit against or a reduction in the final Purchase Price by an amount equal to the balance, if any, then remaining in such Repair & Maintenance Reserve as of the Closing. In accordance with the RTP Agreement, the amount of the Repair & Maintenance Reserve shall be reduced from time to time (but not below zero) by, among other things, the Price Adjustment (as defined in the RTP Agreement) and the aggregate Repair & Maintenance Costs incurred by Landlord; provided, however, that (a) except as set forth in the remainder of this Paragraph or the RTP Agreement, the aggregate Repair & Maintenance Costs applied as a reduction to the amount of the Repair & Maintenance Reserve shall not exceed the aggregate sum of $2,500.00 and (b) any adjustments to the Repair &

Maintenance Reserve shall become effective as of the substantial completion of the applicable item of Repair & Maintenance Work, it being understood that there may be more than one item of Repair & Maintenance Work prior to Closing. From time to time, Landlord shall have the right to provide Tenant (and shall so provide Tenant promptly after receipt of the Exercise Notice) an update of the calculation of the amount of the Purchase Price (including the amount of the Repair & Maintenance Reserve that has been used as of the date of such update) based upon any adjustments to the Purchase Price pursuant to this Addendum or any other provision of the Lease or RTP Agreement, it being understood and agreed that Landlord's calculation of the adjusted Purchase Price and the Repair & Maintenance Reserve, provided same is calculated consistently with the terms hereof and thereof shall be final and binding on Landlord and Tenant absent manifest error. The Monthly Base Rent payable under the Lease shall not be adjusted based upon any adjustments to the Purchase Price or the Repair & Maintenance Reserve. Nothing contained in this Addendum shall affect Tenant's obligation under the Lease to perform or pay for any repair or maintenance work to the Premises which was Tenant's obligation pursuant to the terms of the Lease or the cost of which is otherwise deemed to be Additional Rent.

6. This Addendum may be executed in one or more counterparts, each of which shall be deemed an original. The Agreements, as amended by this Addendum, shall continue in full force and effect, subject to the terms and provisions thereof. In the event of any conflict between the terms of the Agreements and the terms of this Addendum, the terms of this Addendum shall control. This Addendum shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Repair, Maintenance & Improvement Addendum to Residential Lease & Right to Purchase as of _____4/15/2019_____.

**Tenant/Purchase Right Holder:**

Name: Valerie Fahrnow

Name: Albert Brynds

Name: Ashlyne Fahrnow

Name: Mareck Muro

**Landlord:**

HPA US1 LLC _____,
a Delaware limited liability company

By:_____kara Barford_____

Name: _____

Title: Authorized Agent

---

# MOLD ADDENDUM

This Mold Addendum to Residential Lease Agreement ("*Addendum*") is attached to and made a part of that certain Residential Lease Agreement (as heretofore amended and together with any other addenda thereto, the "*Lease*") to which the undersigned Landlord and Tenant are parties with respect to that certain home located at 12519 Connell Drive, Overland Park, KS, 66213 ("*Premises*"). Landlord and Tenant hereby agree to the following terms and provisions:

**1.      NATURE OF MOLD GROWTH**. Mold is a type of fungi which occurs naturally in the environment and is necessary for the natural decomposition of plant and other organic material. It spreads by means of sharing in microscopic spores borne on the wind, and is found everywhere life can be supported. Most people are familiar with mold growth in the form of bread mold, and mold that may grow on bathroom tile. Residential home construction is not, and cannot be, designed to exclude mold spores. If the growing conditions are right, mold can grow in the Premises. In order to grow, mold requires a food source. This might be supplied by items found in the home, such as fabric, carpet, or even wallpaper, or by building materials, such as drywall, wood, and insulation, to name a few. Also, mold growth requires a temperate climate. The best growth occurs at temperatures between 40ºF and 100ºF. Most importantly, mold growth requires moisture.

**2.      MOISTURE AND MOLD GROWTH**. Moisture availability is the only mold growth factor that can be controlled in a residential setting. By minimizing moisture, Tenant can reduce or eliminate mold growth. Moisture in the home can have many causes. Spills, leaks, overflows, condensation, and high humidity are common sources of home moisture. Good housekeeping and home maintenance practices are essential in the effort to prevent or eliminate mold growth. If moisture is allowed to remain on the growth medium, mold can develop within 24 to 48 hours. If moisture sources are not removed or addressed, mold will continue to grow. All mold growth is not necessarily harmful, but mold has been linked with adverse health effects in susceptible persons. The most common effects are allergic reactions, including skin irritation, watery eyes, runny nose, coughing, sneezing, congestion, sore throat and headache. However, there are no specific mold cleanup levels or established numerical abatement standards for mold remediation. The most effective remedy for mold is to remove the source(s) of excess water or continuing moisture intrusion.

**3.      STEPS TO REDUCE MOLD GROWTH**. Mold growth depends largely on how Tenant maintains the Premises. Tenant shall take action to prevent conditions which cause mold, mildew or moisture build-up, and minimize any effects that may be caused by mold growth, including the following actions:

- Before bringing items into the Premises, Tenant shall check for signs of mold on the items. For example, potted plants (roots and soil), furnishings, or stored clothing and bedding material, as well as many other household goods, could already contain mold growth.
- Regular vacuuming and cleaning will help reduce mold levels. Mild bleach solutions and most tile cleaners are effective in eliminating or preventing mold growth if used in accordance with the manufacturer's recommendations.
- Keep the humidity in the Premises low. Vent clothes dryers to the outdoors. Ventilate kitchens and bathrooms by opening the windows, by using exhaust fans, or by running the air conditioning to remove excess moisture in the air, and to facilitate evaporation of water from wet surfaces.
- Promptly clean up spills, condensation, and other sources of moisture. Thoroughly dry any wet surfaces or material. Do not let water pool or stand in the home. Promptly replace any materials that cannot be thoroughly dried, such as drywall or insulation.
- Inspect for leaks on a regular basis. Look for discolorations or wet spots. Repair any leaks promptly. Empty water from condensation pans (refrigerators and air conditioners). Take notice of musty odors, and any visible signs of mold.
- Should mold develop, thoroughly clean the affected area. First, test to see if the affected material or surface is color safe. Porous materials, such as fabric, upholstery, or carpet should be discarded. Should the mold growth be substantial, contact Landlord for further direction on the use of services from a qualified mold abatement professional.

**4.      FURTHER INFORMATION AND RESOURCES**. The U.S. EPA provides information and numerous resources regarding excess water, moisture intrusion and mold: http://www.epa.gov/mold/. The U.S. Centers for Disease Control and Prevention also provide details about mold growth and human health: http://www.cdc.gov/mold/.

**5.      DUTIES OF TENANT**. Tenant agrees to assume responsibility for following the recommendations set forth in this Addendum. It is the responsibility of Tenant to take action to reduce or eliminate the occurrence of mold growth in the home. Tenant's failure to take preventative actions may reduce or preclude Landlord's responsibility for water damage or water intrusion. If there is any water damage or water intrusion to the Premises, Tenant shall take prompt action to prevent conditions which cause mold growth to develop. Tenant shall **immediately** notify Landlord in writing of water intrusion or mold and allow Landlord the

Tenant Name: Valerie Fahrnow          Albert Brynds                    Ashlyne Fahrnow             Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS, 66213
Lease-KS: 2018-01

opportunity to inspect the problem. Failure to notify Landlord of water intrusion or water damage or mold and/or the failure of Tenant to allow Landlord access to the Premises for the purpose of inspection, evaluation and/or corrective action shall be an affirmative defense to any Claims by Tenant arising from water damage or water intrusion.

**6.** **NO REPRESENTATIONS**. Tenant acknowledges and accepts that, except as expressly contained in the Lease, as provided to Tenant in a writing signed by Landlord or as required by Applicable Law, Landlord and Landlord's Agents (i) have not made any representations, warranties nor indemnifications, either expressed or implied, as to (a) the physical condition of the Premises, nor (b) indoor air quality conditions (including the presence or absence of Substances [defined below]) at the Premises, and (ii) are not responsible in any way for conditions that may exist at the Premises or health problems or property damage that might develop from or be related to such conditions or Substances. Naturally occurring radon, molds, fungi, spores, pollens and/or botanical substances or other allergens (e.g., dust, pet dander, insect waste material, etc.) may be found in a home, including radon and mold. In addition, certain building materials (such as asbestos, urea-formaldehyde foam insulation ("UFFI") and drywall— also known as wallboard, gypsum board or plasterboard manufactured in China ("Chinese Drywall")) have been linked to health concerns and/or property damage. These are all collectively referred to as "Substances." To the greatest extent permitted by Applicable Law, Tenant (for itself and all others claiming through Tenant) hereby releases Landlord Indemnitees (and prior owners) from any claims or liability relating to the presence or non-disclosure of Substances in or about the Premises. Tenant is directed to consult the U.S. Environmental Protection Agency website at www.epa.gov or the equivalent state environmental/health services agency if additional information concerning indoor air quality and Substances is desired.

**7.** **LIMITATIONS ON LANDLORD LIABILITY**. **Tenant acknowledges and agrees that Landlord shall not be liable for (and hereby releases Landlord from) any and all Claims with respect to the presence and/or existence of molds, mildew, and/or microscopic spores unless caused by the sole gross negligence or willful misconduct of Landlord. To the extent Landlord may be liable, if at all, Tenant, on behalf of itself, and any Occupants, hereby indemnifies Landlord Indemnitees from and against any and all Claims for property damage, injury, or death resulting from the exposure to microscopic spores, mold, fungi, and/or mildew and from any loss of resale value due to the presence and/or existence of mold, mildew and/or microscopic spores; provided, however, that in no event is Tenant indemnifying Landlord as a result of the presence and/or existence of mold, mildew, and/or microscopic spores if caused by the sole gross negligence or willful misconduct of Landlord.**

**8.** **CONFLICT/LEASE**. This Addendum is incorporated into the Lease as though fully set forth therein and in case of a conflict between the provisions of this Addendum and any provisions of the Lease, the provisions of this Addendum shall govern and control. Capitalized terms used in this Addendum which are not otherwise defined herein shall have the meanings ascribed thereto in the Lease. This Addendum may be executed in one or more counterparts, each of which shall be deemed an original. This Addendum shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**Tenant: It is important that you carefully inspect the Premises for mold before the Commencement Date and identify any problems to Landlord. To minimize the likelihood of mold it is important that you read and follow the requests and recommendations in this Addendum.**

IN WITNESS WHEREOF, the parties hereto have executed this Mold Addendum as of the Effective Date.

**Tenant:**

Name: Valerie Fahrnow

Name: Albert Brynds

Name: Ashlyne Fahrnow

Name: Mareck Muro

**Landlord:**

HPA US1 LLC ,
a Delaware limited liability company

By: *kara Barford*

Name: _____
Title: Authorized Agent

Tenant Name: Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS 66213
Lease-KS: 2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 37 of 62

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

## COMMENCEMENT DATE NOTIFICATION

This Commencement Date Notification to Residential Lease & Right to Purchase ("*Notification*") is being delivered to Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro ("*Tenant*") by Landlord pursuant to that certain Residential Lease Agreement ("*Lease*") and that certain Residential Right to Purchase Agreement ("*RTP Agreement*" and together with the Lease, the "*Agreements*") to which the undersigned Landlord ("*Landlord*") and Tenant are parties with respect to that certain home located at 12519 Connell Drive, Overland Park, KS, 66213                    ("*Premises*").    Capitalized terms which are used in this Notification but are not defined herein shall have the meaning ascribed thereto in the Agreements.

1.  The Commencement Date of the Lease is 04/27/2019                    .

2.  The Initial Term of the Lease (i.e., Year 1) shall expire on 04/26/2020                    .

3.  The First Renewal Term shall begin on 04/27/2020                                        (the "*First Renewal Term Start Date*").

4.  The Pro-Rated Rent for the month in which the Commencement Date occurs is $ 344.00          and is due on or before 04/27/2019        ("*Pro-Rated Rent Due Date*").

5.  If the Commencement Date and/or the Initial Term set forth in this Notification is different from the dates set forth in the Agreements, then the dates contained in this Notification shall supersede and control (i.e., if the Lease states that the Estimated Commencement Date is March 1, 2017 but the Commencement Date does not in fact occur until March 5, 2017, then the March 5, 2017 date contained in the Notification shall be the date used to calculate the Initial Term, Renewal Terms and all other dates which are calculated from the Commencement Date).  The Agreements shall continue in full force and effect, subject to the terms and provisions of this Notification.

6.  Tenant has been provided with a Condition Form ("*Condition Form*") for the Premises and has had the opportunity to note any defects or damage relating to the Premises on the Condition Form before returning same to Landlord. **Tenant must return the Condition Form to Landlord within five (5) days after the Commencement Date** in accordance with the Lease -- any damage to the Premises beyond normal wear and tear which is not so noted by Tenant on the Condition Form will be presumed to have been caused by Tenant.

**Landlord:**

HPA US1 LLC          ,
a Delaware limited liability company


By:_____

Name:  _____
Title:  Authorized Agent

Date:  _____


Tenant Name: Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS, 66213
Lease-KS:  2018-01

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

# RESIDENTIAL RIGHT TO PURCHASE AGREEMENT
## (HOME PARTNERS KANSAS)

**This Residential Right to Purchase Agreement** (the "*Right to Purchase Agreement,*" "*RTP Agreement*" or "*Agreement*") is made and entered into as of the date set forth on the signature page hereof by and among the person(s) identified on the signature page hereof as the Purchase Right Holder (individually or if more than one person is named, collectively, "*Purchase Right Holder*") and the Landlord identified on the signature page hereof, as seller (herein, "*Landlord*" or "*Seller*").

**WHEREAS,** concurrently with the execution of this Agreement, Seller, as landlord, has entered into a Residential Lease Agreement of approximately even date herewith (the "*Lease*") with Purchase Right Holder and the additional other tenants, if any, who are named therein (collectively, the "*Tenant*"), as tenant, upon the terms and conditions contained therein with respect to the real property having a street address of
        12519 Connell Drive, Overland Park, KS, 66213                                                and
which is legally described on *Exhibit B* attached hereto  (together with improvements thereon now or hereafter owned by Seller, the "*Premises*"). Capitalized terms used in this Agreement which are not otherwise defined herein shall have the meanings ascribed to them in the Lease; and

**WHEREAS,** Purchase Right Holder and Seller desire to enter into this Agreement with respect to the Premises upon the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the mutual covenants and obligations stated herein and in the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the recitals set forth above are incorporated into this Agreement as though fully set forth below, and otherwise agree as follows:

1. **RIGHT TO PURCHASE.**  Subject to the terms and conditions of this Agreement, Seller hereby grants to Purchase Right Holder the right to purchase the Premises (the "*Purchase Right*") during the Term of the Lease at the purchase price which is set forth on *Exhibit A* attached hereto which corresponds to the actual Closing Date (defined below) (as applicable, the "*Purchase Price*") and in accordance with the terms and conditions which are contained in this Agreement and the Real Estate Sale Contract (or successor form reflecting substantially similar terms) attached hereto as *Exhibit C* including any addenda attached hereto or thereto or disclosures that may be provided relative thereto (such Real Estate Sale Contract, together with such addenda or disclosures, is referred to as the "*Purchase Contract*"). **THIS RIGHT TO PURCHASE AGREEMENT IS NOT A CONTRACT TO BUY.** The Purchase Price may be further adjusted in accordance with Paragraph 22 below. The Purchase Right is expressly conditioned upon Purchase Right Holder's compliance with each the following conditions:

   a. If Purchase Right Holder wishes to exercise its Purchase Right, Purchase Right Holder must notify Seller in writing of its election to exercise such Purchase Right ("*Exercise Notice*") at least thirty (30) but no more than sixty (60) calendar days prior to the proposed Closing Date (which proposed Closing Date must be identified in the Exercise Notice).  If the Purchase Right Holder consists of more than one (1) person, then the Exercise Notice shall not be valid unless all persons constituting Purchase Right Holder shall sign the same Exercise Notice (it being understood and agreed that such Exercise Notice may be signed in counterparts, but all shall be delivered to Seller simultaneously).  Provided that all steps and conditions specified below are met, title to the Premises shall be transferred to such persons who are identified as the purchasers in such Exercise Notice (collectively, "*Purchasers*"), as tenants in common, unless otherwise designated in the Exercise Notice or in the Executed Purchase Contract (defined below), upon the terms specified below.  Furthermore, if less than all Purchase Right Holders sign an Exercise Notice, it will be of no force or effect.

   b. At the time of delivery of the Exercise Notice and continuing through the Closing Date, (i) Purchase Right Holder shall not be in default or have defaulted in the performance of any of its obligations under this

---

Purchase Right Holder Name: <u>Valerie Fahrnow</u>          <u>Albert Brynds</u>          Ashlyne Fahrnow          Mareck Muro

Premises Address: <u>12519 Connell Drive, Overland Park, KS, 66213  </u>          Page 1

RTP - KS:  2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 39 of 62



Agreement (beyond expiration of applicable notice and cure periods) and (ii) Tenant shall not then be in default in the performance of any of its obligations under the Lease (beyond expiration of applicable notice and cure periods); otherwise, in either event, at Landlord's option and upon notice to Purchase Right Holder, the Exercise Notice shall be of no force or effect.

c.  At the time of delivery of the Exercise Notice and continuing through the Closing Date, the Lease shall not have expired or been terminated; otherwise, the Exercise Notice shall be of no force or effect.

d.  Within ten (10) days after delivery of the Exercise Notice, Purchaser must execute and deliver (i) to Seller counterparts (originals if required by Seller) of the Purchase Contract reflecting the Purchase Price (as adjusted pursuant to this Agreement and/or the Lease) as of the proposed Closing Date (such agreement, once fully executed and delivered by Seller, the "*Executed Purchase Contract*") together with (ii) the $1,000 earnest money deposit required by the Purchase Contract, in good and collectible funds, made payable and delivered to Seller or as Seller shall otherwise direct. **Notwithstanding anything contained in this Agreement to the contrary, in the event that any of the conditions contained in this Paragraph 1 has not been completely satisfied at the time Seller receives either the Exercise Notice or the Purchase Contract signed on behalf of the Purchaser, then Seller shall not be obligated to execute the submitted Purchase Contract and the Exercise Notice shall be deemed invalid for all purposes. In the event that Seller does not execute and return to Purchaser the Executed Purchase Contract as aforesaid, then Seller shall refund the earnest money deposit made by Purchase Right Holder pursuant to this Subparagraph 1.d.**

e.  Purchase Right Holder shall not have the right to assign any of their rights under this Agreement or the Executed Purchase Contract it being understood and agreed that only the persons identified in this Agreement as the Purchase Right Holder shall be named as Purchaser in the Purchase Contract, and Purchase Right Holder shall not be permitted to name additional purchasers to the Purchase Contract nor remove any person identified as a Purchase Right Holder; provided, however, that notwithstanding the foregoing, if more than one person is identified in this Agreement as the Purchase Right Holder, then all (but not less than all) of the Purchase Right Holders identified in this Agreement may designate a subset of Purchase Right Holders to be Purchaser in the Purchase Contract provided that such designation is contained in the Exercise Notice signed by all of the Purchase Right Holders and all (but not less than all) of the Purchase Right Holders agree to execute such documents or instruments as may be necessary to effectuate such designation in connection with the Closing (defined below).

f.  The closing date pursuant to the Executed Purchase Contract (the "*Closing Date*") shall be a date that is mutually agreed to by Purchaser and Seller, but shall be a date that is:

   i.  no sooner than thirty (30) but no more than sixty (60) days after the date of delivery of the Exercise Notice provided that the Executed Purchase Contract is fully executed no less than ten (10) days after the Exercise Notice; and

   ii.  no later than the scheduled Expiration Date of the Term of the Lease; provided, however, in the event that the Closing Date is scheduled for, or is delayed such that it will actually occur, after the scheduled Expiration Date of the current Term of the Lease (but in no event beyond the last day of the Fourth Renewal Term of the Lease), then:

      A.  the Term of the Lease shall automatically be extended for the subsequent Renewal Term of the Lease (should one remain) and any termination notice given by Tenant pursuant to Section 3 of the Lease shall automatically and irrevocably be deemed to have been rescinded by Tenant; and

      B.  the Purchase Price shall be adjusted pursuant to the terms of this Agreement to reflect the actual Closing Date.

Purchase Right Holder Name:  Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro

Premises Address:  12519 Connell Drive, Overland Park, KS, 66213

RTP - KS:  2018-01

Page 2



DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

Notwithstanding anything contained in the Lease or this Agreement to the contrary, the Term of the Lease shall automatically terminate and expire (and such date shall become the "Expiration Date" under the Lease for all purposes) effective as of the earliest to occur of: (I) the actual Closing Date, (II) the last day of the Fourth Renewal Term of the Lease, and (III) such other Expiration Date as may be provided in the Lease, it being understood and agreed that any holdover of the Premises beyond the date set forth in this paragraph shall be subject to the holdover provisions contained in the Lease.

g. **The Purchase Right (and the Executed Purchase Contract if same shall have been entered into) shall, at Seller's option and upon notice to Purchase Right Holder, terminate, become null and void and of no force or effect (subject to Applicable Laws [as defined in the Lease]), upon the occurrence of any of the following**:

    i. Purchase Right Holder fails to duly deliver an Exercise Notice to Seller in accordance with this Agreement at least sixty (60) days prior to the scheduled Expiration Date of the Lease (subject to Paragraph 1.f.ii above) but in all events at least sixty (60) days prior to the last day of the Fourth Renewal Term of the Lease;

    ii. Purchase Right Holder defaults under this Agreement including, without limitation, if the Purchase Right Holder violates the restrictions on who may be named as Purchaser in the Purchase Contract, the restrictions against changing the person(s) named as Purchaser in the Executed Purchase Contract, or the restrictions on transfer of the Purchase Right set forth herein;

    iii. Purchaser assigns or attempts to assign any rights it may have in the Executed Purchase Contract, except as expressly allowed in this Agreement;

    iv. Tenant assigns or attempts to assign the Lease or any interest therein, sublets or attempts to sublet (whether Landlord consents to same or not) all or any portion of the Premises, or issues or attempts to issue a license to use all or any portion of the Premises, in violation of the Lease;

    v. Tenant has defaulted under its obligations under the Lease and such default has not been cured within any applicable notice and cure periods, if the Lease has expired or is terminated for any reason or if Tenant has been lawfully evicted from the Premises; or

    vi. Upon failure of the Closing to occur within thirty (30) days after the initially scheduled Closing Date due to Purchaser's default under the Executed Purchase Contract (but in no event later than the last day of the Fourth Renewal Term of the Lease).

In the event the first Executed Purchase Contract is terminated by the Purchaser as a result of the Appraisal Contingency contained therein, then (and only then) shall Purchase Right Holder have the right to submit a second (2nd) Exercise Notice in accordance with the terms of this Agreement (and execute a second Purchase Contract). For clarification purposes, Purchase Right Holder shall be entitled to issue an Exercise Notice no more than two (2) times provided that the initial Exercise Notice resulted in a termination of the Executed Purchase Contract due to an Appraisal Contingency. It shall be irrelevant that any such Exercise Notice may be deemed invalid, revoked, of no force or effect, void or terminated pursuant to the terms of this Agreement.

h. Upon Closing, (A) Landlord or Seller, as the case may be, shall credit Purchaser an amount equal to (i) any unapplied Security Deposit then held by Landlord under the Lease (subject to permitted setoffs), (ii) a pro-rated amount of any prepaid Rent as of the Closing Date, plus (iii) any other amounts which Landlord has expressly agreed to credit to Tenant in accordance with the terms of the Lease (e.g., pet fees previously paid by Tenant) and (B) all such amounts so applied or credited shall automatically be deemed to have been returned to the Tenant under the Lease and Landlord shall have no further obligation to account for same to the Tenant under the Lease. However, at least five (5) days prior to the scheduled Closing Date, Purchase

Purchase Right Holder Name: <u>Valerie Fahrnow</u>    <u>Albert Brynds</u>        Ashlyne Fahrnow        Mareck Muro

Premises Address: 1<u>2519 Connell Drive, Overland Park, KS, 66213</u>                       Page 3

RTP - KS: 2018-01



Right Holder shall have the right to direct Seller in writing to refund the Security Deposit and prepaid Rent to the Tenant in accordance with the terms of the Lease.

i. The Purchase Right is personal to Purchase Right Holder. Purchase Right Holder shall not permit the transfer, assignment or other conveyance (including by operation of law) of all or any interest in the Purchase Right or in this Agreement, except as otherwise expressly stated in this Agreement. Likewise, Purchaser shall not have the right to assign any right or interest it may have in and to the Executed Purchase Contract.

j. Notwithstanding anything contained in this Agreement to the contrary, Purchase Right Holder's delivery of the Exercise Notice or Purchaser's entering into an Executed Purchase Contract shall not extinguish or release Purchase Right Holder or any Tenant from any liability or obligations under this Agreement or the Lease, as applicable, including but not limited to the obligation to pay Rent through the last day of the Term of the Lease. Landlord shall have the right to collect all outstanding payments due under the Lease as a condition of consummating the Closing.

Each of the terms and conditions contained in this Paragraph 1 must be fully satisfied in order for the Purchase Right Holder to validly exercise the Purchase Right and for the Purchaser to consummate the Closing. The consummation of the purchase of the Premises by Purchaser pursuant to the Executed Purchase Contract is referred to as the "*Closing*".

2. **CONDITION OF PREMISES**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY OTHER DOCUMENT EXECUTED BY SELLER PURSUANT TO THIS AGREEMENT OR THE EXECUTED PURCHASE CONTRACT, AND TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW, (A) PURCHASE RIGHT HOLDER, FOR ITSELF AND ON BEHALF OF PURCHASER, REPRESENTS, WARRANTS AND ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PREMISES IN ITS "**AS-IS, WHERE-IS, WITH ALL FAULTS**" CONDITION AS OF THE DATE OF EXECUTION OF THE EXECUTED PURCHASE CONTRACT AND THE CLOSING DATE AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED, AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, HABITABILITY OR ANY OTHER WARRANTY OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER; (B) SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PREMISES; AND (C) PURCHASE RIGHT HOLDER, IN ITS CAPACITY AS TENANT UNDER THE LEASE, SHALL BE DEEMED TO BE FULLY AWARE OF THE CONDITION OF THE PREMISES AND ACKNOWLEDGES THAT IT SHALL HAVE HAD AMPLE OPPORTUNITY TO INSPECT THE PREMISES PRIOR TO ISSUANCE OF THE EXERCISE NOTICE AND THE EXECUTION OF THE CONTRACT AND, TO THE EXTENT THAT THE PREMISES HAS BEEN DAMAGED PRIOR TO CLOSING, PURCHASE RIGHT HOLDER (AND PURCHASER) SHALL BE DEEMED TO HAVE CONSENTED TO AND/OR CAUSED SUCH DAMAGE AND TO ACCEPT THE PREMISES IN ITS DAMAGED CONDITION AS OF THE CLOSING. IN FURTHERANCE THEREOF, TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW, SELLER SHALL HAVE NO OBLIGATION UNDER THIS AGREEMENT OR THE EXECUTED PURCHASE CONTRACT TO REPAIR OR RESTORE THE PREMISES. PURCHASE RIGHT HOLDER ACKNOWLEDGES AND AGREES THAT: (I) THE PURCHASE PRICE WAS NEGOTIATED WITH THE EXPRESS UNDERSTANDING THAT PURCHASE RIGHT HOLDER IS RESPONSIBLE FOR ALL PROPERTY MAINTENANCE NEEDS OF THE PREMISES PURSUANT TO THE LEASE (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE LEASE TO THE CONTRARY), THIS AGREEMENT AND THE EXECUTED PURCHASE CONTRACT AND (II) **THE LEASE PROVIDES THAT THE TENANT (WHICH INCLUDES THE PURCHASE RIGHT HOLDER) WILL OCCUPY THE PREMISES DURING THE TERM OF THE LEASE, AND THE PARTIES HERETO EXPRESSLY CONTEMPLATE THAT TENANT/PURCHASE RIGHT HOLDER WILL THEREFORE BE IN A**



**UNIQUE POSITION TO INVESTIGATE ALL MATTERS RELATED TO THE CONDITION OF THE PREMISES**.

Purchase Right Holder acknowledges and agrees that it is familiar with and has been provided with each of the disclosures identified in the Lease and that same shall be deemed to be incorporated into this Agreement and the Executed Purchase Contract by this reference without the necessity of attaching same hereto or thereto.

Seller shall not discriminate against Purchase Right Holder in the provision of services or in any other manner on the basis of race, religion, sex, national origin, familial status or disability, nor on the basis of any class protected by Applicable Law.

3.  **SUBORDINATION.**  This Agreement and Purchase Right Holder's interest in this Agreement are and shall be subject to and subordinate, junior and inferior to any and all Liens (as defined in the Lease and to the extent not prohibited by Applicable Laws) now or hereafter affecting the Premises and to any and all advances now or thereafter made under any such Liens (including future advances) and the interest payable on such Liens and to any existing or future deeds placed on the Premises.  Purchase Right Holder will execute such instruments evidencing such subordination and attornment at Seller's request.  If Purchase Right Holder fails to comply with such request, Purchase Right Holder hereby irrevocably empowers and appoints Seller his/her attorney-in-fact to do so in Purchase Right Holder's name and on Purchase Right Holder's behalf.   Such power shall be deemed to be coupled with an interest and shall be irrevocable.

4.  **TIME IS OF THE ESSENCE.  Purchase Right Holder agrees that time is of the essence for the performance of each and every covenant, term, agreement and condition contained in this Agreement and the Executed Purchase Contract (including but not limited to delivery of notices and payment obligations) by or on behalf of the Purchase Right Holder and Purchaser and that each of them shall be held in strict compliance with the same.**

5.  **DEFAULT.**  If Purchase Right Holder fails to comply with any of the provisions of this Agreement, if Purchaser defaults in any of its obligations under the Executed Purchase Contract, or if any Tenant fails to comply with any of the provisions of the Lease, and such failure or default is not cured within applicable notice and cure periods, if any, then (a) Seller shall have the right, upon notice to Purchase Right Holder, to terminate this Agreement, the Lease and/or the Executed Purchase Contract, or any of them, and (b) a default under any one of the Lease, this Agreement and the Executed Purchase Contract shall constitute a default under all of them and shall afford Landlord the right to exercise any or all of Seller's or Landlord's rights and remedies applicable thereto, at law or in equity. See also Paragraph 21 of this Agreement.

6.  **ATTORNEYS' FEES.**  If at any time after the date of this Agreement, either party institutes any action or proceeding (including an arbitration proceeding) against the other relating to the provisions of the Lease, this Agreement or any default under either of them or the Premises (whether founded in tort, contract, equity or to secure a declaration of rights thereunder), the party not prevailing in the action or proceeding or appeal therefrom will reimburse the prevailing party for its reasonable attorneys' fees (not to exceed the sum of $2,000.00 in the aggregate for any such action which amount shall be inclusive of (a) fees incurred at trial or arbitration, any appeal therefrom, or in connection with any bankruptcy proceedings, and (b) all costs and expenses incurred in connection with such action, proceeding, appeal or in collection of any judgment including expert fees, any post-judgment fees and costs). The term "prevailing party" shall include, without limitation, a party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense.

7.  **RECORDING OF AGREEMENT.**  Neither Purchase Right Holder nor Purchaser shall record this Agreement or the Executed Purchase Contract (or any memorandum hereof or thereof) in the public records of any public office and should this provision be violated, then (a) same shall constitute a default under this Agreement and the Executed Purchase Contract, (b) Seller shall have the right to immediately terminate this Agreement, the Lease

Purchase Right Holder Name: Valerie Fahrnow        Albert Brynds           Ashlyne Fahrnow       Mareck Muro

Premises Address: 12519 Connell Drive, Overland Park, KS, 66213           Page 5

RTP - KS:  2018-01



and/or the Executed Purchase Contract and shall be entitled to all of Seller's and Landlord's Rights and Remedies available at law or in equity and (c) Purchase Right Holder and Purchaser hereby irrevocably empower and appoint Seller his/her attorney-in-fact to record a termination of any such agreement in their name and on their behalf, such power shall be deemed to be coupled with an interest and shall be irrevocable.

8. **GOVERNING LAW; CONSTRUCTION; TRIAL BY JURY.** This Agreement shall be governed, construed and interpreted by, through and in accordance with the laws of the state in which the Premises is located, without reference to its conflict of law's provisions. The parties hereto agree that any suit or proceeding arising under this Agreement shall be brought solely in a federal or state court serving the county in which the Premises is located. Each party consents to the jurisdiction of these courts and waives any objection to jurisdiction or venue. EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT, BUT ONLY TO THE EXTENT SUCH WAIVER IS NOT PROHIBITED BY APPLICABLE LAW. It is understood and agreed that notwithstanding anything contained in this Agreement to the contrary, in the event that any of Seller's rights or remedies contained in this Agreement are subject to or are prohibited by the terms of Applicable Laws, then Seller's/Landlord's rights and remedies shall be limited so that they comply with and shall be subject to such Applicable Laws. Likewise, nothing contained herein is intended to limit or interfere with any rights which are expressly granted to Purchase Right Holder pursuant to Applicable Laws and which are considered by such laws to be non-waivable by Purchase Right Holder. In construing this Agreement and the Lease, no provision hereof or thereof shall require the performance or waiver of any obligation or right, as applicable, which would violate any Applicable Laws and any such provision shall be interpreted so as to comply therewith.

9. **SEVERABILITY.** If any clause, phrase, provision or portion of this Agreement or the application thereof, including without limitation, to any person or circumstance, shall, for any reason and to any extent, be invalid or unenforceable under applicable law, such event shall not affect, impair or render invalid or unenforceable, the remainder of this Agreement nor any other clause, phrase, provision or portion hereof, nor shall it affect the application of any clause, phrase, provision or portion hereof to other persons or circumstances, but instead the remainder shall remain in full force and effect as though any invalid or unenforceable part was not written into this Agreement and shall be enforced to the maximum extent permitted by law. The omission of initials on any page shall not invalidate this Agreement.

10. **SURVIVAL.** Except as otherwise expressly provided herein, nothing contained in this Agreement shall serve to extinguish any of Tenant's outstanding obligations under the Lease.

11. **CONSTRUCTION; SUCCESSORS; BINDING EFFECT.** The words "Landlord", "Tenant," "Purchaser" and "Purchase Right Holder" wherever used herein shall be construed to mean "Landlords," "Tenants," "Purchasers" and "Purchase Right Holders" in case more than one person constitutes either party to this Agreement. The covenants, obligations, conditions and agreements herein shall be binding upon and, to the extent expressly permitted in this Agreement, inure to the benefit of, their respective successors, heirs, executors, administrators and permitted assigns. The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

12. **DESCRIPTIVE HEADINGS.** The descriptive headings used herein are for convenience of reference only, and they are not intended to have any effect whatsoever in determining the rights or obligations of the parties hereto.

13. **NO WAIVER.** All remedies provided herein shall be cumulative. No waiver of a breach or default by Seller shall be deemed a continuing waiver. No indulgence, waiver, election or non-election by Seller under this Agreement or Landlord under the Lease shall affect such party's duties and liabilities hereunder or thereunder, as the case may be. No action or omission of Seller, including without limitation, making payments on behalf of Purchase Right Holder or Tenant, not enforcing or belatedly enforcing written notice requirements, rental due dates, acceleration, liens, or other of Seller's or Landlord's Rights and Remedies will be considered a waiver under any circumstances. Except when notice or demand is required by statute, Purchase Right Holder waives

Purchase Right Holder Name: <u>Valerie Fahrnow</u>          <u>Albert Brynds</u>          Ashlyne Fahrnow          Mareck Muro
Premises Address: <u>12519 Connell Drive, Overland Park, KS, 66213</u>          Page 6
RTP - KS: 2018-01

any notice and demand for performance from Seller if Purchase Right Holder defaults under this Agreement. Seller's exercising one remedy will not constitute an election or waiver of any other of Seller's or Landlord's Rights and Remedies. None of Seller's or Landlord's Agents is personally liable for any of Seller's contractual, statutory, or other obligations merely by virtue of acting on Seller's behalf, and all provisions regarding Seller's non-liability and non-duty apply to the same.

14. **COUNTERPART EXECUTION; MODIFICATION.** This Agreement and the Purchase Contract may be executed in one or more counterparts, each of which shall be deemed an original. Furthermore, executed counterparts of this Agreement or the Purchase Contract, any amendment hereto or thereto may be delivered by facsimile or other reliable electronic means (including emails of pdf/tif documents), and such facsimile or other electronic transmission shall be valid and binding for all purposes when transmitted to and actually received by the other party. Notwithstanding the foregoing, each party delivering executed documents by facsimile or other electronic means agrees to provide the other party with an original, hard copy of the relevant signed documents promptly after the request of the other party.

15. **ATTORNEY REVIEW. Purchase Right Holder acknowledges that (a) it has received a copy of the Lease and the Purchase Contract, (b) it is familiar with the terms thereof and (c) it has had the opportunity to consult with its legal counsel regarding this Agreement, the Purchase Contract and the Lease, and that, accordingly, the terms of this Agreement, the Purchase Contract and the Lease are not to be construed against any party because of that party's role in drafting same or construed in favor of any party because that party failed to understand the legal effect of the provisions thereof.**

16. **MULTIPLE PURCHASE RIGHT HOLDERS.** Each person constituting Purchase Right Holder is jointly and severally liable for all obligations under this Agreement. If one person constituting Purchase Right Holder violates its obligations under this Agreement, then all persons constituting Purchase Right Holder will be considered to have violated this Agreement. Each person constituting Purchase Right Holder acknowledges and agrees that Seller's requests and notices (including sale notices) sent to the person and address identified as the Purchase Right Holder Notice Recipient in Paragraph 17 below conclusively constitutes notice to all persons constituting Purchase Right Holder. The Purchase Right Holder Notice Recipient for Seller's requests and notices hereby acknowledges and agrees that he or she (and not Seller) is responsible for ensuring that all other persons constituting Purchase Right Holder receive all requests, notices to which they are entitled. Purchase Right Holder shall have the right to change the person then-designated as the Purchase Right Holder Notice Recipient pursuant to a notice signed by all of the persons constituting the Purchase Right Holder which identifies such new Purchase Right Holder Notice Recipient. In the event Seller receives conflicting notices from the various persons constituting Purchase Right Holder, Seller shall have the right to rely upon notices only from the person then-identified as the Purchase Right Holder Notice Recipient and to disregard all other notices. Purchase Right Holder agrees that it shall, at all times, cause the Purchase Right Holder Notice Recipient to be the same person who is identified as the Tenant Notice Recipient under the Lease.

17. **NOTICES.** Except as otherwise provided herein (including, without limitation, the provisions of Paragraph 16 concerning a multiple-person party), all notices required shall be in writing and shall be served by one party to the other party (each, a "*Notice*"). **If notice is required to be given to Seller, notice must be in writing and sent to Seller at the address set forth below**. Notice shall be given as required by Applicable Law and otherwise in the following manner: (a) by personal delivery of such Notice (in which event such Notice shall be effective on the date of such delivery); or (b) in the case of Notice to Purchase Right Holder, Seller shall have the right to provide Notice to Purchase Right Holder by posting the Notice upon the front door of the Premises and, if required by Applicable Law, mailing a copy; or (c) by mailing of such Notice to the addresses contained herein by U.S. regular mail or U.S. registered or certified mail, return receipt requested (except as otherwise provided herein, Notice served pursuant to this subclause (c) shall be effective three (3) Business Days after the date of mailing); or (d) Notice shall be effective as of date and time of receipt of a facsimile transmission, provided that the Notice transmitted shall be received on a Business Day and during Business Hours (in the event such Notice is received either on a non-Business Day or during non-Business Hours, the effective date and time of receipt of such Notice

Purchase Right Holder Name: <u>Valerie Fahrnow</u>       <u>Albert Brynds</u>        Ashlyne Fahrnow        Mareck Muro

Premises Address: <u>12519 Connell Drive, Overland Park, KS, 66213</u>        Page 7



shall be 9:00 a.m. **Central Time** of the first Business Day after receipt); or (e) Notice shall be effective as of date and time of electronic mail transmission of a Notice, provided that the Notice transmitted shall be sent on a Business Day during Business Hours and recipient shall have acknowledged such transmission (in the event an electronic mail transmission Notice is transmitted either during non-Business Hours or a non-Business Day, the effective date and time of Notice shall be 9:00 a.m. **Central Time** of the first Business Day after receipt); or (f) Notice by a nationally-recognized overnight delivery or courier company (e.g., FedEx) shall be effective one Business Day after delivery to the courier, shipping prepaid. In addition to the foregoing delivery options, notices from Landlord may be delivered to Purchase Right Holder via a link to Seller's portal.

Notice Addresses:

**Seller's Notice Address:**

HPA US1 LLC
180 N Stetson Ave Suite 3650,
Chicago, IL 60601
Attn: General Counsel
TELEPHONE: (877) 234-5155
EMAIL: notices@homepartners.com
FAX: (312) 780-1669

**With a copy to:**

HPA US1 LLC
c/o Pathlight Property Management
6500 International Pkwy #1100
Plano, TX 75093
Attn: Property Manager
EMAIL: movein@pathlightmgt.com
TELEPHONE: (800) 527-5030
FAX: (866) 221-8563

**Purchase Right Holder Notice Address:**

**THE FOLLOWING PERSON SHALL BE THE DESIGNATED "PURCHASE RIGHT HOLDER NOTICE RECIPIENT" AUTHORIZED TO DELIVER AND ACCEPT NOTICES ON BEHALF OF ALL PURCHASE RIGHT HOLDERS PURSUANT TO PARAGRAPH 16 ABOVE (THERE SHALL BE ONLY ONE DESIGNATED PURCHASE RIGHT HOLDER NOTICE RECIPIENT AT ANY TIME) AND THE PURCHASE RIGHT HOLDER NOTICE RECIPIENT ADDRESS SHALL BE THE PREMISES;** provided, however, that if a physical mailing address other than the Premises is inserted below, such below address shall be used solely for the mailing by U.S. regular mail of an informational copy of Notices otherwise sent to the Premises, it being agreed that Seller's failure to send such informational copy shall not affect the effectiveness of Notices sent to the Premises or otherwise delivered in accordance with this Paragraph):

PURCHASE RIGHT HOLDER NOTICE RECIPIENT: Valerie Fahrnow
ADDRESS (for information purposes only): 12519 Connell Drive, Overland Park, KS, 66213
EMAIL: Valeriefahrnow@hotmail.com
FAX: _____

Each party shall have the right from time to time to change the place notice is to be given under this Paragraph (or, in the case of notices to Purchase Right Holder Notice Recipient, where an informational copy is to be sent) by written notice thereof to the other party. Written notice from Seller's or Landlord's Agent or Seller's or Landlord's attorney shall constitute notice from Seller. Any person giving a notice under this Agreement should retain a copy of the memo, letter, or fax that was given. Facsimiles and portable document format (pdf) signatures are binding. All notices must be signed (if by email, signature may be typed within the email).

18. **ENTIRE AGREEMENT.** This Agreement, the Lease together with the Document Review Acknowledgment signed by Tenant and any other written documents signed by Seller or Landlord and Purchase Right Holder or Tenant, and delivered to the other (including the Executed Purchase Contract, if executed), constitute the complete and entire agreement among the parties, and no representations or oral statements of either party are binding unless contained herein or therein. None of those agreements may be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties thereto. Neither Seller nor any of Seller's

Purchase Right Holder Name: Valerie Fahrnow        Albert Brynds        Ashlyne Fahrnow        Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS, 66213        Page 8
RTP - KS: 2018-01



or Landlord's Agents has made any oral promises, representations, or agreements not contained herein. Seller's Agents have no authority to waive, amend, or terminate this Agreement, the Lease or any part of it, unless such authority is in writing and signed by Landlord, and no authority to make promises, representations, or agreements that impose security duties or other obligations that would be binding or enforceable on Seller or Seller's or Landlord's Agents unless in each such instance such authority is in writing signed by Landlord.

19. **NO THIRD PARTY BENEFICIARIES.** This Agreement does not create any rights, claims or benefits inuring to any person or entity that is not a party to this Agreement nor does it create or establish any third party beneficiary to this Agreement or the Purchase Contract. Purchase Right Holder shall not be a third party beneficiary of any agreements entered into by Seller which may affect the Premises.

20. **ASSIGNMENT BY SELLER; LIMITATION OF LIABILITY**. Seller shall have the absolute right to sell, transfer and/or assign, in whole or in part, all of its rights in the Premises and its rights and obligations under this Agreement and upon such sale, transfer and/or assignment, Seller shall transfer all of its rights and obligations under this Agreement to such assignee/transferee and Seller shall thereupon be released from any further obligations under this Agreement, and Tenant agrees to look solely to such successor in interest of Seller for the performance of such obligations. Any liability of Seller under this Agreement shall be limited solely to its interest in the Premises and in no event shall any personal liability be asserted against Seller, its members, or their respective members, partners, shareholders, officers, directors, agents or employees, in connection with this Agreement nor shall any recourse be had to any other property or assets of Seller, its members, or their respective members, partners, shareholders, officers, directors, agents or employees. In no event shall Seller nor any of its agents be liable for consequential or punitive damages as a result of a breach or default under or otherwise in connection with this Agreement. No member, officer, director, employee, agent, management representative, or personnel of Seller shall be personally liable for any of Seller's contractual, statutory, or other obligations merely by virtue of acting on Seller's behalf.

21. **AGREEMENT EFFECTIVENESS; NO OFFER**. Seller has delivered a copy of this Agreement to Purchase Right Holder for its review and Seller's delivery thereof does not constitute an offer by Seller to Purchase Right Holder, nor an option. Notwithstanding anything contained in this Agreement to the contrary, the submission of this Agreement to Seller, executed on behalf of Purchase Right Holder, shall constitute an irrevocable offer to Seller to enter into this Agreement which may be accepted by Seller within fifteen (15) days after Purchase Right Holder's submission thereof to Seller, and Purchase Right Holder shall not have the right to terminate this Agreement nor revoke its offer within such 15-day period. Seller has made (or will be making) an offer to purchase the Premises in reliance upon Purchase Right Holder's having indicated its agreement to submit (or having submitted) a copy of this Agreement signed by such Purchase Right Holder to Seller and Tenant's agreement to submit (or having submitted) a copy of the Lease signed by such Tenant to Landlord. Furthermore, Purchase Right Holder acknowledges that Seller shall have incurred significant costs in an attempt to purchase (or the actual purchase of) the Premises in material reliance upon such irrevocable offer and acknowledges and agrees that Seller shall have the right, in the event that it agrees (it being understood and agreed that Seller/Landlord shall have no obligation to so agree) to either (a) a revocation or termination of Purchase Right Holder's irrevocable submission of this Agreement and the Lease by the Tenant to Landlord within such 15-day period or (b) a termination of the Lease or this Agreement prior to Seller's acquisition of title to the Premises, to retain the "Deposit" under the Document Review Acknowledgment submitted by one or more of the parties constituting Purchase Right Holder (regardless of whether or not same is deemed to be prepaid Rent, Security Deposit or otherwise) to reimburse Seller for out-of-pocket costs and expenses incurred by Seller in connection with purchasing or attempting to purchase the Premises (including but not limited to inspection costs, third party professional costs, closing costs, rehabilitation costs of the Premises, attorneys' fees and the like; collectively, the "*Termination Costs*") and to the extent that the amount of the Deposit retained by Seller exceeds the aggregate amount of the Termination Costs, such difference shall be deemed to be liquidated damages to compensate Seller for the loss of its bargain. The parties hereto acknowledge and agree that the amount of Seller's actual damages in such circumstance would be difficult, if not impossible, to determine and that the amount of the Deposit in excess of the Termination Costs is a reasonable estimate of Seller's damages and not a penalty.



Except for the rights and obligations of Seller and Purchase Right Holder contained in this Paragraph 21 and in Section 44 of the Lease (which shall become binding against Tenant and Purchase Right Holder upon their execution and submission of the Lease and this Agreement whether or not they are accepted by Seller or if accepted, later terminated) and the obligations contained in the Document Review Acknowledgment, (a) this Agreement and the Lease shall not otherwise become effective until this Agreement and the Lease have both been executed by Seller and a fully executed copy of each is delivered to Tenant and the Purchase Right Holder, as applicable, (b) none of Seller, Landlord, Tenant nor Purchase Right Holder shall be bound by the Lease nor this Agreement and neither shall become effective unless and until each of the parties hereto and thereto shall have executed and delivered to each other both the Lease and this Agreement, (c) this Agreement is expressly contingent upon Seller acquiring title to the Premises on or before the scheduled Estimated Commencement Date under the Lease (as such date may be extended by the terms of the Lease), and (d) in the event that the Lease is terminated pursuant to Section 44 of the Lease or otherwise, then this Agreement shall automatically terminate and be of no further force or effect except for such obligations which are expressly intended to survive such termination pursuant to the terms of this Agreement.

22. **PURCHASE PRICE ADJUSTMENT. Purchase Right Holder acknowledges that it has been advised and agrees that the Purchase Price of the Premises shall be calculated and adjusted in accordance with the following provisions.**

a.  Purchase Right Holder acknowledges and agrees that (i) Seller's final costs to be incurred in connection with acquiring, improving and/or rehabilitating the Premises (which shall include, but not be limited to, amounts paid by Seller to purchase the Premises, inspection and closing costs [including items such as transfer taxes, survey costs, title insurance, escrow/closing fees], homeowner's association application and approval fees, costs to perform Landlord Work, make-ready work, life-safety repair work, asset preservation, lock changes, cleaning, initial landscape clean-up, pool start-up (where applicable) and similar items of work that Seller elects or is required to have made to the Premises together with a fee not to exceed 0.5% of such costs reflecting Seller's internal costs in completing the acquisition of the Premises) (collectively, "*Acquisition Costs*") have not been determined as of the Effective Date, (ii) the Purchase Price identified in the initial **Exhibit A** hereto has been calculated as of the Effective Date and is the product of (x) Seller's pre-inspection estimates of Acquisition Costs (collectively, the "*Estimated Acquisition Cost*") multiplied by (y) 103.50 % (the "*Price Adjustment Factor*"), which amounts have been approved in writing by Purchase Right Holder prior to the Effective Date, and (iii) Seller shall have the right to perform a more thorough inspection of the Premises either prior to or after the Effective Date (which may, at Seller's option, include obtaining third-party cost estimates to perform all or a portion of the improvements/rehabilitation work to the Premises) which may affect the Purchase Price as provided below.

b.  Within one hundred eighty (180) days after the Commencement Date of the Lease, Seller shall provide Purchase Right Holder with a statement ("*Price Adjustment Statement*") which shall identify, as applicable: (i) the aggregate amount of actual Acquisition Costs (collectively, "*Final Acquisition Cost*") incurred by Seller in acquiring, improving and/or rehabilitating the Premises as described in subparagraph (a) above, calculated as of the date such Price Adjustment Statement is issued, (ii) the difference, if any, between the Estimated Acquisition Cost and the Final Acquisition Cost, (iii) the amount of any resulting reduction in the amount of the Purchase Price in the event that the Final Acquisition Cost is less than the Estimated Acquisition Cost (in which event an updated **Exhibit A** to this Agreement shall be included), and (iv) the balance then remaining, if any, in the Repair & Maintenance Reserve (defined below).

The Price Adjustment Statement may contain estimated costs (as opposed to actual costs) for one or more items of work comprising Acquisition Costs to the extent that the performance thereof has been delayed or not yet completed due to things like weather conditions (e.g., air-conditioning, roof or asphalt repairs which may not be able to be performed during certain seasons depending on where the Premises is located), in which

Purchase Right Holder Name: <u>Valerie Fahrnow</u>          <u>Albert Brynds</u>          Ashlyne Fahrnow          Mareck Muro

Premises Address: <u>12519 Connell Drive, Overland Park, KS, 66213</u>          Page 10

RTP - KS: 2018-01



event the Price Adjustment Statement shall be sent (or updated if previously sent) once all outstanding items of work have been completed and the Final Acquisition Cost determined, which may be after such 180-day period but no later than the Closing Date. Seller shall not be obligated to provide receipts nor a detailed breakdown of the various cost components comprising the Final Acquisition Cost but will do so by general categories upon request from Purchase Right Holder if such request is made within 60 days after issuance of the Price Adjustment Statement.

"*Price Adjustment*" is equal to the product obtained by multiplying (A) the difference between the Estimated Acquisition Cost and the Final Acquisition Cost by (B) the Price Adjustment Factor.

If the Final Acquisition Cost is less than the Estimated Acquisition Cost, then the **Purchase Price contained in the initial Exhibit A hereto shall be reduced by an amount equal to the Price Adjustment,** which amount shall be reflected in the updated **Exhibit A** provided with the Price Adjustment Statement and the Repair & Maintenance Reserve shall remain unchanged.

Alternatively, if the Final Acquisition Cost is greater than the Estimated Acquisition Cost, then the **Purchase Price shall remain unchanged,** however, the Repair & Maintenance Reserve shall be reduced by an amount equal to the Price Adjustment and such amount shall be reflected on the Price Adjustment Statement.

c.  The Purchase Price of the Premises as reflected on the initial **Exhibit A** hereto includes a repair and maintenance reserve in the amount of $2,500.00 ("*Repair & Maintenance Reserve*") which amount shall be reduced (but not below zero), by an amount equal to (i) the Price Adjustment (in the event that the Final Acquisition Cost is greater than the Estimated Acquisition Cost as described in Paragraph 22.b above) and (ii) the aggregate amount of Repair & Maintenance Costs that are incurred by Landlord from time to time during the Term of the Lease (as described in the Repair, Maintenance & Improvement Addendum to Residential Lease & Right to Purchase which is attached to the Lease and which shall be deemed to be incorporated into this Agreement by this reference as though fully set forth herein).

If there shall be a balance remaining in the Repair & Maintenance Reserve as of the Closing, then Seller shall, at its option, either (A) issue a credit against the Purchase Price or (B) reduce the Purchase Price, in each case by the amount of such remaining balance which amount may be reflected on the closing disclosure at the Closing.

Notwithstanding anything contained in this Paragraph 22.c to the contrary, to the extent that Tenant fails to either pay for, reimburse Landlord or perform any portion of the Repair & Maintenance Work which is Tenant's obligation to pay or perform pursuant to the terms of the Lease or should there be any Rent payments outstanding, then if such items have not been paid in full by Tenant prior to the Closing, then Landlord shall have the right to either increase the Purchase Price or reduce the Repair & Maintenance Reserve then remaining by the outstanding aggregate amount thereof.

d.  Promptly after receipt of the Exercise Notice, Seller shall provide Purchase Right Holder with a calculation of the Purchase Price (based upon the then-outstanding balance of the Repair & Maintenance Reserve as of the date of such calculation) as of the proposed Closing Date which shall be the amount inserted into the Executed Purchase Contract but which shall remain subject to adjustment in accordance with the terms of this Paragraph 22 including if the actual Closing Date would delay the Closing until the subsequent Renewal Term. Additionally, Seller shall provide Purchase Right Holder with a calculation of the Purchase Price as aforesaid upon request from Purchase Right Holder, no more than once during any calendar.

e.  Prior to the Closing, Purchase Right Holder agrees that Seller shall have the right to adjust the amount of the Purchase Price and/or the amount of any closing credit contained in such Executed Purchase Contract (or the closing disclosure): (i) for any matters that have either not yet occurred or the final cost thereof determined as of the date such calculation was initially made, (ii) based upon any reductions to the Repair & Maintenance



Reserve (including Repair & Maintenance Costs incurred after the date of the Executed Purchase Contract), (iii) as permitted by the Lease and this Agreement, (iv) in accordance with the Executed Purchase Contract and (v) if the actual Closing Date would cause the Purchase Price to be adjusted based on **Exhibit A**.

f.  It is expressly understood and agreed by the Parties that any adjustments to Purchase Price contained in the Executed Purchase Contract as a result of matters occurring prior to the Closing shall occur, if at all, prior to the Closing. Once the Closing has occurred, each party hereto waives the right to dispute the calculation of the Purchase Price (including the calculation of the Repair & Maintenance Reserve) paid pursuant to the Executed Purchase Contract (including credits or adjustments shown on the final disclosure statement), all of which shall be final and binding on the parties hereto and to the Executed Purchase Contract.

g.  Any updated or revised **Exhibit A** to this Agreement or calculation of the Repair & Maintenance Reserve prepared by Seller and delivered to Purchase Right Holder in accordance with the terms of this Agreement shall automatically be deemed to supersede and replace any then-existing **Exhibit A** to this Agreement and the Repair & Maintenance Reserve for all purposes, it being understood and agreed that Seller's calculation of any revisions to the Repair & Maintenance Reserve and/or the Purchase Price (provided same shall have been calculated in accordance with the terms of this Agreement and the Lease and absent manifest error) shall be final and binding on Seller and Purchase Right Holder. Purchase Right Holder acknowledges that adjustments to the dates of the Initial Term under the Lease could affect the Purchase Price.

23. **FIRE OR CASUALTY**.  Notwithstanding anything contained in this Agreement to the contrary, if all or a material part of the Premises is damaged or destroyed or is taken by eminent domain, then each of Purchase Right Holder and Seller shall have the right to terminate this Agreement, upon written notice to the other, whereupon this Agreement shall be of no further force or effect. For purposes hereof, "material damage" shall mean the time to repair the Premises would take, in Landlord's reasonable estimation, more than thirty (30) days from the date of such casualty.  However, if the damage was caused, in whole or in part, by the negligence or intentional or willful acts or omissions of Tenant or any Occupant, then Landlord shall have the right to terminate this Agreement upon notice to Tenant regardless of the extent of the damage. If the damage occurs after execution of the Executed Purchase Contract, the terms and provisions thereof shall govern such fire or casualty.  Nothing contained herein shall relieve Tenant from liability under the Lease with respect to such casualty.

24. **ADEQUATE CONSIDERATION.**  Purchase Right Holder and Seller each acknowledges and agrees that their respective rights and obligations contained in this Agreement as well as the Purchase Right are supported by adequate consideration, which consideration includes but is not limited to (a) the payment of the "Deposit" pursuant to and as defined in the Document Review Acknowledgment submitted by at least one of the Purchase Right Holders, (b) the payment of the Security Deposit and the Rent pursuant to and in accordance with the terms of the Lease, (c) the credits and other payments which would have been credited by Seller to the Purchaser under the Purchase Contract if the sale of the Premises were consummated pursuant to the terms of this Agreement, and (d) Tenant's entering into the Lease and agreeing to be bound pursuant to the obligations contained therein.

25. **EXPIRATION.**  Except as set forth in the last sentence of this Paragraph and the Executed Purchase Contract, if applicable, all of Purchase Right Holder's rights contained in this Agreement to purchase the Premises (including the Purchase Right which must be exercised, if at all, in accordance with Paragraph 1 above), shall expire, terminate, **become null and void and of no force or effect in accordance with the terms of this Agreement but in no event later than the earlier to occur of the Expiration Date of the Lease or the day immediately preceding the fifth (5th) anniversary of the Commencement Date of the Lease**, time being of the essence and notwithstanding anything contained in this Agreement to the contrary. Notwithstanding the immediately preceding sentence, the provisions contained in this Agreement and the Lease pertaining to the calculation of the Purchase Price and the Repair & Maintenance Reserve and adjustments thereto in the event the Executed Purchase Contract is entered into shall survive and be binding in connection with the Executed Purchase Contract.

26. **KANSAS SPECIFIC PROVISIONS**.

Purchase Right Holder Name: <u>Valerie Fahrnow</u>        <u>Albert Brynds</u>        Ashlyne Fahrnow        Mareck Muro

Premises Address: <u>12519 Connell Drive, Overland Park, KS, 66213</u>        Page 12

RTP - KS: 2018-01

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 50 of 62



DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

a. Kansas law requires persons who are convicted of certain crimes, including certain sexually violent crimes, to register with the sheriff of the county in which they reside. If you, as the buyer, desire information regarding those registrants, you may find information on the homepage of the Kansas Bureau of Investigation (KBI) at http://www.Kansas.gov/kbi or by contacting the local sheriff's office.

b. Every buyer of residential real property is notified that the Premises may present exposure to dangerous concentrations of indoor radon gas that may place occupants at risk of developing radon-induced lung cancer. Radon, a class-A human carcinogen, is the leading cause of lung cancer in non-smokers and the second leading cause overall. Kansas law requires sellers to disclose any information known to the seller that shows elevated concentrations of radon gas in residential real property. The Kansas department of health and environment recommends all home-buyers have an indoor radon test performed prior to purchasing or taking occupancy of residential real property. All testing for radon should be conducted by a radon measurement technician. Elevated radon concentrations can be easily reduced by a radon mitigation technician. For additional information go to www.kansasradonprogram.org.

[remainder of page intentionally left blank]

---

Purchase Right Holder Name: Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro

Premises Address: 12519 Connell Drive, Overland Park, KS, 66213          Page 13

RTP - KS: 2018-01



DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

In Witness Whereof, and intending to be legally bound hereby, the parties have executed this Residential Right to Purchase Agreement effective as of _____4/15/2019_____ ("*Effective Date*").

**Purchase Right Holder:**

DocuSigned by:

_____
EB64399DCA004A0...
Name:   Valerie Fahrnow

DocuSigned by:

_____
F5955F91ED0A4BE...
Name:   Albert Brynds

DocuSigned by:

_____
AD43E238994A40A...
Name:   Ashlyne Fahrnow

DocuSigned by:

_____
CC63E7173918419...
Name:   Mareck Muro

**Landlord/Seller:**

HPA US1 LLC
a Delaware limited liability company

DocuSigned by:

By:___kara Barford_____
B15997C2DF1E4AE...
Name:_____

Title:  Authorized Agent

**LIST OF EXHIBITS:**

Exhibit A  -  Purchase Price
Exhibit B  -  Legal Description of Premises
Exhibit C  -  Purchase Contract

Purchase Right Holder Name: Valerie Fahrnow          Albert Brynds          Ashlyne Fahrnow          Mareck Muro
Premises Address: 12519 Connell Drive, Overland Park, KS, 66213
RTP - KS:  2018-01
Page 14

Case 21-20342   Doc# 18-1   Filed 04/21/21   Page 52 of 62

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

**EXHIBIT A**
**TO RESIDENTIAL RIGHT TO PURCHASE AGREEMENT**

**(Effective as of __4/15/2019__ )**

| **Date of Closing:** | **Purchase Price\*** |
| --- | --- |
| | **(as of the date of this Exhibit A)** |
| Initial Term of Lease (Year 1) | $__411900.00__ |
| First Renewal Term of Lease (Year 2) | $__426200.00__ |
| Second Renewal Term of Lease (Year 3) | $__441000.00__ |
| Third Renewal Term of Lease (Year 4) | $__456300.00__ |
| Fourth Renewal Term of Lease (Year 5) | $__472200.00__ |

\*    The Purchase Price set forth in this **Exhibit A** shall be: (1) calculated and adjusted in accordance with Paragraph 22 of the Right to Purchase Agreement and (2) subject to adjustment pursuant to and in accordance with the terms of the Right to Purchase Agreement and/or the terms of the Lease (including the Repair, Maintenance & Improvement Addendum thereto).

The Purchase Price set forth herein includes a Repair & Maintenance Reserve in the initial amount of $2,500. Any balance in the Repair & Maintenance Reserve at the time of Closing may result in a credit or reduction in the Purchase Price in accordance with Paragraph 22 of the Right to Purchase Agreement.

This Exhibit A may be updated from time to time pursuant to and in accordance with the terms of Paragraphs 22.b and 22.c of the Right to Purchase Agreement.

For the avoidance of doubt, the Purchase Price shall be calculated based upon the actual Closing Date, not the estimated or target Closing Date contained in the Executed Purchase Contract.

Purchase Right Holder Name: _Valerie Fahrnow_____     _Albert Brynds_____     Ashlyne Fahrnow     Mareck Muro
Premises Address: _12519 Connell Drive, Overland Park, KS, 66213____

RTP - KS:  2018-01

EXHIBIT A

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

**EXHIBIT B**

**LEGAL DESCRIPTION OF PREMISES**


If not available at time of execution of the Right to Purchase Agreement, to be provided by Seller at Purchase Right Holder's request or as part of the Executed Purchase Contract.

Purchase Right Holder Name: <u>Valerie Fahrnow</u>    <u>Albert Brynds</u>    Ashlyne Fahrnow    Mareck Muro

Premises Address: <u>12519 Connell Drive, Overland Park, KS, 66213</u>    EXHIBIT B

RTP - KS: 2018-01

## EXHIBIT C

## REAL ESTATE SALE CONTRACT (KANSAS)

1. The person(s) who are identified on the signature page hereof as the Purchaser (individually or if more than one person is named, collectively, "Purchaser") who is identified as one or all of the persons constituting the Purchase Right Holder in that certain Residential Right to Purchase Agreement ("Right to Purchase Agreement"), agrees to purchase at a purchase price of $ _____, subject to adjustment in accordance with the terms hereof ("Purchase Price") and on the terms set forth herein, the real estate located at the commonly known address of _____ _____, which may be legally described in Exhibit A attached hereto and incorporated therein by this reference, together with any and all personal property and fixtures located thereon to the extent owned by Seller (collectively, the "Premises"). Capitalized terms which are used in this Contract but which are not otherwise defined herein shall have the meaning ascribed thereto in the Lease (defined below) or the Right to Purchase Agreement, as applicable.

   Each person constituting Purchaser (should there be more than one) is and shall be jointly and severally liable for all obligations of Purchaser under this Contract. Purchaser shall not have the right to assign this Contract nor any rights or interests herein.

2. This Real Estate Sale Contract ("Contract") is for the sale of the real estate and property (including fixtures, equipment and personal property) in its **"AS IS, WHERE IS, WITH ALL FAULTS"** condition, and Purchaser acknowledges and agrees that, except as expressly set forth in this Contract, (a) no representations, warranties or guarantees with respect to the condition of the Premises, the real estate or property located thereon have been made by Seller other than those known defects, if any, disclosed in writing by Seller, (b) the sale of the Premises is without any representations or warranties by Seller, including, without limitation, habitability or fitness for a particular purpose, (c) one or more of the persons who constitute Purchaser has been in occupancy of the Premises in its capacity as Tenant pursuant to that certain Residential Lease Agreement ("Lease") with the Seller, Purchaser shall be deemed to be fully aware of the condition of the entire Premises and acknowledges that it has had ample opportunity to inspect the Premises prior to execution of this Contract, (d) to the extent that the Premises has been damaged prior to Closing, Purchaser shall be deemed to have caused and/or consented to/accepted such damage and expressly accepts the Premises including all such damage, and (e) Seller has not agreed to and shall have no obligation to perform any repair or maintenance work to the Premises under this Contract. IN FURTHERANCE THEREOF, TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAWS, SELLER SHALL HAVE NO OBLIGATION UNDER THIS CONTRACT TO REPAIR OR RESTORE THE PREMISES. PURCHASER ACKNOWLEDGES AND AGREES THAT: (I) THE PURCHASE PRICE WAS NEGOTIATED WITH THE EXPRESS UNDERSTANDING THAT PURCHASER IS RESPONSIBLE FOR ALL REPAIR AND MAINTENANCE NEEDS OF THE PREMISES PURSUANT TO THE LEASE, THE RIGHT TO PURCHASE AGREEMENT AND THIS CONTRACT; (II) TENANT (WHICH INCLUDES THE PURCHASER) HAS BEEN IN OCCUPANCY OF THE PREMISES SINCE THE COMMENCEMENT DATE UNDER THE LEASE AND IS AND WAS IN A UNIQUE POSITION TO INVESTIGATE ALL MATTERS RELATED TO THE CONDITION OF THE PREMISES; (III) THIS OFFER IS MADE BY PURCHASER PURSUANT TO THE RIGHT TO PURCHASE AGREEMENT, (IV) TENANT SHALL NOT BE RELIEVED OF OBLIGATIONS ACCRUING UNDER THE LEASE PRIOR TO THE EXPIRATION OR TERMINATION THEREOF, AND (V) UPON CLOSING, PURCHASER SHALL BE DEEMED TO HAVE UNCONDITIONALLY WAIVED AND RELEASED SELLER FROM ALL OBLIGATIONS SELLER MAY HAVE UNDER THE LEASE, THE RIGHT TO PURCHASE AGREEMENT AND THIS CONTRACT TO PERFORM ANY REPAIR OR MAINTENANCE OBLIGATIONS THEREUNDER, IT BEING UNDERSTOOD AND AGREED THAT ALL SUCH OBLIGATIONS THAT REMAIN OUTSTANDING AS OF CLOSING SHALL EXPIRE AND TERMINATE UPON CLOSING; ACCORDINGLY, SELLER SHALL HAVE NO OBLIGATION UNDER THIS CONTRACT OR OTHERWISE TO REPAIR OR RESTORE ALL OR ANY PART OF THE PREMISES AFTER CLOSING.

3. The seller who is identified on the signature page of this Contract ("Seller") agrees to sell the Premises at the price and terms set forth herein, and to convey or cause to be conveyed to Purchaser, title thereto (as tenants in common unless Seller is notified that Purchaser desires to hold title differently at least five (5) Business Days prior to Closing) by a recordable special warranty deed, with release of homestead rights, if applicable, and a proper bill of sale, if needed, subject only to: (a)

Purchase Right Holder Name: _____
Premises Address: _____     EXHIBIT C – Page 1

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

easements, agreements, covenants, conditions and restrictions of record;  (b) private, public and utility easements and roads and highways, if any, not materially affecting the value of or unduly interfering with Purchaser's reasonable use of the Premises as a single family residence ; (c) party wall rights and agreements, if any; (d) special taxes or assessments for improvements not yet completed and not yet due and payable as of Closing; (e) any unconfirmed special tax or assessment; (f) installments not due at the time of Closing of any special tax or assessment for improvements heretofore completed; (g) real estate taxes not due and payable as of the date of Closing and subsequent years including taxes which may accrue by reason of new or additional  improvements; (h) any matters that are the result of any actions or inactions of the Purchaser (or those claiming through Purchaser) during its tenancy; (i) homeowner association or similar dues, if any, not due and payable as of the date of Closing, (j) the following mortgage or trust deed (applicable only if filled in by the parties):_____, and (k)_____.

4.  Simultaneously herewith, Purchaser shall pay $1,000.00 to Seller or as Seller shall otherwise direct, as earnest money to be applied to the Purchase Price (or closing costs or credits) at Closing (unless otherwise agreed in writing), and agrees to pay or satisfy the balance of the Purchase Price at the time of Closing as follows:

A.  The payment of the balance of the Purchase Price, by wire transfer or certified funds, adjusted for earnest money deposits, prorations and customary closing costs (which amounts shall be identified on the closing disclosure). For proration and other purposes, Purchaser shall be deemed to own the Premises as of the Closing Date.

B.  The Purchase Price contained in this Contract (i) was determined in accordance with the Right to Purchase Agreement and (ii) was based on the initial Closing Date contained in this Contract (it being understood and agreed that if the Closing Date should be delayed and the actual Closing Date would result in an increase in the Purchase Price in accordance with the Right to Purchase Agreement, then the Purchase Price contained in this Contract shall automatically be increased by the same amount).

C.  Seller shall have the right to adjust the amount of the Purchase Price and/or the amount of any closing credit contained in this Contract (or any credits contained in the closing statement): (x) for any matters that were not known or finalized as of the date the Purchase Price contained in this Contract was calculated, (y) based upon any reductions to the Repair & Maintenance Reserve (including Repair & Maintenance Costs incurred after or not known/finalized as of the Effective Date of this Contract), and (z) as expressly permitted by the Lease and the Right to Purchase Agreement (it being understood and agreed that the terms and provisions contained in the Right to Purchase Agreement and the Lease as they affect the calculation of the Purchase Price or the Repair & Maintenance Reserve shall survive any termination or expiration of the Right to Purchase Agreement or the Lease, as the case may be, prior to Closing).

D.  Prior to closing, Seller shall determine the outstanding balance, if any, of the Repair & Maintenance Reserve and such balance shall either (i) be given to Purchaser as a closing credit or (ii) the Purchase Price shall be reduced by such amount.

E.  All general property taxes that have accrued for any prior calendar year that remain unpaid shall be paid by Seller either to the County Treasurer and/or the Purchaser in the form of a credit at closing. All taxes that have accrued for the current calendar year shall be prorated on a calendar-year basis as of the day immediately prior to the Closing Date. For the purpose of determining the credit amount for accrued but unpaid taxes, taxes shall be assumed to be the same as the most recent year when taxes were billed based upon certified tax rates. This shall be a final settlement and there shall be no reproration after Closing.

F.  Purchaser directs Seller that an amount equal to any unapplied Security Deposit and any prepaid Rent then held by Landlord under the Lease together with any pet fees or pet deposits previously paid by Tenant to Landlord under the Lease, in each case subject to permitted setoffs as of Closing, be applied or credited against the Purchase Price (or closing costs or credits) unless otherwise agreed in writing. Seller shall have the right (but will not be required) to require written authorization from all Tenants or Purchase Right Holders confirming such direction. Upon Closing, such amounts so applied toward the Purchase Price or closing costs will be deemed to have been returned to Tenant pursuant to the terms of the Lease and Landlord will have no further obligation to account for same under the Lease.

As of the Effective Date of this Contract, Seller confirms that (i) the Security Deposit currently being held by Landlord under the Lease is in the amount of $_____ and (ii) Tenant has paid pet fees under the Lease in the

Purchase Right Holder Name: _____

Premises Address: _____

RTP - KS:  2018-01

EXHIBIT C – Page 2

aggregate amount of $_____. Such amounts (adjusted as of Closing) shall be identified on the settlement statement.

It is expressly understood and agreed by Purchaser and Seller that any adjustments to Purchase Price contained in this Contract shall occur, if at all, prior to consummation of the Closing. Once the Closing has occurred, each party hereto waives the right to dispute the calculation of the Purchase Price (including the calculation of the Repair & Maintenance Reserve) paid pursuant to this Contract (including credits or adjustments shown on the final closing statement), all of which shall be final and binding on the parties to this Contract, the Lease and the Right to Purchase Agreement notwithstanding anything contained therein to the contrary (however Tenant shall not be relieved of any obligations under the Lease accruing prior to the Closing).

5.  The time of Closing shall be on _____or on the date, if any, to which such time is extended by reason of paragraph 16.B below hereafter becoming operative (whichever date is later), unless otherwise subsequently mutually agreed in writing, at the office of _____ (to be designated by Seller) provided title is shown to be good or is otherwise accepted by Purchaser.

6.  Possession shall be deemed to have been delivered by Seller at the time of Closing. Seller will not be obligated to deliver the Premises to Purchaser at the time of Closing, it being understood and agreed that one or more of the persons who constitute Purchaser has been in possession of the Premises pursuant to the terms of the Lease and although the Lease provides that it shall automatically terminate and expire upon the sale of the Premises pursuant to this Contract, Purchaser is expressly taking title subject to any holdover by any tenant or occupant under the Lease. Keys and/or means to operate all locks, mailboxes, security systems, alarm and garage door openers have previously been provided to Purchaser and no additional copies will be provided to Purchaser except to the extent in Seller's possession.

7.  Purchaser represents to Seller that no broker was used in connection with this Contract and no commissions, fees or other compensation shall be payable or owed to a broker as a result of the sale of the Premises to Purchaser (except for any broker retained by Seller in which event Seller shall be responsible for any commission due such broker) and Purchaser shall indemnify Seller against a breach of such representation. This provision shall survive the closing or termination of this Contract indefinitely. Real estate broker fees or commissions, if any, shall be paid at Closing in accordance with the listing agreement, buyer service agreement or other written agreement for compensation by the party obligated to pay same per such agreement.

8.  At Seller's option, the earnest money shall be held (a) by a title company or escrow agent identified by Seller or (b) by Seller, for the mutual benefit of the parties.

9.  Notwithstanding anything contained in this Contract to the contrary, in case, after the execution of this Contract but prior to Closing, all or a material part of the Premises is damaged or destroyed by fire or other casualty, then Purchaser and Seller shall each have the right, within ten (10) days after receipt of notice of such event, to notify the other that such party has elected to terminate this Contract, whereupon this Contract shall be of no further force or effect and neither party shall have any liability to the other under this Contract except that the earnest money shall be returned to Purchaser. If all or a material portion of the Premises is taken by eminent domain (or deed in lieu thereof) prior to Closing, then Purchaser and Seller shall each have the right, within ten (10) days after receipt of notice of such event, to notify the other that such party has elected to terminate this Contract, whereupon this Contract shall be of no further force or effect and neither party shall have any liability to the other under this Contract except that the earnest money shall be returned to Purchaser. If this Contract is not terminated pursuant to this paragraph, then the parties shall proceed to closing and Seller shall, at its election, (i) in the event of a casualty, at Seller's option, either (A) repair such damage and/or provide Purchaser with a credit for the estimated remaining cost of such repairs or (B) assign to Purchaser the applicable insurance proceeds pertaining to such damage, or (ii) in the event of a condemnation, Purchaser shall pay the Purchase Price and Seller will assign to Purchaser the right to recover all condemnation proceeds to which Seller may be entitled under applicable law. Seller shall notify Purchaser prior to closing how it has elected to proceed. Nothing contained in this Contract shall relieve Tenant from liability under the Lease with respect to damage or a casualty occurring on or before the Expiration Date of the Lease.

10. Seller shall terminate and cancel all hazard and other insurance held by it in connection with the Premises as of Closing. Purchaser shall obtain new insurance policies at Closing, to the extent desired by Purchaser or required by Purchaser's lender.

11. If applicable, prior to signing this Contract, Purchaser:

(*check one*) __has __ has not received a completed Seller's Disclosure Statement for Residential Property;
(*check one*) __has __ has not received the EPA Pamphlet, "Protect Your Family From Lead in Your Home";
(*check one*) __has __ has not received a Lead-Based Paint Disclosure; and
(*check one*) __has __ has not received the Disclosure of Information on Radon Hazards.

In addition to the disclosures made pursuant to the terms of this Contract, Purchaser acknowledges and agrees that, prior to the execution of this Contract: (a) it has received copies of and is familiar with each of the disclosures which is identified in the Lease and/or the Right to Purchase Agreement and that all such disclosures shall be deemed to be incorporated into this Contract by this reference without the necessity of attaching same hereto and (b) it was provided with an opportunity to conduct a paint inspection or risk assessment for lead-based paint or lead-based paint hazards (unless required by law to be conducted by Landlord or Seller) and it has either completed such inspections and is satisfied with the results thereof or has waived the opportunity to perform such inspections.

Purchaser and Seller agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedure Act of 1974. In the event that either party shall fail to make appropriate disclosure when asked, such failure shall be considered a breach on the part of said party.

Purchaser certifies that he/she/it has not been designated or named as a terrorist, a "Specially Designated National and Blocked Person," or any other banned or blocked individual or entity pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website. Purchaser shall defend, indemnify, and hold harmless Seller from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any current or future breach of the foregoing certification.

12. Every buyer of residential real property is notified that the Premises may present exposure to dangerous concentrations of indoor radon gas that may place occupants at risk of developing radon-induced lung cancer. Radon, a class-A human carcinogen, is the leading cause of lung cancer in non-smokers and the second leading cause overall. Kansas law requires sellers to disclose any information known to the seller that shows elevated concentrations of radon gas in residential real property. The Kansas department of health and environment recommends all home-buyers have an indoor radon test performed prior to purchasing or taking occupancy of residential real property. All testing for radon should be conducted by a radon measurement technician. Elevated radon concentrations can be easily reduced by a radon mitigation technician. For additional information go to www.kansasradonprogram.org.

13. Kansas law requires persons who are convicted of certain crimes, including certain sexually violent crimes, to register with the sheriff of the county in which they reside. If you, as the buyer, desire information regarding those registrants, you may find information on the homepage of the Kansas Bureau of Investigation (KBI) at http://www.Kansas.gov/kbi or by contacting the local sheriff's office.

14. Purchaser acknowledges that Seller may be entering into this transaction in connection with a tax-deferred exchange (the "Exchange") and if requested by Seller, Purchaser shall cooperate with Seller's request to effectuate such Exchange, including executing any documents, instruments or agreements reasonably requested by Seller provided Purchaser shall not be obligated to (i) expend any costs in connection with such Exchange or (ii) accept or assume any additional obligations or liabilities in connection with such Exchange.

15. If Purchaser does not receive a fully executed copy or duplicate original of this Contract (duly executed by the Seller) within ten (10) days from the date Seller receives it signed by the Purchaser, then Purchaser shall have the right to notify Seller that it has revoked this Contract in which event it shall become null and void and the earnest money shall be refunded to the Purchaser.

16. The following Conditions and Stipulations are expressly made a part of this Contract:

A. Seller shall deliver or cause to be delivered to Purchaser or Purchaser's agent, not less than 5 days prior to the time of Closing, a title commitment for an owner's title insurance policy issued by a title insurance company or agent selected by Seller in the amount of the purchase price, covering title to the real estate on or after the date hereof, showing title in the intended grantor subject only to (a) the general exceptions contained in the policy unless the real estate is improved

Purchase Right Holder Name: _____

Premises Address: _____                    EXHIBIT C – Page 4
RTP - KS: 2018-01

with a single family dwelling or an apartment building of four or fewer residential units; (b) the title exceptions set forth above, including, without limitation, the title exceptions set forth in Paragraph 3 above; and (c) title exceptions pertaining to liens or encumbrances of a definite or ascertainable amount which may be removed by the payment of money at the time of Closing and which Seller may so remove at that time by using the funds to be paid upon the delivery of the deed (all of which are herein referred to as the "Permitted Exceptions"). The title commitment shall be conclusive evidence of good title therein shown as to all matters insured by the policy, subject only to the exceptions therein stated. Seller also shall furnish Purchaser an affidavit of title in customary form covering the date of Closing and showing title in Seller subject only to the foregoing Permitted Exceptions and unpermitted exceptions, if any, as to which the title insurer commits to extend insurance in the manner specified in Subparagraph B below.

B.  If the title commitment discloses Unpermitted Exceptions, Seller shall have 30 days from the date of delivery thereof to have the exceptions removed from the commitment or to have the title insurer commit to insure against loss or damage that may be occasioned by such exceptions, and, in such event, Seller shall have the right to delay the date of Closing from the date specified in Paragraph 5 until no later than 35 days after delivery of the commitment. If Seller fails to have the exceptions removed, or in the alternative, to obtain the commitment for title insurance specified above as to such exceptions within the specified time, Purchaser may terminate this Contract or may elect, upon notice to Seller within 10 days after the expiration of the 30-day period, to take title as it then is, without a reduction in the purchase price. If Purchaser does not so elect to take title as it then is, this Contract shall become null and void without further actions of the parties. Purchaser shall have no right to specific performance or damages as a consequence of Seller's inability to provide insurable title.

C.  Rents, water and other utility charges, fuel, prepaid service contracts, property taxes and other similar items shall be adjusted ratably as of the time of Closing. The amount of the current property taxes not then ascertainable shall be adjusted on the basis of 100% of the most recent ascertainable taxes. All prorations are final.

D.  If this Contract is terminated without Purchaser's fault, the earnest money shall be returned to the Purchaser as its sole remedy but if the termination is caused by the Purchaser's fault, then the earnest money shall be forfeited to the Seller as liquidated damages. The parties acknowledge and agree that the amount of Purchaser's actual damages in such circumstance would be difficult, if not impossible, to determine and that the above amount is a reasonable estimate of damages and is not a penalty.

E.  At the election of either party, not less than five (5) Business Days prior to Closing, this sale shall be closed through an escrow with the title company in accordance with the provisions of the customary form of Deed and Money Escrow as agreed upon between the parties, with provisions inserted in such Escrow Agreement as may be required to conform with this Contract. If this transaction is a cash purchase (no mortgage secured by Purchaser), the parties shall share the title company escrow closing fee equally; otherwise, the escrow fee shall be paid by Purchaser. Purchaser shall make payment of any documentary or other tax or fee payable in connection with any mortgage or deed of trust that is to be recorded or any promissory note that is executed in connection with the Closing. In the event any documentary or other tax or fee becomes payable in connection with the conveyance of the Premises to Purchaser, such tax or fee shall be due and payable by the party upon whom such obligation is imposed by statute, if any, otherwise, in accordance with local custom.

F.  Time is of the essence of this Contract and each of the provisions contained herein.

G.  All notices under this Contract shall be in writing and shall be served on the parties at the addresses following their signatures. Personal delivery, electronic mail, or the mailing of a notice by registered or certified mail, return receipt requested, or the sending of a notice by commercial overnight delivery or courier company (e.g., FedEx), shall be sufficient service. Notices may be given by a party's attorney.

H.  This Contract may be executed in one or more counterparts, each of which shall be deemed an original. Furthermore, executed counterparts of this Contract and any amendment hereto may be delivered by facsimile or other reliable electronic means (including emails of pdf/tif documents), and such facsimile or other electronic transmission shall be valid and binding for all purposes when transmitted to and actually received by the other party; however, each party delivering executed documents by facsimile or other electronic means agrees to provide the other party with an original, hard copy of the relevant signed documents promptly after the request of the other party. This Contract constitutes the complete and entire agreement among the parties pertaining to the sale of the Premises, and no representations or oral statements of either party are binding unless contained herein (except to the extent expressly contained in the Lease or

the Right to Purchase Agreement). This Contract may not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto. Neither Seller nor any of its agents has made any oral promises, representations, or agreements not contained in this Contract and no agent of Seller has any authority to waive, amend, or terminate this Contract or any part of it, and no authority to make promises, representations, or agreements that impose duties or other obligations on Seller or waives any obligation of Purchaser hereunder.

I.  If at any time after the this Contract has been fully executed and delivered, either party institutes any action or proceeding against the other relating to the provisions of this Contract, the party not prevailing in the action or proceeding will reimburse the prevailing party for its reasonable attorneys' fees (not to exceed the sum of $1,000.00 in the aggregate for any such action which amount shall be inclusive of (a) fees incurred at trial or arbitration, any appeal therefrom, or in connection with any bankruptcy proceedings, and (b) all costs and expenses incurred in connection with such action, proceeding, appeal or in collection of any judgment including expert fees, any post-judgment fees and costs). The term "prevailing party" shall include, without limitation, a party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense.

J.  If any provision herein contained which by its nature and effect is required to be observed, kept or performed after the Closing, it shall survive the Closing and remain binding upon and for the benefit of the parties hereto until fully observed, kept or performed but in no event beyond the date which is six (6) months after the date of Closing (unless such provision expressly contains a different survival period).

K.  Seller shall not be obligated to provide Purchaser with a current survey of the Premises but agrees that if it has a copy of a survey in its possession, it will provide a copy thereof to Purchaser. Purchaser acknowledges that should its lender or the title company require a current survey of the Premises, obtaining such current survey shall be Purchaser's obligation and at Purchaser's sole cost.

L.  This Contract shall be governed, construed and interpreted by, through and in accordance with the laws of the state where the Premises is located, without reference to its conflict of law's provisions. In case any provisions contained in this Contract is held invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability shall not affect any other provision of this Contract.

M.  If Seller is a "foreign person", as defined by applicable law, or if Seller fails to deliver an affidavit to Purchaser that Seller is not a "foreign person", then Purchaser shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. Internal Revenue Service regulations require filing written reports if currency in excess of specified amounts is received in the transaction.

17. ☐ _____ (**This section is applicable (a) only if checked and initialed by Seller and (b) for the <u>first</u> Executed Purchase Contract associated with the Right to Purchase Agreement and there shall be no Appraisal Contingency thereafter).**

Appraisal Contingency. Purchaser shall have the right to terminate this Contract in the event an Appraisal (defined below) obtained by Purchaser certifies an appraised value for the Premises that is less than the Purchase Price ("Appraisal Contingency"). For purposes hereof, the "Appraisal" must be in writing, prepared and signed by a licensed real estate appraiser in the state in which the Premises is located and must be dated no earlier than the Effective Date of this Contract and no later than the scheduled Closing Date set forth above (as same may be extended in writing). In order to terminate this Contract due to an Appraisal Contingency, Purchaser must provide Seller, prior to the scheduled Closing Date, with a written notice of such termination together with a copy of the Appraisal satisfying the foregoing requirements. Promptly after such termination due to an Appraisal Contingency, the earnest money (minus any out-of-pocket costs incurred by Seller in connection with preparing for the Closing such as ordering a title commitment or obtaining a pay-off letter, which amounts shall be retained by Seller) shall be promptly refunded to Purchaser.

[remainder of page intentionally left blank]

Purchase Right Holder Name: _____

Premises Address: _____                    EXHIBIT C – Page 6

RTP - KS: 2018-01

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

This Real Estate Sale Contract is dated effective as of _____ ("Effective Date").

**Purchaser:**                                              **Seller:**

_____,
a Delaware limited liability company

_____

Printed Name: _____       By:_____

Name:_____
_____       Title:  Authorized Agent

Printed Name: _____

Seller's Address:

_____

Printed Name: _____       180 N Stetson Ave Suite 3650,
Chicago, IL 60601

Purchaser's Address if different from the Premises:       Attention:  Closing Department

_____
_____

SAMPLE DO NOT SIGN

Purchase Right Holder Name: _____
Premises Address: _____          EXHIBIT C – Page 7
RTP - KS:  2018-01

DocuSign Envelope ID: 9A857054-5FCE-4EEB-932B-E351BEFD775D

**EXHIBIT A**
**TO**
**REAL ESTATE SALE CONTRACT**


**Legal Description of Premises**


If not attached at the time the Real Estate Sale Contract is executed, the legal description shall be the same legal description as is contained in the title commitment or owner's title insurance policy provided by Seller or otherwise as set forth below.



Purchase Right Holder Name: _____

Premises Address: _____          EXHIBIT C – Page 8

RTP - KS: 2018-01

Case 21-20342    Doc# 18-1    Filed 04/21/21    Page 62 of 62

# Pathlight Property Management

**Lease: Fahrnow - Brynds**
**Contact: Albert Brynds**
**Contact: STEWART TITLE COMPANY**
**Contact: Valerie Fahrnow**

**Property Address: 12519 Connell Dr**
                         **Overland Park,KS 66213-1872**

| Balance as of 04/09/2021 | Prepayments | Total Unpaid | Deposit Held |
|---|---|---|---|
| $10,906.81 | **$0.00** | $10,906.81 | **$2,580.00** |

| Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|
| Unpaid Charge | 04/06/2021 | | 4010 - Late Fee : Calculated on 04/06/2021 5:12 AM by system | | | $232.27 | | $10,906.81 |
| Unpaid Charge | 04/01/2021 | 4/01/2021- 4/26/2021 | 4000 - Rent : Tenant to pay pro-rated rent of $2,322.67 per lease end date of 4/26/2021 (Base rent of $2,680.00 divided by 30 days then multiplied by 26. | | | $2,322.67 | | $10,674.54 |
| Unpaid Charge | 03/25/2021 | | 4279 - Water : 01/14/2021 - 03/10/2021 Water | | | $47.96 | | $8,351.87 |
| Unpaid Charge | 03/25/2021 | | 4277 - Trash Service : 03/01/2021 - 05/31/2021 Trash Service | | | $65.00 | | $8,303.91 |
| Unpaid Charge | 03/25/2021 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $8,238.91 |
| Unpaid Charge | 03/06/2021 | | 4010 - Late Fee : Calculated on 03/06/2021 5:14 AM by system | | | $268.00 | | $8,230.96 |
| Unpaid Charge | 03/01/2021 | | 4000 - Rent | | | $2,680.00 | | $7,962.96 |
| Unpaid Charge | 02/25/2021 | | 4279.1 - Water:Sewer : 11/11/2020 - 01/13/2021 Sewer | | | $169.27 | | $5,282.96 |
| Unpaid Charge | 02/25/2021 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $5,113.69 |

| | Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | Unpaid Charge | 02/06/2021 | | 4010 - Late Fee : Calculated on 02/06/2021 5:12 AM by system | | | $268.00 | | $5,105.74 |
| | Unpaid Charge | 02/01/2021 | | 4000 - Rent | | | $2,680.00 | | $4,837.74 |
| | Unpaid Charge | 01/25/2021 | | 4279 - Water : 11/11/2020 - 01/13/2021 Water | | | $78.32 | | $2,157.74 |
| | Unpaid Charge | 01/25/2021 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $2,079.42 |
| | Unpaid Charge | 01/06/2021 | | 4010 - Late Fee : Calculated on 01/06/2021 5:13 AM by system | | | $188.32 | | $2,071.47 |
| | Settled ePayment | 01/05/2021 | 7L45JS6MLA3 | Payment of $796.85 applied to [01/01/21, acct 4000, $2,680.00] and $86.00 applied to [12/25/20, acct 4279, $86.00] and $109.20 applied to [12/25/20, acct 4279.1, $109.20] and $7.95 applied to [12/25/20, acct 4302, $7.95]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 01/07/2021 | | $1,000.00 | $1,883.15 |
| | Partially Paid Charge | 01/01/2021 | | 4000 - Rent | | | $2,680.00 | | $2,883.15 |
| | Paid Charge | 12/25/2020 | | 4279 - Water : 09/11/2020 - 11/10/2020 Water | | | $86.00 | | $203.15 |
| | Paid Charge | 12/25/2020 | | 4279.1 - Water:Sewer : 09/11/2020 - 11/10/2020 Sewer | | | $109.20 | | $117.15 |
| | Paid Charge | 12/25/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $7.95 |
| | Settled ePayment | 12/05/2020 | DHJ67B2MLA4 | Payment of $7.95 applied to [11/25/20, acct 4302, $7.95] and $65.00 applied to [11/25/20, acct 4277, $65.00] and $2,680.00 applied to [12/01/20, acct 4000, $2,680.00]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 12/09/2020 | | $2,752.95 | ($0.00) |
| | Paid Charge | 12/01/2020 | | 4000 - Rent | | | $2,680.00 | | $2,752.95 |

Case 21-20342    Doc# 18-2    Filed 04/21/21    Page 2 of 13

| Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|
| Paid Charge | 11/25/2020 | | 4277 - Trash Service : 12/01/2020 - 02/28/2021 Trash Service | | | $65.00 | | $72.95 |
| Paid Charge | 11/25/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $7.95 |
| Settled ePayment | 11/04/2020 | 5TXYW80MLA5 | Payment of $109.20 applied to [10/25/20, acct 4279.1, $109.20] and $76.18 applied to [10/25/20, acct 4279, $76.18] and $2,680.00 applied to [11/01/20, acct 4000, $2,680.00] and $7.95 applied to [10/25/20, acct 4302, $7.95]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 11/06/2020 | | $2,873.33 | ($0.00) |
| Paid Charge | 11/01/2020 | | 4000 - Rent | | | $2,680.00 | | $2,873.33 |
| Paid Charge | 10/25/2020 | | 4279.1 - Water:Sewer : 07/16/2020 - 09/10/2020 Sewer | | | $109.20 | | $193.33 |
| Paid Charge | 10/25/2020 | | 4279 - Water : 07/16/2020 - 09/10/2020 Water | | | $76.18 | | $84.13 |
| Paid Charge | 10/25/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $7.95 |
| Settled ePayment | 10/02/2020 | DJ7N2WWLLA8 | Payment of $2,680.00 applied to [10/01/20, acct 4000, $2,680.00]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 10/06/2020 | | $2,680.00 | ($0.00) |
| Paid Charge | 10/01/2020 | | 4000 - Rent | | | $2,680.00 | | $2,680.00 |
| Settled ePayment | 09/04/2020 | T4N4LGSLLA3 | Payment of $2,680.00 applied to [09/01/20, acct 4000, $2,680.00] and $7.95 applied to [08/25/20, acct 4302, $7.95] and $65.00 applied to [08/25/20, acct 4277, $65.00] and $106.08 applied to [08/25/20, acct 4279, $106.08] and $109.20 applied to [08/25/20, acct 4279.1, $109.20]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 09/09/2020 | | $2,968.23 | ($0.00) |

Case 21-20342    Doc# 18-2    Filed 04/21/21    Page 3 of 13

| | Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | Paid Charge | 09/01/2020 | | 4000 - Rent | | | $2,680.00 | | $2,968.23 |
| | Paid Charge | 08/25/2020 | | 4279.1 - Water:Sewer : 05/12/2020 - 07/15/2020 Sewer | | | $109.20 | | $288.23 |
| | Paid Charge | 08/25/2020 | | 4279 - Water : 05/12/2020 - 07/15/2020 Water | | | $106.08 | | $179.03 |
| | Paid Charge | 08/25/2020 | | 4277 - Trash Service : 09/01/2020 - 11/30/2020 Trash Service | | | $65.00 | | $72.95 |
| | Paid Charge | 08/25/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $7.95 |
| | Settled ePayment | 08/03/2020 | TX5GJRPLLA5 | Payment of $2,680.00 applied to [08/01/20, acct 4000, $2,680.00] and $88.40 applied to [07/06/20, acct 4010, $100.00]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 08/05/2020 | | $2,768.40 | ($0.00) |
| | Paid Charge | 08/01/2020 | | 4000 - Rent | | | $2,680.00 | | $2,768.40 |
| | Charge Adjustment | 07/20/2020 | Utilities Credit | 4279 - Water : Approved by Gwendolyn due to a water leak | Valerie Fahrnow | | | $522.48 | $88.40 |
| | Paid Charge | 07/06/2020 | | 4010 - Late Fee : Calculated on 07/06/2020 5:14 AM by system | | | $100.00 | | $610.88 |
| | Settled ePayment | 07/04/2020 | TQ9ZGBLLLA5 | Payment of $2,169.12 applied to [07/01/20, acct 4000, $2,680.00] and $7.95 applied to [06/25/20, acct 4302, $7.95] and $109.20 applied to [06/25/20, acct 4279.1, $109.20] and $510.88 applied to [06/25/20, acct 4279, $510.88]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 07/08/2020 | | $2,797.15 | $510.88 |
| | Paid Charge | 07/01/2020 | | 4000 - Rent | | | $2,680.00 | | $3,308.03 |
| | Paid Charge | 06/25/2020 | | 4279 - Water : 03/07/2020 - 05/11/2020 Water | | | $510.88 | | $628.03 |
| | Paid Charge | 06/25/2020 | | 4279.1 - Water:Sewer : 03/07/2020 - 05/11/2020 Sewer | | | $109.20 | | $117.15 |

| Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|
| Paid Charge | 06/25/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $7.95 |
| Settled ePayment | 06/04/2020 | TM28HMJLLA8 | Payment of $2,630.00 applied to [06/01/20, acct 4000, $2,680.00] and $65.00 applied to [05/25/20, acct 4277, $65.00] and $7.95 applied to [05/25/20, acct 4302, $7.95]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 06/08/2020 | | $2,702.95 | $0.00 |
| Paid Charge | 06/01/2020 | | 4000 - Rent | | | $2,680.00 | | $2,702.95 |
| Paid Charge | 05/25/2020 | | 4277 - Trash Service : 06/01/2020 - 08/31/2020 Trash Service | | | $65.00 | | $22.95 |
| Paid Charge | 05/25/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | ($42.05) |
| Charge Adjustment | 05/14/2020 | Utilities Credit | 4301 - Utility Failure to Tran... : Approved by Maria due to the resident having electric services in their name already and we billed them. | Valerie Fahrnow | | | $50.00 | ($50.00) |
| Settled ePayment | 05/04/2020 | WMNGKWDLLA4 | Payment of $50.00 applied to [04/25/20, acct 4301, $50.00] and $14.82 applied to [04/25/20, acct 4276, $14.82] and $7.95 applied to [04/25/20, acct 4302, $7.95] and $2,680.00 applied to [05/01/20, acct 4000, $2,680.00] and $109.20 applied to [04/25/20, acct 4279.1, $109.20]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 05/07/2020 | | $2,861.97 | $0.00 |
| Paid Charge | 05/01/2020 | | 4000 - Rent | | | $2,680.00 | | $2,861.97 |
| Paid Charge | 04/25/2020 | | 4279.1 - Water:Sewer : 01/10/2020 - 03/06/2020 Sewer | | | $109.20 | | $181.97 |
| Paid Charge | 04/25/2020 | | 4301 - Utility Failure to Tran... : 03/15/2020 - 03/19/2020 Utility Failure to Transfer Fee | | | $50.00 | | $72.77 |
| Paid Charge | 04/25/2020 | | 4276 - Electricity : 03/15/2020 - 03/19/2020 Electricity | | | $14.82 | | $22.77 |

Case 21-20342    Doc# 18-2    Filed 04/21/21    Page 5 of 13

| Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|
| Paid Charge | 04/25/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $7.95 |
| Settled ePayment | 04/04/2020 | XFW425BLLA5 | Payment of $2,593.33 applied to [04/01/20, acct 4000, $2,593.33] and $7.95 applied to [03/25/20, acct 4302, $7.95] and $65.00 applied to [03/25/20, acct 4277, $65.00] and $162.36 applied to [03/25/20, acct 4279, $162.36]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 04/08/2020 | | $2,828.64 | $0.00 |
| Paid Charge | 04/01/2020 | | 4000 - Rent | | | $2,593.33 | | $2,828.64 |
| Paid Charge | 03/25/2020 | | 4279 - Water : 01/10/2020 - 03/06/2020 Water | | | $162.36 | | $235.31 |
| Paid Charge | 03/25/2020 | | 4277 - Trash Service : 03/01/2020 - 05/31/2020 Trash Service | | | $65.00 | | $72.95 |
| Paid Charge | 03/25/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $7.95 |
| Settled ePayment | 03/05/2020 | 7QXVTX6LLA7 | Payment of $7.95 applied to [03/02/20, acct 4302, $7.95] and $103.51 applied to [03/02/20, acct 4279.1, $103.51] and $2,580.00 applied to [03/01/20, acct 4000, $2,580.00]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 03/10/2020 | | $2,691.46 | $0.00 |
| Paid Charge | 03/02/2020 | | 4279.1 - Water:Sewer : 11/08/2019 - 01/09/2020 Sewer | | | $103.51 | | $2,691.46 |
| Paid Charge | 03/02/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $2,587.95 |
| Paid Charge | 03/01/2020 | | 4000 - Rent | | | $2,580.00 | | $2,580.00 |
| Settled ePayment | 02/15/2020 | 160ZY84LLA2 | Payment of $258.00 applied to [02/06/20, acct 4010, $258.00] and $270.02 applied to [02/01/20, acct 4000, $2,580.00]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 02/21/2020 | | $528.02 | $0.00 |

Case 21-20342    Doc# 18-2    Filed 04/21/21    Page 6 of 13

| Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|
| Paid Charge | 02/06/2020 | | 4010 - Late Fee : Calculated on 02/06/2020 5:24 AM by system | | | $258.00 | | $528.02 |
| Settled ePayment | 02/06/2020 | KCHGXT4LLA7 | Payment of $91.50 applied to [01/14/20, acct 4035, $91.50] and $2,309.98 applied to [02/01/20, acct 4000, $2,580.00] and $7.95 applied to [01/25/20, acct 4302, $7.95] and $25.00 applied to [01/06/20, acct 4065, $25.00] and $65.57 applied to [01/25/20, acct 4279, $65.57]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 02/11/2020 | | $2,500.00 | $270.02 |
| Paid Charge | 02/01/2020 | | 4000 - Rent | | | $2,580.00 | | $2,770.02 |
| Journal Entry | 01/28/2020 | reclass JE on 01082020 | reclass JE on 01082020 | | | $3,181.00 | $3,181.00 | $190.02 |
| Paid Charge | 01/25/2020 | | 4279 - Water : 11/08/2019 - 01/09/2020 Water | | | $65.57 | | $190.02 |
| Paid Charge | 01/25/2020 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $124.45 |
| Paid Charge | 01/14/2020 | | 4035 - Legal & Professional Fe... : Anderson & assoc 12/31/19 Batch # 11263 | | | $91.50 | | $116.50 |
| Charge Adjustment | 01/08/2020 | 1 - 4010 | 4010 - Late Fee : Waive January late fee as one time courtesy per LBogl | Valerie Fahrnow | | | $258.00 | $25.00 |
| Journal Entry | 01/08/2020 | CR LBogl 1/08/20 | RSS - Requested by Layton B. Partial reimbursement for repair to electrical panel and replacement after hot tub and other repairs. Approved by NKon | | | | $3,181.00 | $283.00 |
| Charge Adjustment | 01/08/2020 | GWC TARge 1/08/20 | 4010 - Late Fee : RSS - Requested by Tiffany A. GWC in the amount of late fee due to delay in processing reimbursement. Approved by LBogl | Valerie Fahrnow | | | $258.00 | $3,464.00 |
| Paid Charge | 01/06/2020 | | 4010 - Late Fee : Calculated on 01/06/2020 5:08 AM by system | | | $258.00 | | $3,722.00 |

<span style="color:blue">Case 21-20342    Doc# 18-2    Filed 04/21/21    Page 7 of 13</span>

| Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|
| Paid Charge | 01/06/2020 | 903701060589938 | 4065 - Svc Chg/Ret/Stop Pmt et... : Wire Fee | | | $25.00 | | $3,464.00 |
| Deposited Payment | 01/06/2020 | 903701060589938 | Payment of $65.00 applied to [11/25/19, acct 4277, $65.00] and $7.95 applied to [11/25/19, acct 4302, $7.95] and $2,163.21 applied to [12/01/19, acct 4000, $2,580.00]/Wire Payments | Albert Allan Brynds Jr | 01/06/2020 | | $2,236.16 | $3,439.00 |
| Paid Charge | 01/01/2020 | | 4000 - Rent | | | $2,580.00 | | $5,675.16 |
| Paid Charge | 12/25/2019 | | 4279.1 - Water:Sewer : 09/11/2019 - 11/07/2019 Sewer | | | $102.56 | | $3,095.16 |
| Paid Charge | 12/25/2019 | | 4279 - Water : 09/11/2019 - 11/07/2019 Water | | | $73.70 | | $2,992.60 |
| Paid Charge | 12/25/2019 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $2,918.90 |
| Paid Charge | 12/06/2019 | | 4010 - Late Fee : Calculated on 12/06/2019 9:49 AM by system | | | $258.00 | | $2,910.95 |
| Paid Charge | 12/01/2019 | | 4000 - Rent | | | $2,580.00 | | $2,652.95 |
| Paid Charge | 11/25/2019 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $72.95 |
| Paid Charge | 11/25/2019 | | 4277 - Trash Service : 12/01/2019 - 02/29/2020 Trash Service | | | $65.00 | | $65.00 |
| Deposited Payment | 11/04/2019 | 903711040360235 | Payment of $25.00 applied to [11/04/19, acct 4065, $25.00] and $2,580.00 applied to [11/01/19, acct 4000, $2,580.00] and $102.56 applied to [10/26/19, acct 4279.1, $102.56] and $85.03 applied to [10/26/19, acct 4279, $85.03] and $91.50 applied to [10/24/19, acct 4035, $91.50] and $7.95 applied to [10/26/19, acct 4302, $7.95]/Wire payment | Albert Allan Brynds Jr | 11/04/2019 | | $2,892.04 | $0.00 |
| Paid Charge | 11/04/2019 | 903711040360235 | 4065 - Svc Chg/Ret/Stop Pmt et... : Wire fee | | | $25.00 | | $2,892.04 |
| Paid Charge | 11/01/2019 | | 4000 - Rent | | | $2,580.00 | | $2,867.04 |

Case 21-20342    Doc# 18-2    Filed 04/21/21    Page 8 of 13

| | Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | Paid Charge | 10/26/2019 | | 4279.1 - Water:Sewer : 07/11/2019 - 09/10/2019 Sewer | | | $102.56 | | $287.04 |
| | Paid Charge | 10/26/2019 | | 4279 - Water : 07/11/2019 - 09/10/2019 Water | | | $85.03 | | $184.48 |
| | Paid Charge | 10/26/2019 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $99.45 |
| | Paid Charge | 10/24/2019 | | 4035 - Legal & Professional Fe... : Anderson & Assoc 10/21/19 Batch # 10179 | | | $91.50 | | $91.50 |
| | Paid Charge | 10/18/2019 | 903710150699098 | 4065 - Svc Chg/Ret/Stop Pmt et... : Wire Fee | | | $25.00 | | $0.00 |
| | Deposited Payment | 10/15/2019 | 903710150699098 | Payment of $25.00 applied to [10/18/19, acct 4065, $25.00] and $610.00 applied to [10/10/19, acct 4000, $2,580.00] and $7.95 applied to [10/10/19, acct 4302, $7.95] and $51.88 applied to [10/10/19, acct 4277, $51.88] and $100.00 applied to [10/15/19, acct 4010, $100.00]/Wire Payment | Albert Allan Brynds Jr | 10/15/2019 | | $794.83 | ($25.00) |
| | Paid Charge | 10/15/2019 | | 4010 - Late Fee : Calculated on 10/15/2019 5:57 AM by system | | | $100.00 | | $769.83 |
| | Paid Charge | 10/10/2019 | | 4000 - Rent : Returned Payment Recharge | | | $2,580.00 | | $669.83 |
| | Paid Charge | 10/10/2019 | | 4302 - Utility Billing Svc Fee : Returned Payment Recharge | | | $7.95 | | ($1,910.17) |
| | Paid Charge | 10/10/2019 | | 4277 - Trash Service : Returned Payment Recharge | | | $51.88 | | ($1,918.12) |
| | Paid Charge | 10/09/2019 | TBRHLRQKLA2 | 4065 - Svc Chg/Ret/Stop Pmt et... | | | $30.00 | | ($1,970.00) |
| | Settled ePayment | 10/09/2019 | R7QQNRQKLA4 | Payment of $1,970.00 applied to [10/10/19, acct 4000, $2,580.00] and $30.00 applied to [10/09/19, acct 4065, $30.00]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 10/15/2019 | | $2,000.00 | ($2,000.00) |

| Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|
| Deposited Payment (Returned) | 10/05/2019 | TBRHLRQKLA2 | Payment of $7.95 applied to [09/25/19, acct 4302, $7.95] and $2,580.00 applied to [10/01/19, acct 4000, $2,580.00] and $51.88 applied to [09/25/19, acct 4277, $51.88]/Returned_NSF | Valerie Kay Fahrnow-Frebyrd | 10/05/2019 | | $2,639.83 | $0.00 |
| Paid Charge | 10/01/2019 | | 4000 - Rent | | | $2,580.00 | | $2,639.83 |
| Paid Charge | 09/25/2019 | | 4277 - Trash Service : 09/19/2019 - 11/30/2019 Trash Service | | | $51.88 | | $59.83 |
| Paid Charge | 09/25/2019 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $7.95 |
| Settled ePayment | 09/04/2019 | ZJ9621NKLA2 | Payment of $7.95 applied to [08/25/19, acct 4302, $7.95] and $102.56 applied to [08/25/19, acct 4279.1, $102.56] and $2,430.00 applied to [09/01/19, acct 4000, $2,580.00] and $28.30 applied to [08/25/19, acct 4278, $28.30] and $92.30 applied to [08/25/19, acct 4279, $92.30]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 09/09/2019 | | $2,661.11 | $0.00 |
| Paid Charge | 09/01/2019 | | 4000 - Rent | | | $2,580.00 | | $2,661.11 |
| Paid Charge | 08/25/2019 | | 4279.1 - Water:Sewer : 05/10/2019 - 07/10/2019 Sewer | | | $102.56 | | $81.11 |
| Paid Charge | 08/25/2019 | | 4279 - Water : 05/10/2019 - 07/10/2019 Water | | | $92.30 | | ($21.45) |
| Paid Charge | 08/25/2019 | | 4278 - Gas : 07/10/2019 - 08/08/2019 Gas | | | $28.30 | | ($113.75) |
| Paid Charge | 08/25/2019 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | ($142.05) |
| Charge Adjustment | 08/20/2019 | 18 - 4301 | 4301 - Utility Failure to Tran... : Mexia approved due to resident having gas service prior to Conservice opting in. | Valerie Fahrnow | | | $150.00 | ($150.00) |

Case 21-20342    Doc# 18-2    Filed 04/21/21    Page 10 of 13

| Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|
| Settled ePayment | 08/02/2019 | PFGDN9KKLA1 | Payment of $2,580.00 applied to [08/01/19, acct 4000, $2,580.00] and $50.00 applied to [07/25/19, acct 4301, $50.00] and $50.00 applied to [07/25/19, acct 4301, $50.00] and $31.87 applied to [07/25/19, acct 4278, $31.87] and $37.94 applied to [07/25/19, acct 4278, $37.94]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 08/08/2019 | | $2,749.81 | $0.00 |
| Paid Charge | 08/01/2019 | | 4000 - Rent | | | $2,580.00 | | $2,749.81 |
| Paid Charge | 07/25/2019 | | 4301 - Utility Failure to Tran... : 05/09/2019 - 06/10/2019 Utility Failure to Transfer Fee | | | $50.00 | | $169.81 |
| Paid Charge | 07/25/2019 | | 4301 - Utility Failure to Tran... : 06/11/2019 - 07/09/2019 Utility Failure to Transfer Fee | | | $50.00 | | $119.81 |
| Paid Charge | 07/25/2019 | | 4278 - Gas : 05/09/2019 - 06/10/2019 Gas | | | $37.94 | | $69.81 |
| Paid Charge | 07/25/2019 | | 4278 - Gas : 06/11/2019 - 07/09/2019 Gas | | | $31.87 | | $31.87 |
| Settled ePayment | 07/04/2019 | MRCLXKGKLA3 | Payment of $7.95 applied to [07/01/19, acct 4302, $7.95] and $6.84 applied to [07/01/19, acct 4278, $6.84] and $50.00 applied to [07/01/19, acct 4301, $50.00] and $65.01 applied to [07/01/19, acct 4277, $65.01] and $11.91 applied to [07/01/19, acct 4279, $11.91] and $23.17 applied to [07/01/19, acct 4279.1, $23.17] and $2,580.00 applied to [07/01/19, acct 4000, $2,580.00]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 07/16/2019 | | $2,744.88 | $0.00 |
| Paid Charge | 07/01/2019 | | 4000 - Rent | | | $2,580.00 | | $2,744.88 |
| Paid Charge | 07/01/2019 | | 4277 - Trash Service : 06/01/2019 - 08/31/2019 Trash Service | | | $65.01 | | $164.88 |

Case 21-20342   Doc# 18-2   Filed 04/21/21   Page 11 of 13

| | Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | Paid Charge | 07/01/2019 | | 4301 - Utility Failure to Tran... : 04/29/2019 - 05/08/2019 Utility Failure to Transfer Fee | | | $50.00 | | $99.87 |
| | Paid Charge | 07/01/2019 | | 4279.1 - Water:Sewer : 04/27/2019 - 05/09/2019 Sewer | | | $23.17 | | $49.87 |
| | Paid Charge | 07/01/2019 | | 4279 - Water : 04/27/2019 - 05/09/2019 Water | | | $11.91 | | $26.70 |
| | Paid Charge | 07/01/2019 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $14.79 |
| | Paid Charge | 07/01/2019 | | 4278 - Gas : 04/29/2019 - 05/08/2019 Gas | | | $6.84 | | $6.84 |
| | Settled ePayment | 06/04/2019 | XXB9H5CKLA3 | Payment of $2,580.00 applied to [06/01/19, acct 4000, $2,580.00] and $25.00 applied to [05/06/19, acct 4065, $25.00] and $24.60 applied to [06/01/19, acct 4277, $24.60] and $7.95 applied to [06/01/19, acct 4302, $7.95] and $30.00 applied to [06/01/19, acct 4300, $30.00]/One Time ePayment received from Valerie Kay Fahrnow, Paid from Frebyrd account | Valerie Kay Fahrnow-Frebyrd | 06/06/2019 | | $2,667.55 | $0.00 |
| | Paid Charge | 06/01/2019 | | 4000 - Rent | | | $2,580.00 | | $2,667.55 |
| | Paid Charge | 06/01/2019 | | 4300 - Utility Set-up Fee : - Utility Set-up Fee | | | $30.00 | | $87.55 |
| | Paid Charge | 06/01/2019 | | 4277 - Trash Service : 04/27/2019 - 05/31/2019 Trash Service | | | $24.60 | | $57.55 |
| | Paid Charge | 06/01/2019 | | 4302 - Utility Billing Svc Fee : - Utility Billing Svc Fee | | | $7.95 | | $32.95 |
| | Charge Adjustment | 05/16/2019 | 5 - 4010 | 4010 - Late Fee : Remove 5/6/2019 late fee due to Propertyware error regarding Velocity Limit | Valerie Fahrnow | | | $258.00 | $25.00 |
| | Deposited Payment | 05/06/2019 | 903705060326226 | Payment of $2,580.00 applied to [05/01/19, acct 4000, $2,580.00]/Wire Payment | Valerie Kay Fahrnow | 05/06/2019 | | $2,580.00 | $283.00 |
| | Paid Charge | 05/06/2019 | 903705060326226 | 4065 - Svc Chg/Ret/Stop Pmt et... : Wire Fee | | | $25.00 | | $2,863.00 |

Case 21-20342     Doc# 18-2     Filed 04/21/21     Page 12 of 13

| Transaction | Date | Ref # | Description | Payer Name | Deposit Date | Charges | Payments | Balance |
|---|---|---|---|---|---|---|---|---|
| Paid Charge | 05/06/2019 | | 4010 - Late Fee : Calculated on 05/06/2019 5:05 AM by system | | | $258.00 | | $2,838.00 |
| Paid Charge | 05/01/2019 | | 4000 - Rent | | | $2,580.00 | | $2,580.00 |
| Paid Charge | 04/27/2019 | | 4000 - Rent | | | $344.00 | | $0.00 |
| Paid Charge | 04/27/2019 | Security Deposit | 2050 - Security Deposit | | | $2,580.00 | | ($344.00) |
| Paid Charge | 04/27/2019 | Pet Fee | 2002 - Owner Held Pet Deposit | | | $600.00 | | ($2,924.00) |
| Deposited Payment | 04/25/2019 | 903704240442913 | Payment of $344.00 applied to [04/27/19, acct 4000, $344.00]/wire payment | Valerie Kay Fahrnow | 04/25/2019 | | $344.00 | ($3,524.00) |
| Deposited Payment | 04/15/2019 | 903704150469910 | Payment of $600.00 applied to [04/27/19, acct 2002, $600.00]/wire payment | STEWART TITLE COMPANY | 04/15/2019 | | $600.00 | ($3,180.00) |
| Deposited Payment | 04/15/2019 | ST20190415157 | Payment of $2,580.00 applied to [04/27/19, acct 2050, $2,580.00]/Wire payment | STEWART TITLE COMPANY | 04/15/2019 | | $2,580.00 | ($2,580.00) |

Copyright © Propertyware® 2003-2021. All rights reserved.
Various trademarks held by their respective owners.

Case 21-20342     Doc# 18-2     Filed 04/21/21     Page 13 of 13